## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

ELON MUSK

Defendant.

Case No. 25-cv-00105-SLS

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ELON MUSK'S MOTION TO STRIKE PRAYERS FOR RELIEF II AND III AND TO DISMISS COMPLAINT

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.    The SEC Has Targeted Mr. Musk For Seven Years .................................. 3

    B.    Mr. Musk Purchases Twitter Stock ............................................................. 4

    C.    The SEC Investigates Mr. Musk Yet Again ............................................... 5

LEGAL STANDARDS .................................................................................................. 6

    A.    Motion To Strike ........................................................................................ 6

    B.    Motion To Dismiss For Failure To State A Claim ..................................... 6

I.    THE SEC FAILS TO PLEAD FACTS TO SUPPORT INJUNCTIVE RELIEF OR
DISGORGEMENT ............................................................................................... 7

    A.    Injunctive Relief Is Impermissible As A Matter Of Law .......................... 7

    B.    Disgorgement Is Impermissible As A Matter of Law ............................... 12

        1.    Disgorgement Would Violate Long Established Limitations On
Equitable Relief ............................................................................. 12

        2.    Disgorgement Would Violate The Eighth Amendment's Excessive
Fines Clause ................................................................................... 22

II.    THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN
BE GRANTED .................................................................................................... 25

    A.    The First Amendment Right Against Compelled Speech Prohibits
Applying Section 13(d) In This Case ....................................................... 25

        1.    Section 13(d) Creates A Content-Based Disclosure Regime That
Fails Strict Scrutiny ....................................................................... 26

        2.    Alternatively, Section 13(d) Fails Intermediate Scrutiny ............. 33

    B.    Rule 13d-1's Vagueness Renders It Unenforceable Under Both First
Amendment And Due Process Principles ................................................. 35

    C.    The SEC Has Engaged In Unconstitutional Selective Enforcement ..................... 38

    D.    The SEC's Unconstitutional Structure Precludes This Enforcement Action ......... 42

CONCLUSION ............................................................................................................ 45

i

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*112 Genesee St., LLC v. United States*,
  172 Fed. Cl. 426 (2024) ...............................................................................14

*Aaron v. SEC*,
  446 U.S. 680 (1980) ................................................................................7, 9

*Am. Hosp. Assoc. v. Azar*,
  983 F.3d 528 (D.C. Cir. 2020) ........................................................................33

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
  760 F.3d 18 (D.C. Cir. 2014) ......................................................................26, 34

*\*Americans for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ...........................................................................28, 30, 33

*Anderson v. Washington Hilton, LLC*,
  2021 WL 3885724 (D.D.C. Aug. 31, 2021) ..............................................................6

*Ariz. Free Enter. Club v. Bennett*,
  564 U.S. 721 (2011) ...............................................................................27, 29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................7

*Atherton v. D.C. Off. of Mayor*,
  567 F.3d 672 (D.C. Cir. 2009) ........................................................................7

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
  598 U.S. 175 (2023) .................................................................................44

*Bayly Corp. v. Marantette*,
  1982 WL 1337 (D.D.C. Oct. 19, 1982) ................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544(2007) ...................................................................................7

*Bellion Spirits, LLC v. United States*,
  7 F.4th 1201 (D.C. Cir. 2021) .......................................................................35

*Berman v. Metzger*,
  1981 WL 1596 (D.D.C. Feb. 9, 1981) .................................................................18

*Branch Ministries v. Rossotti*,
    211 F.3d 137 (D.C. Cir. 2000) ........................................................................... 39

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ................................................................................................. 36

*Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*,
    144 F.4th 9 (1st Cir. 2025) ................................................................................. 31

*Central Hudson Gas & Electric Corp. v. Public Service Commission*,
    447 U.S. 557 (1980) ............................................................................................ 34

*CFTC v. Hanover Trading Corp.*,
    34 F. Supp. 2d 203 (S.D.N.Y. 1999) ................................................................. 21

*Ciminelli v. United States*,
    598 U.S. 306 (2023) ............................................................................................ 18

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ......................................................................................... 36, 38

*Collins v. SEC*,
    736 F.3d 521 (D.C. Cir. 2013) ........................................................................... 23

*Collins v. Yellin*,
    594 U.S. 220 (2021) ................................................................................. 43, 44, 45

*Connally v. General Const. Co.*,
    269 U.S. 385 (1926) ............................................................................................ 35

*Consol. Commc'ns of California Co. v. FCC*,
    715 F. App'x 13 (D.C. Cir. 2018) ...................................................................... 23

*Davis v. FEC*,
    554 U.S. 724 (2008) ............................................................................................ 25

*E. E. Bolles Wooden-Ware Co. v. United States*,
    106 U.S. 432 (1882) ............................................................................................ 20

*\*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ............................................................................................ 35

*\*Frederick Douglass Found., Inc. v. District of Columbia*,
    82 F.4th 1122 (D.C. Cir. 2023) ............................................................... 39, 41, 42

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ............................................................................................ 42

*Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*,
  108 F.3d 358 (D.C. Cir. 1997) ............................................................... 35

*Full Value Advisors, LLC v. SEC*,
  633 F.3d 1101 (D.C. Cir. 2011) ............................................................. 25

*GAF Corp. v. Milstein*,
  453 F.2d 709 (2d Cir. 1971) .................................................................. 31

*Gearhart Indus., Inc. v. Smith Int'l, Inc.*,
  741 F.2d 707 (5th Cir. 1984) ................................................................ 10

*Grundmann v. Trump*,
  2025 WL 1840641 (D.C. Cir. July 3, 2025) ............................................ 44

*Harris v. Bessent*,
  2025 WL 980278 (D.C. Cir. Mar. 28, 2025) ............................................ 44

*Hartman v. Moore*,
  547 U.S. 250 (2006) ............................................................................. 42

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) ............................................................................. 13

*Hemphill v. Kimberly-Clark Corp.*,
  530 F. Supp. 2d 108 (D.D.C. 2008) ......................................................... 3

*Hibernia Sav. Bank v. Ballarino*,
  891 F.2d 370 (1st Cir. 1989) ................................................................ 10

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ............................................................................. 34

*In re E.S. Bankest, L.C.*,
  2006 WL 3922112 (Bankr. S.D. Fla. Dec. 14, 2006) ............................... 37

*Institutional S'holder Servs., Inc. v. SEC*,
  142 F.4th 757 (D.C. Cir. 2025 ............................................................. 36

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967) ............................................................................. 36

*Kokesh v. SEC*,
  581 U.S. 455 (2017) ............................................................................. 15

*LeBlanc v. United States Priv. & C.L. Oversight Bd.*,
  2025 WL 1840591 (D.C. Cir. July 1, 2025) ............................................ 44

*Liu v. SEC,
    591 U.S. 71 (2020) .............................................................................. 1, 12-13, 15, 17, 23

Lucia v. SEC,
    585 U.S. 237 (2018) .............................................................................................42

Matiella v. Murdock St. LLC,
    2023 WL 4684854 (D.D.C. July 21, 2023) ........................................................6

McCullen v. Coakley,
    573 U.S. 464 (2014).............................................................................................33

Miami Herald Publ'g Co. v. Tornillo,
    418 U.S. 241 (1974).............................................................................................26

Myers v. United States,
    272 U.S. 52 (1926)..............................................................................................42

NAACP v. Alabama ex rel. Patterson,
    357 U.S. 449 (1958).............................................................................................26

Nano Dimension Ltd. v. Murchinson Ltd.,
    102 F.4th 136 (2d Cir. 2024)..............................................................................10

*Nat'l Ass'n of Mfrs. v. SEC,
    800 F.3d 518 (D.C. Cir. 2015) ......................................................................26, 34

Nat'l Endowment for the Arts v. Finley,
    524 U.S. 569 (1998).............................................................................................35

*Nat'l Inst. of Family & Life Advocates v. Becerra,
    585 U.S. 755 (2018)..................................................................................25, 30, 32-33

Paroline v. United States,
    572 U.S. 434 (2014).............................................................................................18

Pigford v. Veneman,
    215 F.R.D. 2, 4 (D.D.C. 2003) ...........................................................................6

Pimentel v. City of Los Angeles,
    115 F.4th 1062 (9th Cir. 2024).............................................................................24

Providence Rubber Co. v. Goodyear,
    76 U.S. 788 (1869)..............................................................................................15

R.A.V. v. St. Paul,
    505 U.S. 377 (1992).............................................................................................27

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015).................................................................................26, 27

*Reno v. Am. Civil Liberties Union*,
    521 U.S. 844 (1997)......................................................................................30

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988)..................................................................................28, 30

*Rondeau v. Mosinee Paper Corp.*
    422 U.S. 49 (1975) ............................................................................ 10, 13, 28

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995)......................................................................................30

*Saad v. SEC*,
    980 F.3d 103 (D.C. Cir. 2020) .....................................................................13

*Sandifer v. U.S. Steel Corp.*,
    571 U.S. 220 (2014).....................................................................................14

*Sea Containers Ltd. v. Stena AB*,
    890 F.2d 1205 (D.C. Cir. 1989) ...................................................................10

*SEC v. Ahmed*,
    72 F.4th 379 (2d Cir. 2023).............................................................. 13, 20, 21

*SEC v. Bausch & Lomb Inc.*,
    565 F.2d 8 (2d Cir. 1977)..............................................................................8

*SEC v. Better Life Club of Am., Inc.*,
    203 F.3d 54 (D.C. Cir. 1999) .......................................................................16

*SEC v. Bilzerian*,
    29 F.3d 689 (D.C. Cir. 1994) ......................................................... 13, 16, 17, 40

*SEC v. Brown*,
    878 F. Supp. 2d 109 (D.D.C. 2012) ..............................................................8

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006).........................................................................15

*SEC v. Chappell*,
    107 F.4th 114 (3d Cir. 2024).........................................................................11

*SEC v. Coleman*,
    1993 WL 13653773 (D.D.C. Apr. 21, 1993) .............................................8, 9

*SEC v. Commonwealth Equity Servs., LLC,*
    133 F.4th 152 (1st Cir. 2025) ....................................................................19

*SEC v. Dibella,*
    2008 WL 6965807 (D. Conn. Mar. 13, 2008) .............................................10

*SEC v. Drexel Burnham Lambert Inc.,*
    837 F. Supp. 587 (S.D.N.Y. 1993).............................................................37

*SEC v. E-Smart Techs., Inc.,*
    139 F. Supp. 3d 170 (D.D.C. 2015) ..........................................................16

*SEC v. Fife,*
    311 F.3d 1 (1st Cir. 2002) .........................................................................11

**SEC v. First City Fin. Corp.,*
    890 F.2d 1215 (D.C. Cir. 1989) ................................. 12, 16-17, 19, 22

*SEC v. First City Financial Corp.,*
    688 F. Supp. 705 (D.D.C. 1988)...........................................................16, 19

*SEC v. Gentile,*
    2020 WL 5793699 (D.N.J. Sept. 29, 2020) .........................................6, 11-12

**SEC v. Govil,*
    86 F.4th 89 (2d Cir. 2023)......................................................................17-18

*SEC v. Honig,*
    2024 WL 3454840 (S.D.N.Y. July 18, 2024) ............................................18

*SEC v. John S. Clayton,*
    2:24-cv-00918 (D. Utah Dec. 11, 2024) ....................................................40

*SEC v. Johnson,*
    595 F. Supp. 2d 40 (D.D.C. 2009).............................................................8

*SEC v. Jones,*
    476 F. Supp. 2d 374 (S.D.N.Y. 2007) .......................................................8

*SEC v. Luis Jimenez Carrillo,*
    1:21-cv-11272 (D. Mass. Aug. 4, 2021) ....................................................40

*SEC v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082 (2d Cir. 1972).....................................................................19

*SEC v. McCaskey,*
    2002 WL 850001 (S.D.N.Y. Mar. 26, 2002)..............................................21

*SEC v. Miller*,
　　2024 WL 4534512 (D. Md. Oct. 21, 2024) ...................................................16

*SEC v. Morningstar Credit Ratings, LLC*,
　　578 F. Supp. 3d 563 (S.D.N.Y. 2022) ........................................................12

*SEC v. Nat'l Student Mktg. Corp.*,
　　457 F. Supp. 682 (D.D.C. 1978) ..................................................................8

*SEC v. Pros Intern., Inc.*,
　　994 F.2d 767 (10th Cir. 1993) ......................................................................8

*SEC v. Ripple Labs, Inc.*,
　　2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024) ...............................................18

*SEC v. Sargent*,
　　329 F.3d 34 (1st Cir. 2003) ........................................................................8, 9

*SEC v. Savoy Indus., Inc.*,
　　587 F.2d 1149 (D.C. Cir. 1978) ...............................................................9, 11

*SEC v. Sharp*,
　　626 F. Supp. 3d 345 (D. Mass. 2022) .....................................................20, 24

*SEC v. Slocum, Gordon & Co.*,
　　334 F. Supp. 2d 144 (D.R.I. 2004) ...............................................................9

*SEC v. Sprecher*,
　　81 F.3d 1147 (D.C. Cir. 1996) ...................................................................16

*SEC v. Steadman*,
　　967 F.2d 636 (D.C. Cir. 1992) ..................................................................8, 9

*SEC v. Whittemore*,
　　659 F.3d 1 (D.C. Cir. 2011) ....................................................................16, 20

*SEC v. Wills*,
　　472 F. Supp. 1250 (D.D.C. 1978) ................................................................21

