UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff*,<br><br>v.<br><br>ELON MUSK,<br><br>*Defendant*. | Civil Action No. 25-105 (SLS)<br><br>Judge Sparkle L. Sooknanan |

**MEMORANDUM OPINION**

In the spring of 2022, Elon Musk purchased shares of Twitter, Inc.'s common stock. According to the Securities and Exchange Commission (SEC), the purchase of those shares triggered an obligation to file a report with the SEC disclosing Mr. Musk's Twitter holdings. The SEC sued Mr. Musk, alleging that he violated the Securities Exchange Act of 1934 and Rule 13d-1 promulgated under that Act by filing the required report late. Mr. Musk has moved to transfer this case to the Western District of Texas, or in the alternative, the Southern District of New York. The Court denies that motion.

**BACKGROUND**

The Court draws the facts, accepted as true, from the Plaintiff's Complaint and attachments. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023). The Court also takes "judicial notice of public records from other court proceedings." *Lewis v. Drug Enforcement Admin.*, 777 F. Supp. 2d 151, 159 (D.D.C. 2011).

In January 2022, Mr. Musk directed his personal wealth manager to start purchasing large amounts of Twitter common stock, but not to exceed five percent of Twitter's outstanding common

stock. Compl. ¶ 14, ECF No. 1. The wealth manager instructed a broker dealer to buy the stock, and the broker began doing so on January 31, 2022, and continued to purchase stock throughout February 2022. Compl. ¶ 18. In early March of that year, at Mr. Musk's direction, the wealth manager instructed the broker dealer to buy Twitter stock that would push Mr. Musk past the five percent threshold. Compl. ¶ 22. At the close of trading on March 14, 2022, Mr. Musk "beneficially owned" more than five percent of the outstanding shares of Twitter stock. Compl. ¶ 23.

According to the SEC, passing the five percent threshold triggered a requirement for Mr. Musk to publicly disclose his Twitter holdings by filing a "beneficial ownership report" on a Schedule 13D or, if eligible, Schedule 13G by March 24, 2022. Compl. ¶ 25. But Mr. Musk did not file a Schedule 13G until April 4, 2022. Compl. ¶ 40. Mr. Musk then filed a Schedule 13D on April 5, 2025. Compl. ¶ 43.

Between the March 24 deadline and April 4, Mr. Musk continued to buy large amounts of Twitter common stock, reaching ownership of nearly eight percent of outstanding shares by March 25, 2025, and over nine percent by April 1, 2025. Compl. ¶¶ 28, 37. On April 4, 2025, after Mr. Musk filed the Schedule 13G, Twitter's stock price increased more than twenty-seven percent. Compl. ¶ 42.

On January 14, 2025, the SEC sued Mr. Musk in this Court. The Complaint alleges that Mr. Musk violated Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), and Rule 13d-1, 17 C.F.R. § 240.13d-1. Compl. ¶ 48. It seeks remedies including a civil penalty and disgorgement. Compl. at 9–10.

On August 28, 2025, Mr. Musk filed a Motion to Transfer, asking the Court to transfer this case to the Western District of Texas, or in the alternative the Southern District of New York.

ECF No. 15. That motion is fully briefed and ripe for review. *See* Resp. Opp'n Def.'s Mot. Transfer Venue, ECF No. 20; Reply Supp. Def. Elon Musk's Mot. Transfer Venue, ECF No. 21.

## LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Section 1404(a) is intended "to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.'" *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting *Cont'l Grain Co. v. The FBL–585*, 364 U.S. 19, 26–27 (1960)).

"The threshold question under section 1404(a) is whether the action 'might have been brought' in the transferee district." *SEC v. RPM Int'l, Inc.*, 223 F. Supp. 3d 110, 114 (D.D.C. 2016). "After establishing that the threshold requirement has been met, the Court 'must balance case-specific factors which include the private interests of the parties as well as public interests such as efficiency and fairness.'" *Id.* at 114–15 (quoting *The Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000)). The private-interest factors include: "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof." *Tower Lab'ys, Ltd. v. Lush Cosms. Ltd.*, 285 F. Supp. 3d 321, 325 (D.D.C. 2018) (quoting *Douglas v. Chariots for Hire*, 918 F. Supp. 2d 24, 31 (D.D.C. 2013)). The public-interest factors include: "(1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendar of the transferor and transferee courts; and (3) the local interest in having local controversies decided at home." *Id.* (quoting *Douglas*, 918 F. Supp. 2d at 31). "The burden is on the moving party to establish that transfer is proper." *Id.* (quoting *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996)).