*SEC v. Yang*,
　　2014 WL 2198323 (N.D. Ill. May 27, 2014) ..............................................16

*Sec. of State of Maryland v. Joseph H. Munson Co.*,
　　467 U.S. 947 (1984) .....................................................................................30

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
　　591 U.S. 197 (2020) ...............................................................................43, 44

*Space Expl. Techs. Corp. v. Nat'l Lab. Rels. Bd.*,
    2025 WL 2396748 (5th Cir. Aug. 19, 2025)................................................................44

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024).........................................................................................................11

*Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Cap. LLC*,
    137 F.4th 6 (1st Cir. 2025).............................................................................................10

*Thomas v. Collins*,
    323 U.S. 516 (1945).........................................................................................................29

*Treadway Cos. v. Care Corp.*,
    638 F.2d 357 (2d Cir. 1980)...........................................................................................10

\**Trump v. Wilcox*,
    145 S. Ct. 1415 (2025).....................................................................................................43

*United States v. AT&T Inc.*,
    290 F. Supp. 3d 1 (D.D.C. 2018)..................................................................................39

\**United States v. Bajakajian*,
    524 U.S. 321 (1998)..................................................................................................23, 24

*United States v. Bikundi*,
    926 F.3d 761 (D.C. Cir. 2019).......................................................................................23

*United States v. Hicks*,
    649 F. Supp. 3d 357 (W.D. Tex. 2023).........................................................................14

*United States v. Leeds*,
    2025 WL 743996 (D. Idaho Mar. 7, 2025) ..................................................................24

*United States v. Monzel*,
    641 F.3d 528 (D.C. Cir. 2011) ......................................................................................18

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000).........................................................................................................27

*United States v. Sterlingov*,
    755 F. Supp. 3d 17 (D.D.C. 2024).................................................................................24

*Valibeigi v. District of Columbia*,
    2024 WL 4332626 (D.C. Cir. Sept. 27, 2024)..............................................................39

*Van Hollen, Jr. v. Fed. Election Comm'n*,
    811 F.3d 486 (D.C. Cir. 2016).......................................................................................36

*Vill. of Hoffman Est. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ................................................................35

*Vill. of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980) ................................................................30

*Wayte v. United States*,
    470 U.S. 598 (1985) ................................................................42

*Wellman v. Dickinson*,
    682 F.2d 355 (2d Cir. 1982) ....................................................20

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ................................................................25

*Zauderer v. Off. of Disciplinary Couns.*,
    471 U.S. 626 (1985) ................................................................33

## Statutes

5 U.S.C. § 706(2)(B) ................................................................45

15 U.S.C. § 78m(d) ................................. 1-2, 6, 9-11, 13, 15-16, 18, 21-22, 25-28, 30-34, 38, 40

15 U.S.C. § 78u(d) ........................................................ 13, 14, 18, 24

31 U.S.C. § 5336(a)(3) ................................................................31

## Rules

17 C.F.R. § 240.13d-1 ................................................1-2, 9, 25, 26, 32, 35-38

17 C.F.R. § 240.13d-101 ................................................................34

Fed. R. Civ. P. 12(f) ................................................................6

Fed. R. Evid. 201 ................................................................3

## Other Authorities

"*Receive*," Black's Law Dictionary (12th ed. 2024) ........................................14

"*Victim*," Black's Law Dictionary (12th ed. 2024) ........................................17

111 Cong. Rec. 28, 257 (1965) ................................................................28

Andrew N. Vollmer, *Liu and the New SEC Disgorgement Statute*,
    15 Wm. & Mary Bus. L. Rev. 307 (2024) ........................................14

Appl. to Stay Judgments, *Trump v. Wilcox*, No. 24A966 (2025) (Nos. 25-5037, 25-5057) ..........42

George E. Palmer, Law of Restitution §2.13 (Third Edition, 2025-1 Cum. Supp. 2020)..............21

Inflation Adjustments to the Civil Monetary Penalties (Jan. 15, 2025), https://bit.ly/4mvkZZy ..24

*In the Matter of Berjaya Lottery Mgmt. (H.K.) LTD.*,
     Release No. 74498 (Mar. 13, 2015) .....................................................................................37

*In the Matter of Brian Potiker*,
     Release No. 74503 (Mar. 13, 2015) .....................................................................................37

*In the Matter of Carl C. Icahn*,
     Release No. 100756 (Aug. 19, 2024).....................................................................................22

*In the Matter of Essex Woodlands Management, Inc.*,
     Release No. 101161 (Sept. 25, 2024).....................................................................................40

*In the Matter of FP Res. USA Inc. & Lobster Point Holdings Ltd.*,
     Release No. 83626 (July 13, 2018) .......................................................................................37

*In the Matter of Harvey Katz, William M. Siegel, Thomas M. Dean, Jeffry M. Picower,
     Explanations Inc., & Decisions Inc.*,
     47 SEC 1044 (Apr. 25, 1984) ...............................................................................................37

*In the Matter of Howard S. Jonas*,
     Release No. 101166 (Sept. 25, 2024).....................................................................................22

*In the Matter of Jack W. Schuler*,
     Release No. 101167 (Sept. 25, 2024).....................................................................................22

*In the Matter of Jane G. Ciabattoni*,
     Release No. 74501 (Mar. 13, 2015) .....................................................................................37

*In the Matter of Joseph Theodore Lukens, Jr.*,
     Release No. 98542 (Sept. 27, 2023).....................................................................................22

*In the Matter of Lawrence I. Rosen*,
     Release No. 98545 (Sept. 27, 2023).....................................................................................22

*In the Matter of Mitchell P. Rales*,
     Release No. 101180 (Sept. 25, 2024).....................................................................................22

*In the Matter of Norman M.K. Louie and Mount Kellett Capital Management LP*,
     Release No. 83637 (July 16, 2018) .......................................................................................22

*In the Matter of SMP Investments I, LLC*,
     Release No. 74502 (Mar. 13, 2015) .....................................................................................37

*In the Matter of William A. Houlihan*,
   Release No. 74504 (Mar. 13, 2015) ...................................................................37

J. Robert Brown, Jr., *Corporate Secrecy, the Federal Securities Laws, and the Disclosure of
   Ongoing Negotiations*, 36 Cath. U. L. Rev. 93 (1986) .......................................37

Letter from the Int'l Inst. L. & Fin. to Vanessa A. Countryman, Sec'y, SEC (Apr. 11, 2022),
   https://bit.ly/4kIuYJC................................................................................ 28, 29, 32

Letter from the Int'l Inst. L. & Fin. to Vanessa A. Countryman, Sec'y, SEC (June 27, 2023),
   https://bit.ly/43qX8TQ ........................................................................................32

Lucian A. Bebchuk, Alon Brav, Robert J. Jackson, Jr. & Wei Jiang, *Pre-Disclosure
   Accumulations by Activist Investors: Evidence and Policy*, 39 J. Corp. L. 1 (2013).........38

Marc Steinberg, Understanding Securities Law (5th ed. 2009)......................................37

Mark T. Uyeda, Statement on Modernization of Beneficial Ownership Reporting (Oct. 10, 2023),
   https://bit.ly/41qiVJU........................................................................................29

Matt Levine, *Elon Musk Bought Some Twitter*, Bloomberg (Apr. 4, 2022),
   https://bit.ly/3HrS8FW......................................................................................39

Mintz Levin, *Summary of Schedule 13D and Schedule 13G Filing
   Obligations* (Feb. 14, 2015), http://bit.ly/3HHYGAT.........................................37

Modernization of Beneficial Ownership Reporting, 87 Fed. Reg. 13846
   (Mar. 10, 2022)....................................................................................................28

Restatement (Third) of Restitution and Unjust Enrichment § 53 (2011) ..................20, 21

Robert A. Prentice, *The Role of States in Tender Offers: An Analysis of CTS*, 1988 Colum. Bus.
   L. Rev. 1 (1988)...................................................................................................37

SEC, Press Release (Sept. 25, 2024), https://bit.ly/4mKSTtZ ......................................40

Steven J. Cleveland, *Shareholder Activism & Unconstitutionally Compelled Speech*,
   58 UC Davis L. Rev. 1815 (2025) ......................................................... 30, 32, 34

*The Timing of Schedule 13D*, Forum on Corporate Governance Law
   Harvard Law School (2019), https://bit.ly/43Fj8sV .........................................37

Defendant Elon Musk respectfully requests that this Court strike the Securities and Exchange Commission's ("SEC") prayers for injunctive relief and disgorgement (Prayer for Relief II and III) pursuant to Federal Rule of Civil Procedure 12(f) and dismiss this action in its entirety for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

In its relentless pursuit of Mr. Musk, the SEC has filed a complaint unmoored from centuries of equitable jurisprudence and unconcerned with constitutional limits on governmental authority. The SEC has subjected Mr. Musk to nearly a decade of investigation—including the three-year scorched-earth inquiry into a ***strict liability*** offense that gave rise to this action. The SEC capitalizes on a seldom-litigated statute—Section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 13d-1 thereunder—to transform the alleged late-filing of a single beneficial ownership form by a matter of ***days*** into a claim for a permanent injunction and hundreds of millions of dollars in monetary relief. The injunction and disgorgement the SEC seeks should be stricken in light of the SEC's gross governmental overreach and because the relief sought violates the core limitations on equitable relief recently reaffirmed by the U.S. Supreme Court in *Liu v. SEC*, 591 U.S. 71 (2020). The SEC's Complaint is also constitutionally infirm and therefore fails to state a claim on which relief can be granted and therefore must be dismissed.

***This action never should have been brought.*** The SEC's allegations, even accepted as true, make clear that Mr. Musk allegedly late-filed a single beneficial ownership form by a matter of ***days*** in 2022. The SEC does not allege that Mr. Musk acted intentionally, deliberately, willfully, or even recklessly. The SEC does not allege that Mr. Musk caused any investor harm. Rather, the SEC alleges that Mr. Musk late-filed a single beneficial ownership form three years

ago, and ***fully corrected any alleged error*** immediately upon its discovery.    There is no ongoing violation.    There is no intent.    There is no harm.    Simply put, this action is a waste of this Court's time and taxpayer resources.

As alleged by the SEC, Mr. Musk began purchasing Twitter stock in early 2022 through his personal wealth manager, who instructed a broker to make purchases without exceeding five-percent ownership.    Compl. ¶ 14.    When Mr. Musk's holdings allegedly crossed the five-percent threshold, the SEC alleges that Mr. Musk was required to file a Schedule 13D disclosure statement within ten days, *id.* ¶ 12—a deadline the SEC itself recognizes is ambiguous when weekends intervene, as two did here.    After Mr. Musk's wealth manager consulted securities disclosure counsel about potential filing requirements, Mr. Musk immediately ceased purchasing additional shares and filed his disclosure the next business day.

The SEC's demand for injunctive relief against future violations fails every element required for such relief, serving ***no*** legitimate purpose.    The SEC's pursuit of disgorgement of theoretical "savings"—in an action lacking any allegations of pecuniary harm to investors, causation, or scienter—violates centuries of equity jurisprudence limiting disgorgement, as well as the Supreme Court's recent decision in *Liu*.    The SEC's remedial theories find no support in law, equity, or the SEC's own enforcement history.

The SEC's action also violates core constitutional principles and must be dismissed on those grounds:    Section 13(d)'s disclosure requirements function as content-based compelled speech, chilling protected expression and forcing investors to disclose proprietary trading strategies based on their communicative content.    Rule 13d-1's vague timing requirements—which even the SEC has interpreted inconsistently—denied Mr. Musk constitutionally required fair notice.    The Commission's selective enforcement against Mr. Musk—seeking monetary

relief more than *1,500 times* larger than the relief imposed on similarly situated individuals in similar cases—reveals an agency targeting an individual for his protected criticism of government overhead.    And, the SEC compounds these constitutional violations by purporting to wield enforcement power that concededly violates Article II.

For the foregoing reasons, this Court should strike the Commission's improper prayer for relief and dismiss the Complaint in its entirety with prejudice.

## BACKGROUND

### A.    The SEC Has Targeted Mr. Musk For Seven Years

For the past seven years, the SEC has subjected Mr. Musk to relentless scrutiny through a series of investigations.    In September 2018, the SEC initiated actions against both Mr. Musk and Tesla, Inc. ("Tesla") regarding certain statements made by Mr. Musk on social media.    *See SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y. Sept. 27, 2018), ECF No. 1; *SEC v. Tesla*, 1:18-cv-8947 (S.D.N.Y. Sept. 29, 2018), ECF No. 1; 17 C.F.R. § 240.10b-5.[1]    Facing tremendous pressure, Mr. Musk reluctantly entered into a consent decree—not because he believed he violated the securities laws, but because "Tesla was a less mature company and the SEC's action stood to jeopardize the company's financing" and "was not in the interests of the company and its shareholders."    Decl. of Elon Musk, *SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y. Mar. 8, 2022), ECF No. 72 at ¶ 4.    The resulting consent decree imposed an extraordinary prior restraint on Mr. Musk's speech, requiring pre-approval of his public communications by a Tesla securities lawyer.    *See id.*, ECF Nos. 6, 46. This unprecedented restriction prompted Mr. Musk to repeatedly seek judicial relief from this

---

[1]    The Court "may take judicial notice of public records from other proceedings," including these publicly filed complaints and the other court filings referenced in this section.    *Hemphill v. Kimberly-Clark Corp.*, 530 F. Supp. 2d 108, 111 (D.D.C. 2008); *see* Fed. R. Evid. 201.

unconstitutional burden on his speech.   *See id.*, ECF No. 70; *SEC v. Musk*, 2023 WL 3451402 (2d Cir. May 15, 2023), *cert. denied*, 144 S. Ct. 1457 (2024).