# DISCUSSION

Mr. Musk moves to transfer this case to either the Western District of Texas or the Southern District of New York. After considering all the relevant factors, the Court concludes that neither transfer is warranted.

### A.     Western District of Texas

Mr. Musk first contends that this Court should transfer this case to the Western District of Texas. The SEC concedes that the Western District meets the threshold requirement that the action "might have been brought" there. *See* Opp'n at 8 n.1; *RPM Int'l*, 223 F. Supp. 3d at 114. The Court agrees. "An action may be brought in any judicial district in which 'any defendant resides, if all defendants are residents of the State in which the district is located' or in a district where 'a substantial part of the events or omissions giving rise to the claim occurred.'" *RPM Int'l*, 223 F. Supp. 3d at 114 (quoting 28 U.S.C. § 1391(b)(1)–(2)). The Securities Exchange Act of 1934 also provides that "venue is proper where 'the defendant is found or is an inhabitant or transacts business.'" *Id.* (quoting 15 U.S.C. §§ 77v(a), 78aa). Mr. Musk has proffered sufficient facts to establish that, at a minimum, he transacts business in the Western District of Texas. Decl. Jared Birchall ¶ 1, ECF No. 15-2. Accordingly, the Court proceeds to consider the private- and public-interest factors.

#### 1.     Private Interest Factors

*The Plaintiff's choice of forum*. "Courts ordinarily accord significant deference to a plaintiff's choice of forum," *W. Watersheds Proj. v. Pool*, 942 F. Supp. 2d 93, 97 (D.D.C. 2013), only disturbing that choice if "the balance of convenience is strongly in favor of the defendant," *RPM Int'l*, 223 F. Supp. 3d at 115 (quoting *Gross v. Owen*, 221 F.2d 94, 95 (D.C. Cir. 1955)). But that deference "is diminished where 'that forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter.'" *Wilderness Workshop v. Harrell*, 676

4

F. Supp. 3d 1, 5–6 (D.D.C. 2023) (quoting *Greater Yellowstone Coal. v. Bosworth*, 180 F. Supp. 2d 124, 128 (D.D.C. 2001)); *see also RPM Int'l*, 223 F. Supp. 3d at 115 ("[A]n 'insubstantial factual nexus between the case and the plaintiff's chosen forum' will weaken the deference given to the plaintiff's forum." (quoting *New Hope Power Co. v. U.S. Army Corps of Eng'rs*, 724 F. Supp 2d 90, 95 (D.D.C. 2010))). "Thus, the degree of deference accorded to plaintiffs' choice of forum 'depends on the existence of a connection between the underlying case and this district.'" *W. Watersheds Proj.*, 942 F. Supp. 2d at 97 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 180 (D.D.C. 2009)).

Mr. Musk contends that the SEC's choice of forum receives little deference because the SEC's claim lacks a substantial connection to this District. Mem. P. & A. Supp. Def. Elon Musk's Mot. Transfer Venue at 7, ECF No. 15-1. The Court agrees. In a declaration attached to Mr. Musk's Motion to Transfer, Mr. Musk's wealth manager, Jared Birchall, provides details about the facts alleged in the SEC's Complaint, and the SEC has not disputed Mr. Birchall's representations. Mr. Birchall states that both he and Mr. Musk were in Austin, Texas when Mr. Musk directed him to start making the relevant Twitter stock purchases. Birchall Decl. at ¶ 10. Mr. Birchall then directed a broker dealer in Los Angeles, California to purchase Twitter stock on Mr. Musk's behalf. *Id.* ¶ 12. Mr. Birchall also contacted counsel based in Chicago, Illinois. *Id.* ¶ 14. That counsel eventually filed the Schedule 13G and the Schedule 13D—executed by Mr. Birchall in Austin—via the SEC's Electronic Data Gathering, Analysis, and Retrieval System (EDGAR). *Id.* ¶ 15–16. Finally, Mr. Musk was in Europe when he authorized Mr. Birchall to append his signature to the Schedule 13 G filing, and he was in Texas when the forms were filed. *Id.* ¶ 17.