In February 2023, a jury vindicated Mr. Musk, finding that the very tweets that precipitated the SEC's 2018 enforcement action did not violate the securities laws.   Jury Verdict, *In re Tesla Inc. Sec. Litig.*, 1:18-cv-4865 (N.D. Cal. Feb. 3, 2023), ECF No. 671.   Despite this exoneration, the SEC has persisted in its aggressive pursuit of Mr. Musk.   The SEC not only fought to maintain the restrictions on Mr. Musk's speech, but also sought, unsuccessfully, to have Mr. Musk held in contempt for an allegedly unapproved tweet.   *See SEC v. Musk*, 1:18-cv-8865 (S.D.N.Y.), ECF Nos. 18, 29, 48.   The SEC also leaked information to the press about its investigations into Mr. Musk's compliance with the consent decree.   *SEC v. Musk*, 2024 WL 1511903, at *2 (N.D. Cal. Feb. 10, 2024).

### B.    Mr. Musk Purchases Twitter Stock

The SEC alleges that, in January 2022, Mr. Musk directed his wealth manager to begin purchasing shares of Twitter common stock.   Compl. ¶¶ 2, 14.[2]   At the time, Twitter was a publicly-traded social media company.   *Id.* ¶¶ 8-9.   Mr. Musk and his wealth manager did not seek or obtain legal advice regarding filing obligations under the Exchange Act.   *Id.* ¶¶ 19-20. A broker purchased the shares over a three-month period.   *Id.* ¶¶ 26, 32-33, 35, 37.

On Friday, April 1, 2022, Mr. Musk's wealth manager consulted an attorney regarding Mr. Musk's potential disclosure obligations.   *Id.* ¶ 38.   Mr. Musk immediately ceased purchasing shares and, on the next business day, filed a beneficial ownership disclosure on Schedule 13G disclosing that Mr. Musk had acquired over nine percent of Twitter's outstanding

---

[2]    This section relies on the Complaint strictly for the purposes of this motion and should not be construed as an admission of any fact by Mr. Musk.

common stock.   *Id.* ¶ 41.   The following day, Mr. Musk filed a Schedule 13D, disclosing that he had accepted a seat on Twitter's Board of Directors and that he held Twitter common stock for investment purposes.   *Id.* ¶ 43; Schedule 13D, filed April 5, 2022, http://bit.ly/45TV6M6.

### C.    The SEC Investigates Mr. Musk Yet Again

The SEC immediately launched a new investigation.   The SEC's Division of Corporate Finance sent an inquiry about Mr. Musk's filings the day they were made.   *Musk*, 2024 WL 1511903, at *1.   Shortly thereafter, the Enforcement Division intervened to ensure "that the same individuals investigating Musk's compliance with the consent decree could also manage the present investigation."   *Id.* at *2.

The scope and duration of the SEC's investigation vastly exceeded the Commission's typical investigations of alleged untimely beneficial ownership disclosures, which generally are resolved quickly with modest penalties.   *See infra* at 21-22.   Here, the SEC's investigation lasted ***nearly three years***, and included at least ***32*** administrative subpoenas to Mr. Musk and associated entities and individuals, including ***five*** document subpoenas and ***three*** testimony subpoenas to Mr. Musk personally.   *See* Decl. of Robin Andrews, *SEC v. Musk*, 3:23-mc-80253-JSC (N.D. Cal. Oct. 5, 2023), ECF No. 2; *Musk*, 2024 WL 1511903, at *2.   Many of these requests sought information entirely unrelated to the allegedly late-filed Schedule 13D.   *See Musk*, 2024 WL 1511903, at *2.

After Mr. Musk already had testified before the SEC twice, the SEC sued to compel a third day of testimony.   *Musk*, 2024 WL 1511903, at *1-2.   Although the district court ultimately granted the SEC's motion, it "limit[ed] the SEC to 5 hours of questioning."   *SEC v. Musk*, 2024 WL 2875096, at *9 (N.D. Cal. May 14, 2024).   When Mr. Musk was forced to reschedule due to a SpaceX launch, the SEC pursued sanctions, even though Mr. Musk attended the promptly rescheduled testimony and offered to pay the SEC Staff's travel costs.   *SEC v. Musk*, 3:23-mc-

80253-JSC (N.D. Cal. Oct. 5, 2023), ECF No. 61.    The court denied sanctions as "unnecessary." *Id.*, ECF No. 62 at 2.

The SEC filed this action on January 14, 2025.    *See* ECF No. 1.    The SEC alleges Mr. Musk "underpa[id] by at least $150 million" for the Twitter shares he purchased and seeks various forms of relief, including a permanent injunction barring Mr. Musk from future violations of Section 13(d) and disgorgement of Mr. Musk's allegedly "unjust" enrichment.    Compl. ¶ 1; *id.* at 9, Prayer for Relief, II & III.

## LEGAL STANDARDS

### A.    Motion To Strike

Federal Rule of Civil Procedure 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."    Fed. R. Civ. P. 12(f).    Courts have "liberal discretion" to strike pleadings.    *Pigford v. Veneman*, 215 F.R.D. 2, 4 & n.1 (D.D.C. 2003) (citation omitted).    "When faced with a request to find that a complaint's demand for relief is legally insufficient, courts have utilized both Rule 12(f) and Rule 12(b)(6)," *Matiella v. Murdock St. LLC*, 2023 WL 4684854 at *16 (D.D.C. July 21, 2023), and courts in this District have treated a request "to dismiss [a prayer for relief] ... as a motion to strike," *Anderson v. Washington Hilton, LLC*, 2021 WL 3885724, at *2 (D.D.C. Aug. 31, 2021) (Boasberg, J.).    As with a Rule 12(b)(6) motion, a prayer for relief will be dismissed or stricken if the complaint does not allege sufficient facts to state a plausible claim for that relief.    *See Anderson*, 2021 WL 3885724, at *2 (striking request for relief because insufficient facts alleged); *SEC v. Gentile*, 2020 WL 5793699, at *14 (D.N.J. Sept. 29, 2020) (citation omitted) (similar).

### B.    Motion To Dismiss For Failure To State A Claim

To avoid dismissal under Rule 12(b)(6) for failure to state a claim, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   The Court must accept as true factual allegations contained in the complaint, *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009), but need not accept unfounded inferences, conclusory statements, or recitations of legal elements disguised as factual allegations, *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

The SEC's action cannot withstand scrutiny.   The SEC's prayer for injunctive relief and disgorgement must be stricken, because the SEC seeks remedies that exceed the bounds of equity and ignore constitutional constraints.   The Complaint also must be dismissed in its entirety and with prejudice for failure to state a claim upon which relief can be granted, because the SEC's enforcement action is unconstitutional.

## I.    THE SEC FAILS TO PLEAD FACTS TO SUPPORT INJUNCTIVE RELIEF OR DISGORGEMENT

Even if the SEC were to prevail on its claims (which it should not, *see infra*, Section II), the SEC's Prayer for Relief II and III must be stricken, because the SEC fails to justify entitlement to either injunctive relief or disgorgement.

### A.    Injunctive Relief Is Impermissible As A Matter Of Law

The SEC fails to plausibly allege its entitlement to a permanent injunction, requiring the Court to strike the SEC's second prayer for relief.   The "elements of 'a proper showing'" for injunctive relief "include, at a minimum, ***proof*** that a person is ***engaged in*** or is ***about to engage in*** a substantive violation of either one of the [securities] Acts or of the regulations promulgated thereunder."   *Aaron v. SEC*, 446 U.S. 680, 700-01 (1980) (emphasis added).   This Circuit applies a three-factor test to determine "whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future:" "[1] whether a defendant's violation

was isolated or part of a pattern, [2] whether the violation was flagrant and deliberate or merely technical in nature, and [3] whether the defendant's business will present opportunities to violate the law in the future." *SEC v. Steadman*, 967 F.2d 636, 647-48 (D.C. Cir. 1992) (cleaned up). The SEC's own allegations demonstrate that not a single element of this test is satisfied.

*First*, the SEC alleges no ***pattern*** of violations by Mr. Musk. Instead, the Complaint alleges a ***single*** incident that occurred over three years ago, when Mr. Musk purportedly disclosed Twitter stock purchases at ***most*** "eleven days late," on the first business day after his wealth manager consulted an attorney about the disclosure obligations. Compl. ¶¶ 38, 40. Courts consistently have recognized that such isolated incidents fail to justify the extraordinary remedy of a permanent injunction. *See, e.g.*, *SEC v. Johnson*, 595 F. Supp. 2d 40, 44 (D.D.C. 2009) (finding no proof that violations will continue where violation was an "isolated" episode); *SEC v. Brown*, 878 F. Supp. 2d 109, 119 (D.D.C. 2012) (denying injunction where there was no allegation of "repeated" misconduct); *SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. 682, 716 (D.D.C. 1978) (finding violations were part of an isolated incident not meriting permanent injunction); *SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) (same); *SEC v. Pros Intern., Inc.*, 994 F.2d 767, 769-70 (10th Cir. 1993) (same); *SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 18-19 (2d Cir. 1977) (same). Indeed, where, as here, "several years have passed since [d]efendant['s] alleged misconduct apparently without incident," that "fact further undercuts the [SEC's] assertion that [d]efendant[] pose[s] a continuing risk to the public." *SEC v. Jones*, 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007).

*Second*, the alleged violation was quintessentially "technical in nature." *SEC v. Coleman*, 1993 WL 13653773, at *2 (D.D.C. Apr. 21, 1993). The SEC's Complaint is bereft of allegations that the alleged violation was "flagrant," "deliberate," or that Mr. Musk acted with scienter. The ***absence*** of such allegations is dispositive. *See id.* at *3 (finding "SEC has not demonstrated that

injunctive relief is warranted" because "SEC has not demonstrated that [defendant's] reliance was not in good faith" even after considering two other factors).   The law is clear: "[a]n [SEC] injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against one acting in good faith."   *Aaron*, 446 U.S. at 703 (Burger, C.J., concurring).   "Injunctive relief is reserved for willful lawbreakers or those whose operations are so extremely or persistently sloppy as to pose a continuing danger to the investing public."   *Steadman*, 967 F.2d at 647-48 (vacating permanent injunction where there was "no suggestion that the appellants did not act in good faith" and their "merely technical" violation was "[a]t most ... negligent"); *SEC v. Sargent*, 129 F.4th 1, 16 (1st Cir. 2025) (vacating injunction where violation lacked scienter); *cf. SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1162 n.37, 1168 (D.C. Cir. 1978) (affirming injunction against defendant who violated antifraud provisions of securities laws and had numerous prior securities fraud convictions *in addition to* Section 13(d) violation).   Courts thus consistently decline to impose injunctions for non-scienter based violations.   *See, e.g.*, *Coleman*, 1993 WL 13653773, at *3; *SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 185-86 (D.R.I. 2004).   The SEC's failure to allege bad faith or extreme circumstances here renders injunctive relief impermissible.

*Third*, the SEC does not allege that Mr. Musk's business presents opportunities to violate the law in the future.   Indeed, the SEC makes no allegations about Mr. Musk's business at all, other than to acknowledge that Mr. Musk acquired and took Twitter private, which accordingly *eliminated* any future disclosure requirements under Section 13(d) (whether for Mr. Musk or anyone else).   *See* Compl. ¶¶ 8-9; 17 C.F.R. § 240.13d-1(i)(1) (limiting Rule 13d-1 to publicly traded stock).   When an individual is "not regularly employed in the securities industry" and only committed a single "violation of securities laws in his decades-long [] career," injunctive relief is

properly denied. *SEC v. Dibella*, 2008 WL 6965807, at *13 (D. Conn. Mar. 13, 2008), *aff'd*, 587 F.3d 553 (2d Cir. 2009).