But it is incorrect to say, as Mr. Musk contends, that the SEC's claim is based on events that "*entirely* took place outside of D.C." Mem. at 7 (emphasis added). "The D.C. Circuit has held that the act of filing SEC documents has a locus in the District of Columbia[.]" *SEC v. Roberts*, No. 07-cv-407, 2007 WL 2007504, at *2 (D.D.C. July 10, 2007) (citing *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1154 n.12 (D.C. Cir. 1978)). Indeed, the Circuit has confirmed that "late filing . . . occurs within the district where the report is finally delivered to the designated agency or official." *Invs. Funding Corp. v. Jones*, 495 F.2d 1000, 1002 (D.C. Cir. 1974). So here, Mr. Musk's allegedly late filing of the Schedule 13D and Schedule 13G is deemed to have occurred in this District, where the SEC is headquartered. *See SEC v. Hutchison*, No. 22-cv-2296, 2023 WL 6529544, at *1 (D.D.C. Sept. 20, 2023).[1]

Nevertheless, the SEC's claim does not necessarily have a substantial connection to this District merely because Mr. Musk's allegedly late filings are deemed to have occurred here. Courts in this District have declined to extend a high degree of deference to the SEC's choice of this District as a forum when, "[o]utside of the filings themselves, no underlying operative facts arose in the District of Columbia." *Roberts*, 2007 WL 2007504, at *3 (quoting *SEC v. Ernst & Young*, 775 F. Supp. 411, 414 (D.D.C. 1991)). And here, the SEC does not identify any other facts that

---

[1] Mr. Musk contends that because the filings were completed via the SEC's EDGAR system, which is run from servers operating in Maryland, the filings should not be deemed to occur in the District of Columbia. Mem. at 8. But to reiterate, "late filing . . . occurs within the district where the report is finally delivered to the designated agency or official." *Invs. Funding Corp. v. Jones*, 495 F.2d 1000, 1002 (D.C. Cir. 1974); *see also* 17 C.F.R. § 240.0–3(a) ("All papers required to be filed with the Commission . . . shall be filed at the principal office in Washington, D.C."). Mr. Musk cites no authority for the proposition that an agency running its filing-system server in another district means that the report is "finally delivered" to that other district, rather than to the one where the agency is based. *Cf. SEC v. Hutchison*, No. 22-cv-2296, 2023 WL 6529544, at *1 (D.D.C. Sept. 20, 2023) ("Even if Hutchison is correct that venue is proper in Maryland, where the Commission's EDGAR system is located, venue does not lie there to the exclusion of the District of Columbia." (citation omitted)).

6

support the SEC's choice of forum. Opp'n at 9. Accordingly, this factor weighs only slightly against transfer. *See Roberts*, 2007 WL 2007504, at *2 ("[T]he presumption in favor of a plaintiff's choice of forum is stronger in cases arising under the federal securities laws because the specific venue provision evinces Congressional intent to allow plaintiffs in securities cases the widest possible choice of forums in which to sue.").

*The Defendant's choice of forum.* "While a defendant's choice of forum is a consideration when deciding a § 1404(a) motion, it is not ordinarily entitled to deference. And here, where [Mr. Musk] move[s] to transfer over [the SEC's] opposition, [he] must establish that the added convenience and justice of litigating in [his] chosen forum overcomes the slight deference given to [the SEC's] choice." *Tower Lab'ys*, 285 F. Supp. 3d at 326. Mr. Musk notes that he resides in the Western District of Texas, but he does not identify other facts supporting that his forum preference should be given unusual weight. *See* Birchall Decl. ¶ 5; Mem. at 7–9; *see also Roberts*, 2007 WL 2007504, at *3 (affording weight to the defendant's choice of forum because the "defendant is facing criminal charges in" his chosen forum "stemming out of exactly the same conduct at issue in this case"). Although the Court credits the convenience for Mr. Musk to litigate in his home forum in the convenience-of-the-parties factor below, Mr. Musk's choice of the Western District of Texas is not otherwise entitled to weight.