The facts of this case also closely parallel *Rondeau v. Mosinee Paper Corp.*, in which the Supreme Court held injunctive relief inappropriate for a late filing under Section 13(d) because "none of the evils to which the Williams Act [requiring disclosure of cash tender offers] was directed has occurred or is threatened in this case." 422 U.S. 49, 59 (1975). The Supreme Court explained that injunctive relief was not available "to remedy a [Section] 13(d) violation ***following compliance*** with the reporting requirements." *Id.* at 59 & n.9 (emphasis added). That is, "Section 13(d) is satisfied 'when the shareholders receive the information required to be filed.'" *Nano Dimension Ltd. v. Murchinson Ltd.*, 102 F.4th 136, 140-41 (2d Cir. 2024) (quoting *Treadway Cos. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980) (affirming dismissal of Section 13(d) claims after amended Schedule 13D cured alleged filing deficiencies)). Such is the case here: The SEC does not dispute (and, in fact, ***pleads***) that Mr. Musk ***made the requisite disclosure***, which "showed that Musk beneficially owned more than nine percent of Twitter's outstanding common stock." Compl. ¶¶ 40-41. Numerous courts of appeal have recognized that "once the required disclosures are made, the 'informative purpose' of Section 13(d) is satisfied and 'there [is] no risk of irreparable injury and no basis for injunctive relief.'" *Nano Dimension Ltd.*, 102 F.4th at 140 (quoting *Treadway*, 638 F.2d at 380).[3]

---

[3]    *See also Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1209-11 (D.C. Cir. 1989) (affirming denial of injunctive relief because annexing counterclaim to Schedule 13(d) cured alleged misrepresentation); *Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Cap. LLC*, 137 F.4th 6, 18-21 (1st Cir. 2025) (affirming dismissal of Section 13(d) claim due to lack of irreparable harm from "alleged technical violation"); *Hibernia Sav. Bank v. Ballarino*, 891 F.2d 370, 373 (1st Cir. 1989) (affirming denial of injunctive relief and disgorgement under Form F-11, which is analogous to Schedule 13(d), because subsequent disclosure precluded showing of irreparable harm); *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 715 (5th Cir. 1984)

These equitable principles apply with equal force to litigation brought by the SEC. *See Savoy Indus.*, 587 F.2d at 1165 (finding, in SEC action, that *Rondeau* applies to mere technical violations of Section 13(d) and contrasting *Savoy*'s facts with *Rondeau*'s). As multiple courts of appeal have recognized, the SEC's entitlement to an injunction is "subject to principles of equitable discretion." *SEC v. Gentile*, 939 F.3d 549, 557-58 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2669 (2020) (citation omitted); *see also SEC v. Chappell*, 107 F.4th 114, 128 (3d Cir. 2024) (citing *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (eschewing a lower standard for injunctions sought by the National Labor Relations Board and reiterating that, "absent a clear command from Congress, courts must adhere to the traditional four-factor test")); *SEC v. Fife*, 311 F.3d 1, 8 (1st Cir. 2002).

The Third Circuit's admonition in *SEC v. Gentile* is applicable here:

> That an injunction is permissible **only** where **necessary to prevent ... misconduct from occurring in the future** and not merely to punish past transgressions ... is a standard to which the SEC must also hold itself. When it does not, the buck stops here: Lest we return to those days when only a modest showing was considered sufficient ... federal courts may not grant SEC injunctions except upon a proper showing of the likelihood of future harm.

939 F.3d at 561 (internal quotations and citations omitted) (emphasis added). The SEC fails to meet this bar: The Complaint alleges an isolated and indeliberate violation concerning a highly technical filing regarding a now-private company.

Dismissal of the SEC's prayer for injunctive relief at the pleading stage is not only appropriate, but required. "While the SEC is not required to make an evidentiary showing to survive a motion to dismiss," here, the SEC has failed to even "plausibly state an entitlement to

---

(agreeing that "amended Schedule 13D ... cured any previous violation of Section 13(d) ... preclud[ing] injunctive relief"); *Bayly Corp. v. Marantette*, 1982 WL 1337, at *13 (D.D.C. Oct. 19, 1982) (an omission cannot support injunctive relief once Schedule 13(d) is amended).

[injunctive] relief." *Gentile*, 2020 WL 5793699, at *14; *SEC v. Morningstar Credit Ratings, LLC*, 578 F. Supp. 3d 563, 576-77 (S.D.N.Y. 2022) (dismissing request for injunctive relief at pleading stage because the SEC did not plausibly allege a reasonable likelihood of future securities law violations). The SEC's Complaint, taken as true, does not plead facts sufficient to support injunctive relief; this Court should strike the relief sought now.

### B.      Disgorgement Is Impermissible As A Matter of Law

This Court should likewise strike the SEC's prayer for disgorgement because it flies in the face of long-established and recently reaffirmed principles of equity. The Supreme Court recently underscored that disgorgement must be "circumscribe[d] ... to avoid transforming it into a penalty outside [courts'] equitable powers." *Liu*, 591 U.S. at 82. The SEC's Complaint disregards this clear instruction, which was built on centuries of law limiting equitable relief. Instead, the SEC impermissibly seeks an unprecedented expansion of disgorgement and relief that, if permitted, would transform disgorgement from its proper equitable purpose—returning ill-gotten profits to victims—into a ***punitive*** measure unmoored from traditional equitable principles. Moreover, the staggering $150 million sum the SEC appears to demand—for a mere alleged 11-day disclosure delay that was promptly corrected and caused no actual harm—is so grossly disproportionate as to violate the Excessive Fines Clause of the Eighth Amendment. Both equity and the Constitution therefore compel this Court to strike the SEC's prayer for relief for disgorgement.

### 1.      Disgorgement Would Violate Long Established Limitations On Equitable Relief

The role of disgorgement under federal securities law is firmly established: It serves as "an equitable remedy designed to deprive a wrongdoer of his unjust enrichment." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989). Critical to its nature as an equitable

remedy, disgorgement fundamentally "**excludes** punitive sanctions." *Liu*, 591 U.S. at 74 (emphasis added). In *Rondeau*, the Supreme Court explicitly emphasized—when considering a delayed filing under Section 13(d)—that equitable remedies in securities cases are "historically 'designed to deter, not to punish.'" 422 U.S. at 62 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). The Court warned against using equitable remedies as punishment for past transgressions rather than to prevent future misconduct. This principle applies with particular force to disgorgement, which the Supreme Court confirmed in *Liu* must remain remedial rather than punitive in nature.[4] The D.C. Circuit has reinforced this limitation, emphasizing that disgorgement must be "limited to the wrongdoer's gains and returned to investors." *Saad v. SEC*, 980 F.3d 103, 108 (D.C. Cir. 2020); *see also SEC v. Bilzerian*, 29 F.3d 689, 696 (D.C. Cir. 1994). At its core, disgorgement serves to "restore[] the status quo"—nothing more and nothing less. *Liu*, 591 U.S. at 80 (citation omitted). The SEC's attempt to extract $150 million in disgorgement for an alleged technical and non-scienter-based violation contravenes the rule against punitive applications of equitable remedies.

The SEC's unprecedented disgorgement theory fails for four independent reasons: The SEC fails to allege (i) net profits; (ii) pecuniary harm to identifiable victims; (iii) a genuine causal connection between the alleged violation and the purported savings; and (iv) scienter. Each

---

[4]    In 2021, Congress amended the securities laws to authorize disgorgement in Section 78u(d)(7), on which the SEC relies here. *See* Compl., Prayer III; Publ. L. No. 116-283, § 6501(a)-(b), 134 Stat. 3388, 4625-26. Section 78u(d)(7), which was enacted after *Liu*, represents a "belt and suspenders clarification" of existing equitable remedies, not a wholesale abandonment of centuries of equity jurisprudence. *SEC v. Ahmed*, 72 F.4th 379, 396 (2d Cir. 2023). The SEC does not dispute that *Liu* applies to Section 78u(d)(7). *See id.* at 395 ("[T]he parties assume, and we agree, that *Liu*'s equitable limitations on disgorgement survive [the enactment of Section 78u(d)(7)]."). Regardless, the SEC's disgorgement theory fails independently of *Liu*'s application to Section 78u(d)(7) because it contravenes longstanding equitable principles, governing precedent, and the text of the revised statute.

deficiency alone is fatal to the SEC's prayer for disgorgement; together, they reveal a theory of relief fundamentally at odds with well-established law that exceeds the SEC's authority.

*No Net Profits.*    The text of the disgorgement statute, Supreme Court precedent, D.C. Circuit authority, and the SEC's own prior positions all establish that disgorgement is limited to a defendant's ***net profits*** from wrongdoing.    Here, the SEC does not allege that Mr. Musk realized ***any*** profits from his allegedly late securities filing.    Instead, the SEC seeks to disgorge purely theoretical "***savings***"—not profits—that Mr. Musk purportedly achieved by purchasing Twitter shares at allegedly "artificially low" prices.    Compl. ¶ 1.    This novel theory contradicts the text of the governing statute and fundamental equitable principles governing disgorgement, which limit such awards to net profits realized by a defendant through market transactions.

The statute in which Congress authorized the SEC to seek disgorgement expressly limits disgorgement to amounts "received" by the defendant, evidencing that disgorgement is limited to profits that are ***realized*** and ***obtained***.    15 U.S.C. § 78u(d)(3)(A)(ii); *see* Andrew N. Vollmer, *Liu and the New SEC Disgorgement Statute*, 15 Wm. & Mary Bus. L. Rev. 307, 357-58 (2024) ("The ordinary public understanding of 'received' is actual receipt or possession and not constructive receipt or indirect benefit.").    "It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."    *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (internal quotation marks and citation omitted).    The ordinary meaning of "receive" is to "get" or "come into possession of."    *112 Genesee St., LLC v. United States*, 172 Fed. Cl. 426, 445 (2024) (citation omitted) (collecting dictionary definitions); *see also* "Receive," Black's Law Dictionary (12th ed. 2024) ("receive" means "[t]o take (something offered, given, sent, etc.)"); *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023) ("Receipt is the condition precedent to possession—the latter

is impossible without the former."). By authorizing disgorgement of amounts "received," Congress necessarily limited the remedy to amounts that a defendant actually got.

Consistent with this limitation, in *Liu*, the Supreme Court held that disgorgement is permissible as "equitable relief" under Section 78u(d)(5) ***only*** when it does not exceed a wrongdoer's net profits. 591 U.S. at 75. The Court traced the historical boundaries of equity practice, emphasizing that courts have "routinely deprived wrongdoers of their net profits from unlawful activity." *Id*. at 79. It explained that this remedy must be "tethered to a wrongdoer's net unlawful profits," a "mainstay of equity courts." *Id*. at 80; *see also SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) (explaining that disgorgement "prevent[s] wrongdoers from unjustly enriching themselves through violations"); *Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 804 (1869) (equity "makes the wrong-doer liable for actual, not possible, gains"). The Court further clarified that "net profits" means "the gain made upon any business or investment, when both the receipts and payments are taken into the account." *Liu*, 591 U.S. at 83 (quoting *Goodyear*, 76 U.S. at 804).

Historically, the SEC has agreed. In *Liu*, the SEC argued to the Supreme Court that "[t]raditionally, accounting or disgorgement has been limited to a defendant's profits[.]" Brief for Respondent at 40, *Liu v. SEC*, 591 U.S. 71 (2020) (No. 18-1501). And in *Kokesh v. SEC*, 581 U.S. 455 (2017) (No. 16-529), the SEC explained that "a defendant can violate [the] law[] without obtaining any money from his unlawful acts, in which case a disgorgement order would be impermissible." Brief for Respondent at 17.

The D.C. Circuit also has twice recognized in Section 13(d) cases that disgorgement is properly limited to ***actual profits***. *First*, in *SEC v. First City Financial Corp.*, the SEC argued before the district court that "the proper measure of disgorgement is the difference between what

the defendants paid for the … shares acquired between [when the disclosure should have been filed] through [when the disclosure was filed] and what they were paid for those shares when they sold them back."    688 F. Supp. 705, 727 (D.D.C. 1988).    Defendants offered a different approach, which sought to subtract from the profits actually obtained the profits that could have been obtained if they had filed the Section 13(d) disclosure on time.    *Id*. at 727-28.    Finding this approach wholly "hypothetical" because the defendants actually sold their shares at a higher price after their late filing, the district court followed the "actual profit" theory espoused by the SEC, *id*., and the D.C. Circuit affirmed, 890 F.2d at 1232.    Similarly, in *Bilzerian*, the D.C. Circuit approved disgorgement because the defendant made misrepresentations in a Section 13(d) filing and later profited off his misrepresentation by selling the stock back at a premium.    29 F.3d at 692, 696-97; *cf. SEC v. E-Smart Techs., Inc.*, 139 F. Supp. 3d 170, 189-90 (D.D.C. 2015) (Boasberg, J.) (finding disgorgement inappropriate where the shares "remain unsold"); *SEC v. Yang*, 2014 WL 2198323, at *2 (N.D. Ill. May 27, 2014) (rejecting disgorgement of unrealized "paper profits" in Section 13(d) case because it "turn[s] the purpose of disgorgement on its head"); *aff'd*, 795 F.3d 674 (7th Cir. 2015).    These cases establish a clear principle: Disgorgement in Section 13(d) cases requires ***proof of actual profits*** realized through the ***sale*** of securities, not merely alleged savings while purchasing.[5]    Here, the SEC alleges no such thing.

Despite this widespread agreement on the limitations of disgorgement, here, the SEC alleges only that Mr. Musk ***saved*** money with his allegedly late filing, not that he ***profited***.    In

---

[5]    The D.C. Circuit also repeatedly has affirmed the "profit" requirement in other contexts.    *SEC v. Whittemore*, 659 F.3d 1, 10 (D.C. Cir. 2011) (disgorging profits from pump and dump scheme); *SEC v. Better Life Club of Am., Inc.*, 203 F.3d 54, *2 & n.4 (D.C. Cir. 1999) (disgorging profits from Ponzi scheme); *SEC v. Sprecher*, 81 F.3d 1147, *2 (D.C. Cir. 1996) (disgorging profits from Section 5 and Rule 10b-5 violations); *see also SEC v. Miller*, 2024 WL 4534512, at *10 (D. Md. Oct. 21, 2024) (denying disgorgement because SEC failed to establish profits).

the SEC's words, "[i]f Musk had timely filed, he would have had to pay at least $150 million <u>more</u> to acquire the same number of shares between March 25 and April 1, 2022."    Compl. ¶ 45; *see also id.* ¶ 5 ("Musk underpaid Twitter investors.").    The SEC's allegation that Mr. Musk "would have had to pay … more" is a theory of savings, ***not*** a theory of profit.    *Id.* ¶ 45.    This is underscored by the fact that the SEC does not allege that Mr. Musk ever sold Twitter shares at an inflated price.    *Cf. Bilzerian*, 29 F.3d at 692, 696; *First City*, 890 F.2d at 1232.    To the contrary, the SEC alleges that Mr. Musk kept the shares and purchased the company.    Compl. ¶ 8.    In the absence of a claim that Mr. Musk realized actual profits—which the SEC does not and cannot allege—the profit requirement of disgorgement cannot be satisfied, and the SEC's prayer for disgorgement must be stricken.