*Whether the claim arose elsewhere.* "Transfer is favored when 'the material events that form the factual predicate of the plaintiff's claim did not occur in the plaintiff's chosen forum.'" *RPM Int'l*, 223 F. Supp. 3d at 116 (quoting *Sheffer v. Novartis Pharms. Corp.*, 873 F. Supp. 2d 371, 376 (D.D.C. 2012)). But "[w]here claims arise from actions in several fora, 'this factor does not weigh in favor or against transfer.'" *Tower Lab'ys*, 285 F. Supp. 3d at 326. Mr. Musk contends that "not a single event of relevance to the Complaint took place in Washington, D.C." Mem. at 7

(emphasis omitted). The Court disagrees. As discussed, Mr. Musk's allegedly late filings are deemed to have occurred in this District. *See Jones*, 495 F.2d at 1002. But it is true that the other relevant events occurred in a variety of places outside this District: Austin (where the decision to begin purchasing Twitter stock occurred), Los Angeles (where the broker dealer purchased the stock from), Chicago (where counsel filed the Schedule 13G and Schedule 13D from), and Europe (where Mr. Musk was when he authorized Mr. Birchall to sign the Schedule 13G on his behalf). Birchall Decl. ¶¶ 10, 12, 14–17. Contrast the diffuseness of these events with cases concerning claims arising from facts with a clear center of gravity outside this District. *See, e.g.*, *Roberts*, 2007 WL 2007504, at *3 (key meetings and an internal investigation occurred in Northern California); *Ernst & Young*, 775 F. Supp. at 414 (audits, loans, and partnerships occurred in Texas). Here, the SEC's claim "arose from actions in several fora," and therefore this factor is neutral. *See Hutchison*, 2023 WL 6529544, at *1 (cleaned up).

*The convenience of the parties*. Mr. Musk contends that litigating this case in this District would impose "substantial burdens" on him because he is "an incredibly busy individual" and "it is unlikely [he] could attend an entire trial in Washington, D.C." Mem. at 9. The SEC does not dispute these representations. The Court takes Mr. Musk's convenience seriously, but it also notes that Mr. Musk has considerable means and spends at least forty percent of his time outside his chosen forum. *See* Birchall Decl. ¶ 5. Indeed, although Mr. Musk may have "rarely" traveled to this District in recent months, Mr. Musk's brief itself indicates that he has spent substantial time here this year. *See* Mem. at 4.

For its part, the SEC argues that transfer would inconvenience it. Opp'n at 11. It represents that "the assigned trial attorneys work out of the SEC's headquarters in the District of Columbia." *Id.* A court in this District has considered relevant that SEC "staff working on" the case "[were]

located" in the District of Columbia, even though the SEC had a regional office closer to the defendant's preferred forum. *Roberts*, 2007 WL 2007504, at *4. But the weight of cases in this District hold that "[t]he fact that plaintiffs' counsel is in the District of Columbia is of little significance" to a § 1404(a) analysis. *See, e.g.*, *W. Watersheds Proj.*, 942 F. Supp. 2d at 100 (quoting *Kazenercom TOO v. Turan Petroleum, Inc.*, 590 F. Supp. 2d 153, 163 (D.D.C. 2008)). Accordingly, the Court affords little weight to the SEC's claimed inconveniences. *See Ernst & Young*, 775 F. Supp. at 415 ("[T]he concerns raised seem to relate far more to the convenience of SEC attorneys than to the SEC itself."). This factor weighs slightly in favor of transfer.

*The convenience of the witnesses.* The SEC contends that this factor is only relevant "to the extent that the witnesses may actually be unavailable for trial in one of the fora." Opp'n at 12 (quoting *SEC v. Daly*, No. 05-cv-55, 2006 WL 6190699, at *4 (D.D.C. Feb. 11, 2006)). The SEC is correct that some courts in this District appear to have placed that limitation on this factor. *See, e.g.*, *Patel v. Mayorkas*, No. 23-cv-1522, 2024 WL 1344451, at *3 (Mar. 28, 2024); *RPM Int'l*, 223 F. Supp. 3d at 117; *Daly*, 2006 WL 6190699, at *4. But others appear to have not. *See, e.g.*, *US Dominion, Inc. v. Herring Networks, Inc.*, 639 F. Supp. 3d 143, 160 (D.D.C. 2022); *Tower Lab'ys*, 285 F. Supp. 3d at 326; *Roberts*, 2007 WL 2007504, at *4. The Court observes that 28 U.S.C. § 1404(a) says that the "the convenience of the . . . witnesses" is relevant to a transfer decision, seemingly without any availability-based limitation. But since this potential limitation is ultimately inconsequential to the Court's conclusion on this factor, the Court assumes without deciding that it may consider the witnesses' convenience in all respects.