*No "Victims" Or Pecuniary Harm.*    Even if the SEC could somehow overcome the insurmountable hurdle of the "net profits" requirement, its disgorgement theory faces a second, equally fatal, flaw—the complete absence of any "victims" who suffered pecuniary harm.    *Liu*, 591 U.S. at 75.    As the Supreme Court explained in *Liu*, disgorgement must be "assessed against only culpable actors and for victims;" otherwise, it does not "fall comfortably within 'those categories of relief that were typically available in equity.'"    *Id.* at 84-85 (citation and emphasis omitted).    The Supreme Court held that equity required the SEC "to return [] funds to victims" (which it impermissibly failed to do in the underlying case) and that "the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains."    *Id.* at 88-89.    By requiring the existence of victims to whom ill-gotten gains could be restored, *Liu* "presupposes pecuniary harm,"    *SEC v. Govil*, 86 F.4th 89, 103 (2d Cir. 2023); *see also* "*Victim*," Black's Law Dictionary (12th ed. 2024) (defining victim as a "person harmed by a crime, tort, or other wrong").

Here, the SEC alleges neither victims nor pecuniary harm.    Section 13(d) imposes solely informational requirements, p. 10, *supra*, but any "informational loss" by investors was "fully satisfied" once Mr. Musk's disclosure was filed.    *See supra* at 10-11; *cf. also Berman v. Metzger*, 1981 WL 1596, at *1-3 (D.D.C. Feb. 9, 1981) (finding Section 13(d) does not "imply a private damage remedy" for the sale of stock for allegedly inadequate consideration during the time Schedule 13D should have been filed).    This is equally true in the disgorgement context.    When investors receive the "return on the[ir] investment[s] contemplated at the outset"—as the investors here did—they suffer no pecuniary harm and disgorgement is not a possible remedy.    *Govil*, 86 F.4th at 105; *see SEC v. Honig*, 2024 WL 3454840, at *6 (S.D.N.Y. July 18, 2024) (SEC did not seek disgorgement where there were no victims).    As the court in *SEC v. Ripple Labs, Inc.* held, disgorgement is not an appropriate remedy where investors "could have" sold their stock for more if they had received additional information earlier.    2024 WL 3730403, at *5-7 (S.D.N.Y. Aug. 7, 2024).    "[T]he right to make informed decisions about the dispositions of one's assets" is not a property interest," and therefore the mere fact that an investor did not receive certain information does not constitute harm.    *Govil*, 86 F.4th at 105 (quoting *Ciminelli v. United States*, 598 U.S. 306, 315 (2023)).

**No Causal Connection.**    The SEC's prayer for disgorgement fails for a third independent reason:    The SEC does not plead the required causal nexus between the alleged violation and Mr. Musk's hypothetical savings.    Section 78u states that disgorgement is of unjust enrichment that is realized "**as a result of**" the violation.    15 U.S.C. § 78u(d)(3)(A)(ii) (emphasis added).    "The words 'as a result of' plainly suggest causation."    *Paroline v. United States*, 572 U.S. 434, 445 (2014); *see also United States v. Monzel*, 641 F.3d 528, 536 (D.C. Cir. 2011) (restitution statute's use of "as a result of" "invokes the standard rule that a defendant is liable only for harms that he

proximately caused").   It is also well-established under principles of equity that disgorgement is limited to a "reasonable approximation" of gains "causally connected to the violation."   *First City*, 890 F.2d at 1231.   Courts consistently reject disgorgement where there is "a clear break in or considerable attenuation of the causal connection between the illegality and the ultimate profits."   *Id.* at 1232; *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972).

The Complaint rests on speculation, not the actual causation that the law demands.   The SEC merely asserts, without sufficiently pleaded factual support, that Mr. Musk paid "significantly less" "[a]s a result" of his alleged late disclosure.   Compl. ¶ 44.   But the SEC does not plead how the market would have reacted if Mr. Musk had disclosed his equity stake on March 24, 2022 (or on any other date between March 14, 2022 and March 24, 2022).   The SEC fails to acknowledge, much less address, how Twitter's stock would have reacted in a purely hypothetical world in which Musk disclosed ***different*** stakes in Twitter on ***different*** dates.   Likewise, the SEC fails to acknowledge, much less address, whether Mr. Musk would have continued purchasing Twitter stock between March 25, 2022 and April 1, 2022 in the but-for world, or at what price. Instead, the SEC improperly cites to the price of Twitter following Mr. Musk's April 4 disclosure of a 9% stake and suggests, without basis, that the market would have reacted in ***precisely the same way*** to an earlier disclosure of some lower stake.   Compl. ¶¶ 37, 40, 42.   This approach, which conflates two entirely different scenarios—disclosure at 5% with continued buying versus disclosure at 9% with discontinued buying—represents precisely the type of "hypothetical approach" to causation that courts find impermissible.   *First City*, 688 F. Supp. at 728; *see also SEC v. Commonwealth Equity Servs., LLC*, 133 F.4th 152, 171-72 (1st Cir. 2025) (revenues not subject to disgorgement based on hypothetical assuming "every" client would have made different investment decision based on disclosure because only "some" did).   In contrast, in prior cases in

which the D.C. Circuit has approved disgorgement, the causal connection between the violation and profits was not based on hypothetical scenarios, but rather actual market transactions. *E.g.*, *Whittemore*, 659 F.3d at 7-9.[6]

**No Scienter.**    The SEC's failure to plead scienter provides another independent basis to strike disgorgement.    The SEC seeks disgorgement of Mr. Musk's alleged consequential gains, but such disgorgement is permitted only for **conscious** wrongdoers.    *See SEC v. Ahmed*, 72 F.4th 379, 405 (2d Cir. 2023).    This limitation also is consistent with legislative history.    *See SEC v. Sharp*, 626 F. Supp. 3d 345, 376 n.14 (D. Mass. 2022) (Congresswoman Waters stating disgorgement statute is for "bad actors").

Consequential gains are increases in value that result from "the intervention of an independent transaction by the possessor."    Restatement (Third) of Restitution and Unjust Enrichment ("Restatement") § 53 (2011).    Consequential gains are not "the value of the thing itself but the value it produces in the hands of defendant."    *Ahmed*, 72 F.4th at 405 (citation omitted); *see also E. E. Bolles Wooden-Ware Co. v. United States*, 106 U.S. 432, 434 (1882) (an innocent trespasser who takes property is liable for the "the value of the property when first taken" and "if the conversion sued for was after value had been added to it by the work of the defendant, he should be credited with this addition").

---

[6]    The SEC also has not alleged that any theoretical savings were directly caused by the delayed filing itself rather than the market's reaction to Mr. Musk's interest in Twitter.    Market prices are determined by innumerable factors beyond a single investor's filings, and the SEC has not alleged any price impact from Mr. Musk's disclosure as distinct from broader market speculation about Mr. Musk's intentions for Twitter.    Even if a defendant "profit[s] from the sale of … shares," when that "profit was not derived from [a] failure to file a Section 13(d) statement," but instead from another cause, disgorgement is not a proper remedy.    *Wellman v. Dickinson*, 682 F.2d 355, 368 (2d Cir. 1982).

A "defendant[] without fault"—which is what the SEC alleges Mr. Musk is for allegedly mistakenly violating a strict-liability statute—is **not** liable for consequential gains.    Restatement § 53.    For that reason, courts generally "limit recovery of profits in excess of market value to cases in which the defendant was a **willful** wrongdoer."    George E. Palmer, Law of Restitution §2.13 (Third Edition, 2025-1 Cum. Supp. 2020) (emphasis added).    In contrast to consequential gains, proceeds include the "ordinary income or accretion" from an asset, *e.g*., "dividends on shares," and are recoverable from an innocent recipient to the extent that there is unjust enrichment.    Restatement § 53.

Here, the alleged increase in Twitter's price following the beneficial ownership disclosure is a consequential gain according to the SEC, because it allegedly resulted from the market's reaction to Mr. Musk's purchases.    Compl. ¶¶ 42, 45.    The alleged increased price of the shares was because of Mr. Musk's interest in those shares, not the "value of the thing itself" apart from Mr. Musk's interest.    *Ahmed*, 72 F.4th at 405.    The SEC cannot obtain disgorgement of such consequential gains for a strict liability offense.    *See CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203, 207 (S.D.N.Y. 1999) (recognizing that "in ordinary circumstances … there is no basis for disgorgement by an innocent party"); *SEC v. Wills*, 472 F. Supp. 1250, 1276 (D.D.C. 1978) (denying disgorgement because of lack of scienter and causation); *cf. SEC v. McCaskey*, 2002 WL 850001, at *7, *10 (S.D.N.Y. Mar. 26, 2002) (denying disgorgement where defendant did not intend to profit from market manipulation but rather intended to stabilize stock prices).

The SEC's own enforcement history confirms this principle:    In every other Section 13(d) case authorized by the SEC against an individual in which no intentional misconduct is alleged, the SEC has sought a **statutory penalty** of approximately **$100,000 or less**—a far cry from the

$150 million in disgorgement and unspecified penalty it seeks here.[7]    Notably, the only pure Section 13(d) case in which the D.C. Circuit has affirmed disgorgement involved a *willful* violation of the law (and was still limited to *actual profits*).    *First City*, 890 F.2d at 1220, 1232 (affirming disgorgement where district court found defendant "deliberately violated section 13(d)").    The contrast with this case is stark:    The SEC has not alleged—nor could it—that Mr. Musk deliberately violated Section 13(d).    Absent such allegations, disgorgement becomes *punitive* rather than *remedial*, in contravention of the very nature of the equitable remedy.

Under long-standing principles of equity, the text of the disgorgement statute, and binding precedent, this Court should strike the SEC's prayer for disgorgement.[8]

### 2.    Disgorgement Would Violate The Eighth Amendment's Excessive Fines Clause

This Court should also strike the SEC's prayer for disgorgement because it violates the Eighth Amendment's prohibition against excessive fines.    Under the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."    U.S. Const. amend. VIII.    In assessing an Excessive Fines Clause claim, the Court must "(1) determin[e] whether the government extracted payments for the purpose

---

[7]    *See, e.g.*, *In the Matter of Howard S. Jonas*, Release No. 101166 (Sept. 25, 2024) (imposing $90,000 fine on individual who filed Schedule 13D and amendments years late); *In the Matter of Mitchell P. Rales*, Release No. 101180 (Sept. 25, 2024) (imposing $10,000 fine on individual who filed Schedule 13Ds months late); *In the Matter of Carl C. Icahn*, Release No. 100756 (Aug. 19, 2024) (imposing $500,000 fine on individual who filed amendments to Schedule 13D years late); *In the Matter of Lawrence I. Rosen*, Release No. 98545 (Sept. 27, 2023) (imposing $150,000 fine on individual who failed to timely file various Schedule 13Gs up to a year late); *In the Matter of Norman M.K. Louie and Mount Kellett Capital Management LP*, Release No. 83637 (July 16, 2018) (imposing $100,000 fine on individual who filed Schedule 13D 45 days late); *see also In the Matter of Jack W. Schuler*, Release No. 101167 (Sept. 25, 2024) (total penalty of $200,000 in case alleging violations of both Section 13(d) and Section 16); *In the Matter of Joseph Theodore Lukens, Jr.*, Release No. 98542 (Sept. 27, 2023) (total penalty of $120,000 in case alleging violations of both Section 13(d) and Section 16).

[8]    Consequently, the Court should also strike the SEC's request for prejudgment interest.

of punishment; and (2) assess[] whether the extraction was excessive." *United States v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019). "The first step determines whether the Excessive Fines Clause applies, and the second determines if the Clause was violated." *Consol. Commc'ns of California Co. v. FCC*, 715 F. App'x 13, 15 (D.C. Cir. 2018). The SEC's prayer for disgorgement fails both these prongs.

*First*, because the SEC fails to plead facts supporting disgorgement as permissible equitable relief, the remedy it seeks is necessarily punitive. In *Liu*, the Supreme Court addressed what constitutes equitable disgorgement, distinct from the "version of the SEC's disgorgement remedy" it had found in *Kokesh* was punitive and "exceed[ed] the bounds of traditional equitable principles." 591 U.S. at 85-86. The Supreme Court explained that any remedy beyond "an individual wrongdoer's net profits to be awarded for victims," "transform[s] an equitable remedy into a punitive sanction." *Id.* at 79. As detailed above, *see supra* at 14-18, the SEC has not alleged "net profits" or "victims," rendering the relief it seeks punitive.