Mr. Musk argues that proceeding with the case in this District would substantially burden "key percipient witnesses." Mem. at 9. The key witnesses, according to Mr. Musk, are himself and Mr. Birchall, who are located in Texas, and the broker dealer, who is located in Los Angeles. Reply

9

at 8. The SEC says nothing about these witnesses' convenience, nor does it identify relevant witnesses other than those identified by Mr. Musk. *See* Opp'n at 12–14. Neither Party's representations, however, provide a basis for the Court to weigh this factor heavily. "To make a strong showing on this factor, the moving party must specify 'what a nonresident witness will testify to, the importance of the testimony to the issues in the case, and whether that witness is willing to travel to a foreign jurisdiction.'" *Sheffer v. Novartis Pharms. Corp.*, 873 F. Supp. 2d 371, 378 (D.D.C. 2012) (quoting *Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc.*, 196 F. Supp. 2d 21, 33 (D.D.C. 2002)). Rather than providing details about the potential testimony of witnesses other than Mr. Birchall, as well as their ability to travel, Mr. Musk—and, for that matter, the SEC—addresses this factor only briefly and generally. *See* Reply at 8; Opp'n at 12–14. The Court has only the thinnest basis to assess the relative convenience of this District versus the Western District of Texas for the broker dealer in Los Angeles, the counsel in Chicago, or yet-to-be-identified recordkeepers whose testimony will presumably be needed to litigate this case. Given the limited facts before the Court, where it seems that "witnesses 'are spread out across the country,'" the Court concludes that this factor is neutral. *See Hutchison*, 2023 WL 6529544, at *1 (quoting *US Dominion*, 639 F. Supp. 3d at 160); *see also US Dominion*, 639 F. Supp. 3d at 160 ("Although Colorado may be more convenient for some witnesses, the District of Columbia will likely be more convenient for others.").

*The ease of access to sources of proof.* Mr. Musk states that "[e]vidence is also located in Texas." Mem. at 9; Birchall Decl. ¶ 18 ("The majority of the evidence . . . relevant to this action [is] located in Texas."); Reply at 7 ("[B]usiness records and communications in this case are predominantly located in Texas[.]"). However, "[m]odern technology allows most documentary evidence to be easily transferred. Hence, the location of documents is much less important to

10

determining the convenience of the parties than it once was." *Sheffer*, 873 F. Supp. 2d at 378 (citation omitted). The SEC's claims rest in large part on publicly available filings that can be accessed in any forum, Opp'n at 11, and Mr. Musk's non-specific references to records in Texas do not move the needle. This factor is neutral.

### 2. Public Interest Factors

*The transferee's familiarity with the governing laws*. "[A]ll federal courts are presumed equally familiar with the federal statutes at issue here[.]" *Hutchison*, 2023 WL 6529544, at *1. The Parties agree that this factor is neutral, and the Court also agrees. *See* Mem. at 10; Opp'n at 16.

*The relative congestion of the transferor and transferee courts*. To assess this factor, courts in this District have considered statistics including the average number of cases pending per judgeship and the median times from filing to disposition or trial. *See, e.g.*, *W. Watersheds Proj.*, 942 F. Supp. 2d at 101–02; *Sheffer*, 873 F. Supp. 2d at 380. The Parties draw their information from statistics published by the Judiciary, and the Court relies on that source as well. *See* Mem. at 10; Opp'n at 15–16. The most recent data available from the Judiciary show:

- This District has an average of 452 cases pending per judgeship, versus 791 pending cases per judgeship in the Western District of Texas.[2]

- The median time from filing to disposition in this District is 7.5 months, versus 7.8 months in the Western District.

- The median time from filing to trial in this District is 52.4 months, versus 32.8 months in the Western District.

---

[2] The Court also notes that the Western District of Texas currently has two vacant judgeships, so the number of pending cases per active judge is in fact even higher there. *Current Judicial Vacancies*, U.S. Courts (last visited Sept. 22, 2025), https://www.uscourts.gov/data-news/judicial-vacancies/current-judicial-vacancies [https://perma.cc/4VRY-82D3].