*Second*, $150 million in disgorgement is "grossly disproportional to the gravity of" the penalized conduct. *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). "[E]xtremely large penalties contrasted with minimal harm" violate the Excessive Fines Clause. *Collins v. SEC*, 736 F.3d 521, 526-27 (D.C. Cir. 2013). The D.C. Circuit considers four factors when evaluating proportionality: "(1) the essence of the crime and its relation to other criminal activity; (2) whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct." *Id.* at 526. The Complaint flunks each factor. *First*, the SEC alleges a technical (not intentional, reckless, or willful) violation of a single filing requirement that Mr. Musk remedied on the first business day following its discovery. Compl. ¶¶ 4, 13, 38, 40;

*United States v. Leeds*, 2025 WL 743996, at *13 (D. Idaho Mar. 7, 2025) (penalties for unknown failure to file FBARs "grossly disproportional"); *United States v. Sterlingov*, 755 F. Supp. 3d 17, 33 (D.D.C. 2024) (Moss, J.) (multi-hundred million dollar judgment for an unlicensed business would likely be "grossly disproportional"). The SEC alleges no other unlawful activity. *Second*, legislators have explained that disgorgement under the Exchange Act is intended for "criminals" and "bad actors"—a far cry from an alleged unintentional 11-day foot-fault. *See Sharp*, 626 F. Supp. 3d at 376 n.14. *Third*, the maximum first-tier statutory penalty for an individual found to have unintentionally violated the securities laws without investor harm, is $11,823 as of January 15, 2025. 15 U.S.C. § 78u(d)(3)(B)(i).[9] In *Bajakajian*, the Supreme Court invalidated a $357,144 forfeiture for an alleged violation of a "reporting offense" for which the "maximum fine was $5,000" and that was "unrelated to any other illegal activities." 524 U.S. at 337-40; *see also Pimentel v. City of Los Angeles*, 115 F.4th 1062, 1069 (9th Cir. 2024) (stating that a late fee that is over 150 times the size of the original fine is "grossly disproportional"). Here, the disgorgement sought is ***30,000 times*** the maximum statutory penalty amount, 15 U.S.C. § 78u(d)(3)(B)(i), and over ***12,000 times*** the maximum inflation-adjusted penalty. *Fourth*, the only alleged "harm" to investors is wholly hypothetical, Compl. ¶ 46, and the SEC does not allege that Mr. Musk profited from the alleged violation. For these reasons, this Court should strike the requested disgorgement as an excessive fine under the Eighth Amendment.

---

[9] Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2025), https://bit.ly/4mvkZZy.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

This Court should also dismiss the Complaint in its entirety under Rule 12(b)(6) because the SEC fails to state a claim on which relief can be granted because the Complaint fails on multiple constitutional grounds.    *First*, Section 13(d)'s information disclosure requirements operate as content-based compelled speech that chills protected expression by forcing investors to disclose proprietary strategies based on their communicative content, in violation of the First Amendment under any level of scrutiny.    *Second*, Section 13(d) and Rule 13d-1's vague timing requirements denied Mr. Musk constitutionally required fair notice.    *Third*, the SEC's selective enforcement against Mr. Musk—electing to bring an action and seek monetary relief orders of magnitude larger than that imposed on similarly situated individuals—violates the First Amendment by punishing Mr. Musk and retaliating against him for his constitutionally-protected criticism of governmental overreach and the SEC.    *Finally*, the SEC operates through an unconstitutional structure that violates the constitutional separation of powers.

### A.    The First Amendment Right Against Compelled Speech Prohibits Applying Section 13(d) In This Case

The SEC's application of Section 13(d) and Rule 13d-1 to Mr. Musk violates the First Amendment's protection of free speech.    "The freedom of thought protected by the First Amendment against state action 'includes both the right to speak freely and the right to refrain from speaking at all.'"    *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).    The Supreme Court accordingly has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."    *Davis v. FEC*, 554 U.S. 724, 744 (2008); *see Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 585 U.S. 755, 766-69 (2018); *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Ca.*, 475 U.S. 1, 20 (1986); *Wooley*, 430

U.S. at 705, 717; *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).   Section 13(d) does just that by forcing filers to speak against their will and disclose their investment positions and intent.   Unlike other securities disclosure requirements that previously have been upheld as constitutional, Section 13(d)'s disclosure regime requires individuals to disclose their ***strategies*** and ***intentions***, ***not*** factual and uncontroversial information.   *Compare Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 23 (D.C. Cir. 2014) (country of origin labeling on food permissible), *with Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 527 (D.C. Cir. 2015) (rejecting SEC conflict mineral disclosure regulations as resting on conjecture).   This Court therefore should dismiss the Complaint because: (i) Section 13(d)'s disclosure regime imposes a content-based requirement subject to and failing strict scrutiny, at least as applied to Mr. Musk; and (ii) even under intermediate scrutiny, Section 13(d)'s disclosure regime is unconstitutional.

### 1.    Section 13(d) Creates A Content-Based Disclosure Regime That Fails Strict Scrutiny

The Supreme Court has established that "content-based laws—those that target speech based on its communicative content—are ***presumptively unconstitutional*** and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (emphasis added).   Section 13(d) is quintessentially content-based, because it specifically targets the communicative content of an investor's strategy and intentions and imposes different filing requirements based on those strategies and intentions.   The regulatory scheme creates two different disclosure paths based solely on the content of the investor's plans:   If an investor has acquired securities "with any purpose, or with the effect, of changing or influencing the control of the issuer," 17 C.F.R. § 240.13d-1(b)-(c), then the investor must file a Schedule 13D and disclose those plans.   If the

investor has no such purpose, then the investor may file a Schedule 13G instead. *Id.*; *see also* Compl. ¶¶ 11-12. Thus, Section 13(d)'s bifurcated structure is ***explicitly*** based on the ***content*** of the investor's thoughts and intentions—***the very definition of a content-based regulation***.

Section 13(d)'s regulatory scheme creates an unconstitutional dilemma for investors: either disclose whether they have activist plans for a company by choosing between Schedules 13G and 13D, or delay filing either schedule and violate the securities laws. By forcing categorization based on the content of the investor's thoughts and intentions, Section 13(d) conditions compliance with securities laws on making content-based distinctions that require investors to either disclose their plans or certify they have no such plans. This is a quintessential content-based regulation of speech.

Where, as here, the government compels speech based on its content, the usual presumption of constitutionality afforded congressional enactments is reversed, because "[c]ontent-based regulations are presumptively invalid," *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992), and the SEC bears the burden to rebut that presumption. *E.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000). Under strict scrutiny, a law must "further[] a compelling interest and [be] narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quoting *Ariz. Free Enter. Club v. Bennett*, 564 U.S. 721, 734 (2011)). Section 13(d) fails on both counts.

*First*, the SEC has not demonstrated a compelling governmental interest. The Complaint alleges that Section 13(d) exists to "help investors make informed investment decisions by providing information about accumulations of certain classes of equity securities of a company by persons who have the potential to change or influence control of that company." Compl. ¶ 10. The Supreme Court similarly has characterized the purpose of the Williams Act as ensuring "that public shareholders who are confronted by a cash tender offer for their stock will not be required

to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau*, 422 U.S. at 58.    Historically, this interest was grounded in preventing specific harms from coercive tender offers in the 1960s, where corporate raiders forced shareholders to make hasty decisions under extreme time pressure.    *See* 111 Cong. Rec. 28, 257 (1965) (remarks of Senator Williams).

This case does not involve a coercive tender offer, and the SEC thus cannot justify its enforcement of Section 13(d) against Mr. Musk on that basis.    Accordingly, this Court should find that Section 13(d) is unconstitutional as applied to Mr. Musk.    Section 13(d) is also susceptible to a facial challenge, because the SEC's current enforcement of the statute extends far beyond preventing coercive tender offers to encompass a more generalized purported interest in transparency and curing information asymmetry.[10]    This broader rationale does not rise to the level of a "compelling" governmental interest required under strict scrutiny.    The Supreme Court repeatedly has rejected the notion that transparency alone constitutes a compelling interest.    In *Riley v. National Federation of the Blind of North Carolina, Inc.*, for example, the Court found that the state's interest in informing charitable donors about how their money was being spent was "not as weighty as the State asserts" and did not constitute a compelling state interest, despite being intended to create transparency for donors and prevent fraud.    487 U.S. 781, 798 (1988).    More recently, in *Americans for Prosperity Found. v. Bonta*, the Supreme Court rejected an asserted interest in administrative convenience and general oversight as justifying disclosure that implicated First Amendment rights.    594 U.S. 595, 618 (2021).    These decisions demonstrate

---

[10]    *See* Modernization of Beneficial Ownership Reporting, 87 Fed. Reg. 13846, 13881 (Mar. 10, 2022); Letter from the Int'l Inst. L. & Fin. to Vanessa A. Countryman, Sec'y, SEC, at 6 (Apr. 11, 2022), https://bit.ly/4kIuYJC.    We request that the Court take judicial notice of this publicly available comment letter and others cited in this section.

that general regulatory convenience and transparency—even when aimed at preventing potential misconduct—do not constitute the "necessary" or "crucial" interests required for compelling government interests.

Furthermore, the SEC's professed interest in eliminating information asymmetry represents a ***contested economic policy choice*** rather than a ***compelling governmental need***. Information asymmetry serves essential market functions, driving investment in research and analysis while incentivizing market participation and efficiency.[11]    Indeed, "benefits may stem from the information asymmetry between a Schedule 13D filer and the market" because it is an asymmetry that results "from [filers'] own expenditures on research and analysis or from their efforts and expenditures to pursue changes at the issuers in which they accumulate these shareholdings."[12]    Commentators thus have observed that revealing potential activist investors is "not a fundamental aspect of the securities laws," and there is little evidence to support the notion that investors or issuers need protection from minor incidents of information asymmetry like the intentions of an investor who has acquired far less than a controlling share.[13]    The Supreme Court has made clear that compelling interests require more than contested policy preferences, as "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation" on constitutional rights.    *Thomas v. Collins*, 323 U.S. 516, 530 (1945); *cf. Ariz. Free Enter. Club*, 564 U.S. at 749 (rejecting "leveling the playing field" as a compelling state interest justifying undue burdens on speech).

---

[11]    Mark T. Uyeda, Statement on Modernization of Beneficial Ownership Reporting (Oct. 10, 2023), https://bit.ly/41qiVJU.
[12]    *Id.*
[13]    *See* Letter from the Int'l Inst. L. & Fin., *supra* note 10, at 6.

*Second*, even if protecting investors from information asymmetry about investors' activist intentions were a compelling interest, Section 13(d) is not narrowly tailored to achieve this purpose. Even "a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored. This requirement makes sense. Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Americans for Prosperity Found.*, 594 U.S. at 609 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). To establish that a law or restriction regulating or restricting speech is narrowly tailored, "the Government carries the burden of showing that the challenged regulation advances the Government's [compelling] interest in a direct and material way." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (quotation omitted). A restriction is not narrowly tailored "if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997).

As an initial matter, Section 13(d)'s five-percent threshold is both overinclusive and underinclusive because it bears little relation to an investor's actual ability to influence corporate control and lacks any empirical foundation as a meaningful indicator of control or influence. Steven J. Cleveland, *Shareholder Activism & Unconstitutionally Compelled Speech*, 58 UC Davis L. Rev. 1815, 1850-53 (2025); *see also NIFLA*, 585 U.S. at 776. Accordingly, the Supreme Court repeatedly has held that use of a percentage-based test is not narrowly tailored to achieve an asserted government interest. *Sec. of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 966-67 (1984); *see also Riley*, 487 U.S. at 788 ("unpersuaded" that a "percentage-based definition … passes constitutional muster"); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 639 (1980) (law prohibiting solicitation of charitable contributions with percentage-based test was

overbroad and "insufficiently related to the governmental interests asserted"). The goal of Section 13(d) is "to alert the marketplace" when there is a "*large*, rapid aggregation or accumulation of securities ... which might represent a potential shift in corporate control," *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971) (emphasis added), ***not*** cure minor information asymmetries about the intentions of five-percent stockholders who lack the ability to shift corporate control. But an investor with just over five-percent ownership typically lacks sufficient voting power to implement the very plans or proposals Section 13(d) requires him or her to disclose. *See Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs*., 144 F.4th 9, 25 (1st Cir. 2025) (holding 5% beneficial ownership threshold was likely not narrowly tailored and therefore unconstitutional); Corporate Transparency Act, 31 U.S.C. § 5336(a)(3) (defining "beneficial Owner" as an individual who either (i) owns or controls at least 25% of the ownership interests in the reporting company, or (ii) exercises substantial control over the reporting company); Cleveland, *Shareholder Activism*, at 1849 (noting the "significant disparity between the percentage ownership associated with the exercise of control" and the 5% ownership that triggers Section 13(d)); *id.* at 1850-53 (collecting cases in which courts found percent ownership above 5% was not enough to be a controlling shareholder).

Section 13(d) also requires disclosure of plans and proposals that may never materialize. The statute compels investors to reveal ***tentative*** strategies, ***exploratory*** discussions, and ***preliminary*** considerations that may be abandoned or substantially modified. A plan may never come to fruition because the reporting party has decided not to go through with its plan or because it lacks the practical ability to implement it. Cleveland, *Shareholder Activism*, at 1845. Indeed, evidence shows "the impact that shareholder activists are having on corporate America is modest

and in decline."[14]   In compelling disclosure of such speculative intentions, Section 13(d) forces investors to reveal proprietary thinking that has not yet—and may never—manifest in actual market activity.   Such a "requirement [] is wholly disconnected from [investors'] informational interest."   *NIFLA*, 585 U.S. at 777.   At the same time, this action exemplifies that disclosure is not necessary to prevent harm, as the SEC has failed to plead any actual investor harm from the alleged delayed disclosure.   *See supra* at 17-18; *see also* Cleveland, *Shareholder Activism*, at 184142; Letter from the Int'l Inst. L. & Fin. to Vanessa A. Countryman, Sec'y, SEC, at 2 (June 27, 2023), https://bit.ly/43qX8TQ (assertions of information asymmetry are "unsupported and speculative").