*Federal Court Management Statistics*, U.S. Courts (June 30, 2025), https://www.uscourts.gov/sites/default/files/document/fcms_na_distprofile0630.2025.pdf [https://perma.cc/4AMU-NVJD].

The Court considers significant that the average number of cases per judgeship is much higher in the Western District of Texas than in this District. Mr. Musk contends that the Western District's figure is "artificially inflated" because "roughly half of all the cases filed there are criminal immigration matters, which are typically quickly resolved by pleas." Reply at 9. The Court is skeptical that judges in the Western District would consider their heavy workloads to be "artificially inflated," even if many of their cases are resolved quickly. The Court concludes that the average cases per judgeship is an indication that the Western District is more congested than this Court. The Court recognizes that the median time from filing to trial is much higher in this district than in the Western District of Texas. Still, "this Court individually does not have a congested calendar and could proceed with reasonable alacrity." *Tower Lab'ys*, 285 F. Supp. 3d at 327. Overall, this factor weighs against transfer.

*The local interest in having local controversies decided at home*. "Each state has 'an interest in redressing the harms of its citizens.'" *Sheffer*, 873 F. Supp. 2d at 381 (quoting *MacMunn v. Eli Lilly Co.*, 559 F. Supp. 2d 58, 63 (D.D.C. 2008)). But "when national significance attaches to a controversy, local interest can sometimes be diminished." *Id.* Mr. Musk argues that Texas "has a legitimate interest in adjudicating the conduct of a Texan . . . concerning decisions made in Texas and acted upon in Texas." Reply at 9. But Mr. Musk overstates the extent of this case's connection to Texas. As described above, the SEC's claim concerns conduct that occurred in many places across the country. And the harm alleged by the SEC was to "investors selling Twitter common stock between March 25, 2022 and April 1, 2022." Compl. ¶ 46. Neither this District nor the

12

Western District of Texas can claim a uniquely strong interest in redressing the alleged harms of such a widely dispersed population. Because the securities-law violation alleged by the SEC is "national in scope," this factor is neutral. *See Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 13 (D.D.C. 2007).

* * *

Balancing these factors together, the Court concludes that Mr. Musk has not met his burden to show that discretionary transfer under 28 U.S.C. § 1404(a) to the Western District of Texas is warranted. "As to the private-interest factors, neither party's choice of forum is entitled to much deference here, and the 'claims ar[o]se from actions in several fora,'" with witnesses "spread out across the country" and access to proof not being "easier in one district than another." *Hutchison*, 2023 WL 6529544, at *1 (first quoting *Tower Lab'ys*, 285 F. Supp. 3d at 325–26; and then quoting *US Dominion*, 639 F. Supp. 3d at 160). The public-interest factors are similarly largely a wash, although the relative congestion of the Western District weighs against transfer. Under these circumstances, the Court declines to transfer this case to the Western District of Texas.

### B.   Southern District of New York

In the alternative, Mr. Musk moves for this Court to transfer this case to the Southern District of New York. Mr. Musk suggests that this case "might have been brought" in the Southern District, 28 U.S.C. § 1404(a), because he "transacts business" there via trades executed on the New York Stock Exchange, 15 U.S.C. § 78aa. Reply at 9. Because the Court concludes that transfer is not warranted for the convenience of the parties and witnesses or in the interest of justice, the Court assumes without deciding that this connection is sufficient to establish venue.

Mr. Musk identifies only one consideration to support transfer to the Southern District of New York: that there is a related putative securities class action pending there. In the class action,

Twitter investors claim that Mr. Musk violated the securities laws by late filing his Schedule 13D and Schedule 13G. *See* Am. Compl., *Okla. Firefighters Pension & Ret. Sys. v. Musk*, No. 22-cv-3026 (S.D.N.Y. May 28, 2024); *see also* ECF No. 2 (providing notice of the class action as a related case). Given this factual overlap, Mr. Musk contends that "[t]ransfer of this case to the Southern District of New York would enable 'expertise that Court might gain in one suit to be applied to the benefit of efficiency in the other' and reduce burdens on Mr. Musk and percipient witnesses." Mem. at 11 (citation omitted) (quoting *SEC v. Page Airways Inc.*, 464 F. Supp. 461, 465 (D.D.C. 1978)). The SEC contends that Mr. Musk overstates the potential for efficiency, as the facts necessary to establish the SEC's strict-liability claim here have been conceded by Mr. Musk in the class action. Opp'n 23–24.