Section 13(d) is also underinclusive.   Under 17 C.F.R. § 240.13d-1(b), qualified institutional investors—including banks, broker-dealers, insurance companies, and registered investment advisers—may file simplified Schedule 13G reports up to 45 days after the end of the calendar quarter in which they exceed 5% ownership, potentially over four months after acquisition.   This extended timeline ***directly contradicts*** any claimed compelling government interest in immediate disclosure at the 5% threshold, as markets clearly function without such "critical" information for months at a time.   *See Brown v. Entm't Merchants*, 564 U.S. 786, 801-02 (2011) (finding that under-inclusiveness of a regulation "when judged against its asserted justification … is alone enough to defeat it").   The Commission's bifurcated system—allowing some investors ***months*** to disclose while compelling others to speak within ***days*** based solely on institutional status and intent—reveals that the 5% threshold serves administrative convenience rather than any compelling regulatory purpose.   Similarly, under 17 C.F.R. § 240.13d-1(c), passive investors may hold between 5% and 20% of a company's securities while filing only

---

[14]    *See* Letter from the Int'l Inst. L. & Fin., *supra* note 10, at 7.

simplified Schedule 13G reports, further demonstrating that the SEC's own rules recognize that holdings well above 5% pose no meaningful control threat requiring immediate compelled speech. "There is [thus] a dramatic mismatch … between the interest that the [SEC] seeks to promote and the disclosure regime that [it] has implemented in service of that end." *Americans for Prosperity Found.*, 594 U.S. at 612; *see also McCullen v. Coakley*, 573 U.S. 464, 486 (2014). The statute's simultaneously overbroad yet underinclusive sweep, compelling speech from investors who pose no greater control threat than exempt institutions while ignoring those who do, violates the narrow tailoring requirement.

Less restrictive alternatives also exist to achieve the SEC's purported goal of reducing information asymmetries. For example, the SEC could require disclosure of actual ownership percentages without compelling disclosure of subjective purposes and intentions, or the SEC could raise the filing threshold to a level that more closely correlates with actual control over corporate governance. The burden Section 13(d) places on protected speech exceeds any theoretical benefits to market participants and the statute therefore fails strict scrutiny.

### 2. Alternatively, Section 13(d) Fails Intermediate Scrutiny

Even if this Court were to determine that Section 13(d) is not subject to strict scrutiny, the statute still fails under intermediate scrutiny. The Supreme Court repeatedly has held that certain disclosure requirements in the commercial speech context warrant heightened scrutiny when they are not limited to "purely factual and uncontroversial information." *NIFLA*, 585 U.S. at 768-69; *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626 (1985); *see also Am. Hosp. Assoc. v. Azar*, 983 F.3d 528, 540 (D.C. Cir. 2020).

Section 13(d)'s disclosure requirements go beyond "purely factual and uncontroversial" information. Schedule 13D requires investors to disclose "the purpose or purposes of the acquisition of securities" and any "plans or proposals" they may have—information that is

inherently subjective, strategic, and commercially sensitive.   17 C.F.R. § 240.13d-101.   The disclosure of such strategic plans is also inherently controversial.   As Professor Steven Cleveland has observed, "unrelated stock market participants typically have no duties to one another and they do not speak with one another, unlike a seller advertising her products to consumer."   Cleveland, *Shareholder Activism*, at 1839.   Compelling investors to reveal proprietary strategies developed through substantial research and analysis forces them to disclose controversial commercial information that competitors can exploit.   Because Section 13(d) compels disclosure of non-factual and controversial information, intermediate scrutiny, at a minimum, applies under the test established in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980).[15]

Furthermore, *Zauderer* still requires a court to assess the fit between "the government's identified means and its chosen ends."   *Am. Meat Inst.*, 760 F.3d at 25.   As discussed above, Section 13(d) is vastly overbroad and not fitted to the SEC's alleged aims.   As in *National Association of Manufacturers v. SEC*, 800 F.3d at 524, "[e]ven if the compelled disclosures here are commercial speech … the statute and the regulations violate the First Amendment" because they are insufficiently tailored.

Under intermediate scrutiny, a statute, rule, or regulation must "directly advance[ a substantial] governmental interest" and be "not more extensive than is necessary to serve that interest."   *Central Hudson*, 447 U.S. at 566.   As discussed above, Section 13(d) fails both requirements.   Because Section 13(d) compels disclosure of speech based on its content in

---

[15]    Even if this Court were to find that Section 13(d) disclosures only constitute facts, the First Amendment also applies to facts that the speaker would prefer not to disclose.   *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (holding that general rule that speaker has right to tailor speech, "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact … speaker would rather avoid").

violation of the First Amendment and fails both strict and intermediate scrutiny, this Court should dismiss the Complaint.

### B.    Rule 13d-1's Vagueness Renders It Unenforceable Under Both First Amendment And Due Process Principles

At the time of Mr. Musk's alleged disclosure violation, Rule 13d-1 was also unconstitutionally vague, because it failed to state with requisite clarity ***when*** disclosure was necessary.   "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."   *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).   "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."   *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926); *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).   Only regulations that "a 'reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require'" can "withstand a vagueness challenge." *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1214 (D.C. Cir. 2021) (quoting *Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997)).

When a "law interferes with the right of free speech or of association, a more stringent vagueness test should apply."   *See Vill. of Hoffman Est. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).   Courts are especially concerned with vague laws that touch on First Amendment freedoms because such vagueness chills protected speech, causing individuals to

refrain from constitutionally protected expression for fear of prosecution.    Just as vague speech restrictions lead to self-censorship of protected speech, vague compelled disclosure requirements lead to over-disclosure or premature disclosure out of caution.    This chilling effect on strategic silence is as much a concern under the First Amendment as chill of affirmative speech.    *See Buckley v. Valeo*, 424 U.S. 1, 68 (1976) (finding that chilling of campaign contributions due to compelled disclosures "are not insignificant burdens on individual rights"); *Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 501 (D.C. Cir. 2016) ("The Supreme Court routinely invalidates laws that chill speech far less than a disclosure rule that might scare away charitable donors."). Indeed, vagueness about when speech must be disclosed forces potential speakers to disclose prematurely to avoid penalties, effectively expanding the scope of compelled speech beyond what Congress has authorized and "authoriz[ing] and even encourag[ing] arbitrary and discriminatory enforcement."    *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).    The First Amendment thus demands that the government "regulate in the area only with narrow specificity."    *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967).    Accordingly, when the government compels controversial speech, as Section 13(d) does, the timing parameters of that compulsion must be *precisely* defined.

Rule 13d-1's filing deadline during the relevant time period was impermissibly imprecise, violating both Mr. Musk's First Amendment and Due Process rights.[16]    During the relevant time, between January and April 2022, Rule 13d-1 specified that beneficial owners of more than five percent of outstanding shares of a class of stock had to file either a Schedule 13D or Schedule 13G (if applicable) within "ten days."    At the time, the regulation left the term "days" undefined.    17

---

[16]    This is not the first time the SEC has interpreted an undefined term over broadly. *See Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 768 (D.C. Cir. 2025) (finding the SEC's definition of "solicit" was contrary to law).

C.F.R. § 240.13d-1. Accordingly, regulated individuals and entities were forced to ascertain when to make Section 13(d) filings without knowing whether the SEC regulation referred to "calendar" days (counting weekends and holidays) or "business" days (non-holiday weekdays).

The Complaint's allegations demonstrate that this difference can be critical. The SEC alleges that Mr. Musk crossed the five-percent threshold on March 14, 2022. Compl. ¶ 2. The SEC asserts that the filing was "due within ten *calendar* days after crossing the five-percent threshold, i.e., by March 24, 2022." *Id.* ¶ 3 (emphasis added). Under the business-day calculation, however, the filing would have been due on March 28, 2022, since two weekends interceded.

Despite relying on the "calendar day" method in this case, in public releases before amending the rule in 2023 to resolve the ambiguity, the SEC itself vacillated between the "business day" and "calendar day" approach.[17] Courts, scholars, and practitioners likewise were split.[18]

---

[17] *Compare In the Matter of William A. Houlihan*, Release No. 74504 (Mar. 13, 2015) (stating that "individuals comply with Section 13(d) of the Exchange Act by filing a Schedule 13D ... no later than ten business days after" a triggering event); *In the Matter of Jane G. Ciabattoni*, Release No. 74501 (Mar. 13, 2015) (same); *In the Matter of Berjaya Lottery Mgmt. (H.K.) LTD.*, Release No. 74498 (Mar. 13, 2015) (same); *In the Matter of SMP Investments I, LLC*, Release No. 74502 (Mar. 13, 2015) (same); *In the Matter of Brian Potiker*, Release No. 74503 (Mar. 13, 2015) (same), *with In the Matter of FP Res. USA Inc. & Lobster Point Holdings Ltd.*, Release No. 83626 (July 13, 2018) (Schedule 13D must be filed "within ten [calendar] days"); *In the Matter of Harvey Katz, William M. Siegel*, *Thomas M. Dean, Jeffry M. Picower*, *Explanations Inc., & Decisions Inc.*, 47 SEC 1044 (Apr. 25, 1984).

[18] *See generally The Timing of Schedule 13D*, Forum on Corporate Governance Law Harvard Law School (2019), https://bit.ly/43Fj8sV. Some courts, treatises, and law review articles opted for the "business day" approach. *See, e.g., In re E.S. Bankest, L.C.*, 2006 WL 3922112, at *2 (Bankr. S.D. Fla. Dec. 14, 2006); *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 589-90 (S.D.N.Y. 1993); Marc Steinberg, Understanding Securities Law 488 (5th ed. 2009); J. Robert Brown, Jr., *Corporate Secrecy, the Federal Securities Laws, and the Disclosure of Ongoing Negotiations*, 36 Cath. U. L. Rev. 93, 103 n.40 (1986). Other law review articles, treatises, and law firms opted for the "calendar day" approach. *See, e.g.*, Robert A. Prentice, *The Role of States in Tender Offers: An Analysis of CTS*, 1988 Colum. Bus. L. Rev. 1, 7 (1988); Mintz Levin, *Summary of Schedule 13D and Schedule 13G Filing Obligations* (Feb. 14, 2015), http://bit.ly/3HHYGAT.

These inconsistent interpretations demonstrate Rule 13d-1's fatal ambiguity—even SEC officials could not consistently interpret the filing deadline.   Since not even the issuing agency or securities experts understood the filing requirement, the SEC cannot demonstrate that people of "common intelligence" could know with any level of certainty what the correct deadline was. Indeed, the SEC amended Rule 13d-1 in 2023 to clarify that "days" means "business days," an implicit admission that the prior language was unclear.   88 Fed. Reg. 76896 (Nov. 7, 2023).   The timeliness of myriad Section 13(d) filings has hinged, over the years, on the distinction between "business" and "calendar" days, yet the SEC did not amend the rules until *after* individuals like Mr. Musk faced untenable ambiguity.[19]

When a disclosure requirement by a government agency is given teeth through the threat of an SEC enforcement action in federal court and injunctive and monetary relief, it is crucial that there be no ambiguity as to when the disclosure is due.   *See Morales*, 527 U.S. at 58 ("[T]he purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law.   No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." (citation and quotation marks omitted)).   The indeterminate phrase "ten days" in Rule 13d-1 rendered the regulation void for vagueness and therefore incapable of supplying the SEC with a basis for this enforcement action.

### C.    The SEC Has Engaged In Unconstitutional Selective Enforcement

This Court also should dismiss the Complaint on the independently sufficient ground that the SEC has engaged in selective enforcement against Mr. Musk because he is an outspoken critic of the agency.   For years, the SEC has retaliated against Mr. Musk via a relentless campaign of

---

[19]    *See* Lucian A. Bebchuk, Alon Brav, Robert J. Jackson, Jr. & Wei Jiang, *Pre-Disclosure Accumulations by Activist Investors: Evidence and Policy*, 39 J. Corp. L. 1, 21 tbl. 6 (2013).

investigations, unconstitutional speech restrictions, and vindictive enforcement actions.   *See supra* at 3-4.   The SEC has pursued Mr. Musk for alleged contempt (unsuccessfully), sought sanctions against him (rejected by the court as "unnecessary"), leaked information about its investigations to the press, and issued over ***thirty*** administrative subpoenas in the investigation giving rise to this action alone, many seeking information entirely unrelated to the alleged violation—all of which produced nothing more than the instant Complaint for a single alleged beneficial ownership filing violation, which was promptly cured.   *See supra* at 4-6.   The SEC's preoccupation with Mr. Musk has led commentators to remark on the "Elon Musk Division of the U.S. Securities and Exchange Commission."[20]

"A selective enforcement claim has two elements: a plaintiff must demonstrate (1) he was similarly situated in material respects to other individuals against whom the law was not enforced, and (2) the selective enforcement infringed a constitutional right."   *Valibeigi v. District of Columbia*, 2024 WL 4332626, at *3 (D.C. Cir. Sept. 27, 2024) (quoting *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023)).   With regard to the first element, courts in this District find that parties are "'similarly situated' for purposes of a selective enforcement claim 'when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.'"   *United States v. AT&T Inc.*, 290 F. Supp. 3d 1, 4 (D.D.C. 2018) (quoting *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000)).   Such is the case here.   Although the SEC regularly seeks and obtains monetary penalties against individuals for late filings under Section 13(d), Mr. Musk is the ***only*** individual or entity from whom the SEC has ***ever*** sought

---

[20]    Matt Levine, *Elon Musk Bought Some Twitter*, Bloomberg (Apr. 4, 2022), https://bit.ly/3HrS8FW.

disgorgement under similar circumstances.    *See supra* at 21-22.    In some, limited, cases, the SEC has sought disgorgement for Section 13(d) violations where it ***also*** alleges that the defendant committed fraud.[21]    But the SEC has ***never*** sought disgorgement in a Section 13(d) case—***except*** in this case against Mr. Musk—in which it does not allege intentional, deliberate, or willful misconduct or investor harm.