It is true that courts in this District have recognized that "[t]he interests of justice are better served when a case is transferred to the district where related actions are pending." *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 56 (D.D.C. 2000) (quoting *Martin-Trigona v. Meister*, 668 F. Supp. 1, 3 (D.D.C. 1987)). "There are two primary reasons for this: First, significant judicial efficiencies can be realized when two related cases are consolidated." *Davis v. MTN Irancell Telecomms. Servs. Co.*, Nos. 22-cv-829, 22-cv-830, 2023 WL 2755415, at *5 (D.D.C. Mar. 30, 2023). "Second, courts have often found transfer appropriate 'to avoid subjecting a defendant to the grave risk of inconsistent judgments deriving from the same conduct.'" *Id.* (quoting *FTC v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 29 (D.D.C. 2008)).

Neither rationale provides much support for transfer here. The Parties agree that the SEC's case cannot be consolidated with the class action without the SEC's consent, which the SEC has represented it will not give. *See* Opp'n at 24; Reply at 10 n.7; 15 U.S.C. § 78u(g) (requiring the SEC's consent before any of its claims "for equitable relief" may be consolidated with actions not

brought by the SEC). And "considerations of efficiency 'need not be given significant weight, or even any weight [in the transfer analysis] . . . if there is no realistic possibility of consolidating the pending litigation with the related cases.'" *Davis*, 2023 WL 2755415, at *5 (alterations in original) (quoting 15 Wright & Miller's Federal Practice & Procedure § 3854 (4th ed. 2025)). The risk of inconsistent judgments is also not "particularly acute" here, where Mr. Musk has not suggested that he may face "'inconsistent orders' or conflicting injunctions leading to irreconcilable legal obligations." *Id.* (quoting *Cal. Farm Bureau Fed'n v. Badgley*, No. 02-cv-2328, 2005 WL 1532718, at *2 (D.D.C. June 29, 2005)). Further, Mr. Musk does not dispute the SEC's representation that in the class action he has conceded the very factual allegations that underlie the SEC's claim here. *See* Reply at 10. And even if Mr. Musk "prevail[s] in one forum and not in the other, that result would not be an untenable one; to the contrary, such a prospect is a matter of daily life for" those who face securities liability "in multiple jurisdictions." *Davis*, 2023 WL 2755415, at *6.

Finally, the Court doubts that there is much "expertise," Mem. at 11, to be gained in the class action that can be leveraged for efficiency in this case. *See Reiffin*, 104 F. Supp. 2d at 56. Although Mr. Musk has not yet indicated whether he disputes the SEC's factual representations in this case, he has filed a Motion to Strike and Dismiss, raising several constitutional arguments for dismissal and challenging the equitable relief sought by the SEC. ECF No. 16. These issues, of course, are not ones raised in the private class action seeking damages. In sum, given that the legal issues in these cases do not yet seem to overlap, and given the relatively simple factual predicate underlying the SEC's claim, the Court sees little efficiency to be gained through transfer.

Mr. Musk does not base his request for transfer to the Southern District of New York on the public- or private-interest factors. Although the Court's discussion above largely applies

15

identically to the factors' application here, there are three differences that the Court addresses for completeness's sake. First, transfer would mean that the claim would no longer be litigated where Mr. Musk's filings are deemed to have been made. *See Roberts*, 2007 WL 2007504, at *3. Second, there are potential convenience gains for Mr. Musk and Mr. Birchall from appearing in the same forum as the class action. Still, these gains are no greater than the convenience gains of the Western District of Texas, which was not enough to tip the balance in favor of transfer. Third, the Southern District of New York is not meaningfully less congested than this Court, although it certainly seems less congested than the Western District of Texas. *See Federal Court Management Statistics*, *supra* (identifying an average of 591 pending cases per judgeship, a median of 5.6 months from filing to disposition of civil matters, and a median of 34.2 months from filing to trial in civil matters). These differences do not change the calculus enough to make transfer warranted.

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Musk's Motion to Transfer, ECF No. 15. A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date: October 2, 2025