In September 2024, just months before the SEC brought this action against Mr. Musk, the SEC publicly announced "charges against 23 entities and individuals for failures to timely report information about their holdings and transactions in public company stock."[22]    The 15 entities charged with violating Section 13(d) paid penalties ranging from $40,000 to $750,000, while the ten individuals charged, "who were officers, directors, and/or beneficial owners of publicly traded companies," paid penalties ranging from $10,000 to $200,000.    The SEC did not, unlike here, seek disgorgement or amounts grossly in excess of the statutory penalty.    The SEC's case against Essex Woodlands, in particular, bears a striking resemblance to this action.    Essex Woodlands "acquir[ed] beneficial ownership of more than 5% of TELA's common stock as of November 8, 2019," but did not file "an initial Schedule 13G statement ... [until] November 27, 2019."[23]    Its filing was nearly twenty calendar days late, but the SEC sought only a $225,000 monetary penalty—not hundreds of millions in disgorgement.[24]

---

[21]    *See Bilzerian*, 29 F.3d at 693; *see also* Complaint, *SEC v. Luis Jimenez Carrillo*, 1:21-cv-11272 (D. Mass. Aug. 4, 2021), ECF No. 1 (seeking disgorgement for violating Section 10(b) antifraud provisions and 13(d) reporting requirement); Complaint, *SEC v. John S. Clayton*, 2:24-cv-00918 (D. Utah Dec. 11, 2024), ECF No. 1 (same).

[22]    SEC, Press Release (Sept. 25, 2024), https://bit.ly/4mKSTtZ.

[23]    *In the Matter of Essex Woodlands Management, Inc.*, Release No. 101161 at 9 (Sept. 25, 2024).

[24]    *Id.* at 10.

The SEC's targeting of Mr. Musk also plainly meets the second prong required to establish

selective enforcement because the SEC seeks to punish Mr. Musk for exercising his constitutional

rights under the First Amendment. *See Frederick Douglass Found.*, 82 F.4th at 1143. Mr.

Musk is an outspoken and much-followed political critic who repeatedly has criticized the SEC:

- "Just want to [note] that the Shortseller Enrichment Commission is doing incredible work. And the name change is so on point!" Elon Musk (@elonmusk), Twitter (Oct. 4, 2018, 4:16 pm), https://bit.ly/40bzokF;
- "I want to be clear. I do not respect the SEC. I do not respect them." 60 Minutes Interview (Dec. 9, 2018 at 1:36-40), https://bit.ly/4mFjc4m;
- "Something is broken with SEC oversight." Elon Musk (@elonmusk), Twitter (Feb. 26, 2019, 7:25 am), https://bit.ly/44Uz78k;
- "Will send some to the Shortseller Enrichment Commission to comfort them through these difficult times." Elon Musk (@elonmusk), Twitter (July 2, 2020, 2:50 pm), https://bit.ly/44DULwa (referring to "fabulous short shorts in radiant red satin with gold trim");
- "SEC, three letter acronym, middle word is Elon's." Elon Musk (@elonmusk), Twitter (July 2, 2020, 2:57 pm), https://bit.ly/46zz4Qy;
- Calling SEC officials "those bastards" and saying he "did I not have respect for the SEC." Elon Musk Talks Twitter, Tesla And How His Brain Works—Live At TED2022, TED (Apr. 15, 2022 at 28:00-28:42), https://bit.ly/3ULcP38;
- "The San Francisco office of the SEC were shameless puppets of Wall St shortseller sharks, while doing nothing to protect actual shareholders. That is why I lost all respect for them." Elon Musk (@elonmusk), X (Apr. 25, 2022, 8:35 am), https://bit.ly/4lk7lIf;
- "A friend of mine had a meeting with senior officials at the SEC and they hadn't been in the building for so long that they couldn't figure out how to turn on the lights!! So they were just sitting there in the dark with cell phone flashlights looking like demented burglars 🤣🤣" Elon Musk (@elonmusk), X (Nov. 25, 2024, 6:58 pm), https://bit.ly/3IkmASP;
- "The SEC is just another weaponized institution doing political dirty work" Elon Musk (@elonmusk), X (Dec 12, 2024, 7:35 am), https://bit.ly/3GGlZdA;
- "SEC. The middle word is definitely 'Elon's', but I can never remember what the other two words stand for 🤔." Elon Musk (@elonmusk), X (Nov. 23, 2024, 1:35 am), https://bit.ly/40b7hlA.

In turn, the SEC has targeted Mr. Musk for nearly a decade through a series of

investigations, litigations, and restrictions on speech, strongly suggesting that the SEC is retaliating

against Mr. Musk for his protected speech. To establish First Amendment retaliation, courts

examine whether there is a causal connection between protected speech and adverse government

action.   *Hartman v. Moore*, 547 U.S. 250, 256 (2006).   Here, the temporal proximity between Mr. Musk's repeated public criticisms of the SEC and the agency's enforcement action—seeking massive and unprecedented disgorgement for an alleged unintentional 11-day filing delay— provides strong evidence of constitutionally impermissible motivation.   The SEC appears to be exploiting its investigative and prosecutorial power to punish Mr. Musk's protected expression. Such retaliation is patently unconstitutional.   "[P]rosecutorial decisions, like other government actions, cannot turn on the exercise of free speech rights."   *Frederick Douglass Found.*, 82 F.4th at 1141 (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

### D.    The SEC's Unconstitutional Structure Precludes This Enforcement Action

This Court also should dismiss the Complaint because the SEC's structure violates Article II of the Constitution.   Article II "grants to the President ... the power of appointment and removal of executive officers."   *Myers v. United States*, 272 U.S. 52, 163-64 (1926).   As the Solicitor General recently agreed:   "Article II empowers the President to remove, at will, members of multimember boards that wield substantial executive power."   Appl. to Stay Judgments at 12, *Trump v. Wilcox*, No. 24A966 (2025) (Nos. 25-5037, 25-5057); *see also* Letter from Sarah M. Harris, Acting Solicitor General, to Hon. Mike Johnson, Speaker, U.S. House of Representatives (Feb. 25, 2025), http://bit.ly/41tqyzn.   The SEC undisputedly exercises substantial executive power through enforcement actions like this one.   The Solicitor General's position therefore establishes that the SEC's structure—which restricts the President's removal power to "cause"— violates Article II.   When an agency's structure violates the Constitution, enforcement actions brought under that structure must be dismissed.   *See Lucia v. SEC*, 585 U.S. 237, 251-52 (2018).

Historically, the SEC has taken the position that Commissioners can only be removed for cause.   *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 487 (2010). Although this structure was once thought permissible under *Humphrey's Executor*, that is no longer

the case.   The Supreme Court has explicitly acknowledged that the reasoning behind *Humphrey's Executor* has "not withstood the test of time."   *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 n.2 (2020).   Recent Supreme Court decisions in *Seila Law*, *Free Enterprise Fund*, *Collins v. Yellin*, 594 U.S. 220, 259 (2021), and *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), reflect the Court's growing recognition that agencies exercising significant executive power must remain accountable to the President regardless of their particular structure.   The Court clarified in *Seila Law* that *Humphrey's Executor* "permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power," describing the 1935 structure of the Federal Trade Commission.   591 U.S. at 216.   The modern SEC bears little resemblance to the 1935 FTC.   Most critically, the SEC exercises substantial ***executive*** power—it investigates potential violations, brings enforcement actions like this one in federal court, and imposes significant monetary and injunctive relief.   As the Solicitor General, speaking for the United States, recently stated, "[t]he power to seek remedies 'against private parties on behalf of the United States in federal court' is 'a quintessentially executive power not considered in *Humphrey's Executor*.'"   Appl. to Stay Judgments at 16, *Trump v. Wilcox* (quoting *Seila*, 591 U.S. at 219). These functions place the SEC squarely outside the narrow exception carved out by *Humphrey's Executor* for quasi-legislative and quasi-judicial agencies.

The Supreme Court indicated its agreement when it granted the President's emergency request to stay district court orders enjoining the President from removing agency heads without cause.   *Wilcox*, 145 S. Ct. at 1415.   The Court stayed the lower court orders because the President "may remove without cause executive officers who exercise [executive power] on his behalf" and agencies like the NLRB and MSPB "exercise considerable executive power."   *Id.*

(citing *Seila*, 591 U.S. at 215-18).   The Supreme Court's order demonstrates that the SEC's enforcement powers are precisely the type of executive authority that cannot be insulated from presidential control.   Heeding *Wilcox*, the D.C. Circuit has stayed court orders restricting the Executive's removal power.   *See Grundmann v. Trump*, 2025 WL 1840641, at *1 (D.C. Cir. July 3, 2025); *LeBlanc v. United States Priv. & C.L. Oversight Bd.*, 2025 WL 1840591, at *1 (D.C. Cir. July 1, 2025).[25]

The proper remedy for the unconstitutional removal restriction here is dismissal.   This Court may issue relief necessary to prevent Mr. Musk from being subject to adverse action by the SEC, an agency with unconstitutional removal protections.   *See Space Expl. Techs. Corp. v. Nat'l Lab. Rels. Bd.*, No. 24-50627, 2025 WL 2396748, at *2 (5th Cir. Aug. 19, 2025) (upholding preliminary injunction in challenge to ongoing proceeding because "[w]hen an agency's structure violates the separation of powers, the harm is immediate—and the remedy must be, too"). Dismissal is appropriate here because subjecting Mr. Musk to this action by the SEC and its unconstitutional removal protections is a "here-and-now injury" that will be impossible to remedy after the case ends.   *See Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 191 (2023).   In stark contrast to *Collins v. Yellin*, 594 U.S. at 257, where "the only remaining remedial question concern[ed] retrospective relief"—whether to unwind dividend payments made pursuant to an

_____

[25]      In *Harris v. Bessent*, multiple judges in this Circuit also recognized that for-cause removal protections for commissioners of multi-member agencies that exercise significant executive power are likely unconstitutional.   2025 WL 980278, at *14-18, *21-23 (D.C. Cir. Mar. 28, 2025) (Walker & Henderson, JJ., concurring), *vacated on reconsideration en banc*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025).   Judge Walker observed that recent Supreme Court decisions have "consistently declined to extend *Humphrey's* beyond its facts," applying only to "agenc[ies] materially indistinguishable from the 1935 FTC." *Id.* at *9, *12.   Characterizing *Humphrey's Executor* as "a benched quarterback watching ... the original meaning of the Constitution[] from the sideline," Judges Walker and Henderson determined that the NLRB wields "substantial executive power" and therefore must be subject to executive control.   *Id.* at *13-14, *23.

amendment adopted by an Acting Director subject to an unconstitutional removal restriction—this case involves halting an ongoing enforcement proceeding.    This Court therefore can, and should, prospectively dismiss this action without unwinding past agency actions.[26]

To the extent Mr. Musk is required to show harm, harm is evident from both the timing and circumstances of this enforcement action.    In *Collins v. Yellin*, the Supreme Court recognized that "clear[]" harm would be shown where "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way."    594 U.S. at 259-60.    Here, just days before President Trump was sworn into office, the SEC filed suit against Mr. Musk—a vocal critic of the outgoing Administration and a then-key advisor to the incoming Administration.    The President has since condemned the "weaponiz[ation of] the legal force of numerous Federal law enforcement agencies," including the SEC, "against those perceived political opponents in the form of investigations, prosecutions, [and] civil enforcement actions."    Exec. Order No. 14,147, 90 Fed. Reg. 8235 (Jan. 20, 2025).    Dismissal therefore is appropriate and necessary to cure the unconstitutional restrictions on removal of SEC Commissioners.

## CONCLUSION

For the foregoing grounds, this Court should strike the SEC's prayers for injunctive relief and disgorgement, and dismiss the Complaint in its entirety with prejudice.

---

[26]    Alternatively, this enforcement action should be set aside under 5 U.S.C. § 706(2)(B) as "contrary to constitutional right" because it subjects Defendant to proceedings brought by Commissioners whose removal protections the Executive Branch has determined violate the Constitution.

Dated:   August 28, 2025                    QUINN EMANUEL URQUHART
                                            & SULLIVAN, LLP


_____

Sarah Heaton Concannon (D.C. Bar No. 1780045)
Rachel G. Frank (D.C. Bar No. 1659649)
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8000
sarahconcannon@quinnemanuel.com
rachelfrank@quinnemanuel.com

Alex Spiro (*pro hac vice* pending)
295 5th Ave, 9th Floor
New York, NY 10016
(212) 849-7000
alexspiro@quinnemanuel.com

*Attorneys for Elon Musk*

### CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of August 2025, I filed the foregoing motion electronically with the Clerk of Court using the ECF system.

_____

Sarah Heaton Concannon