## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

*Plaintiff*,

v.

ELON MUSK,

*Defendant*.

Case No. 25-cv-00105-SLS

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE AND DISMISS

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

LEGAL STANDARDS ........................................................................................... 2

    A.   Motion to Strike Pursuant to Rule 12(f) ........................................... 2

    B.   Motion to Dismiss Pursuant to Rule 12(b)(6) ................................... 3

ARGUMENT .......................................................................................................... 3

I.    The Court Should Deny Musk's Motion to Strike Certain Relief ........................ 3

    A.   A Permanent Injunction Is an Appropriate Remedy ....................... 4

    B.   Disgorgement Is an Appropriate Remedy ...................................... 11

        1)   Musk's Disgorgement Arguments Are Premature ............................ 11

        2)   The SEC's Complaint Provides Allegations Sufficient to Support a Request for Disgorgement ...................................................... 12

        3)   The SEC's Request for Disgorgement Is Constitutional ..................... 19

II.   The Court Should Deny Musk's Motion to Dismiss ............................................ 22

    A.   Section 13(d) Does Not Violate the First Amendment ................... 22

        1)   *Zauderer*'s Standard of Review Applies .............................. 23

        2)   The Statute and Rule Satisfy *Zauderer*'s Standard ........................... 24

        3)   Musk's Challenge Also Fails Under *Central Hudson* .......................... 29

        4)   Strict Scrutiny Does Not Apply .................................................. 33

    B.   Section 13(d) and Rule 13d-1 Are Not Void for Vagueness ......................... 34

    C.   The Doctrine of Selective Enforcement Does Not Apply........................... 39

        1)   The SEC Regularly Enforces Section 13(d) ............................................ 39

        2)   A Prayer for Disgorgement Does Not Infringe Musk's Constitutional Rights ......................................................................................... 42

    D.   The Commission's Structure Is Constitutional ........................................... 43

        1)   Musk Has Not Shown Any Limits to Removal .................................... 43

        2)   Musk Does Not Show Harm from Commissioners' Purported Removal Protections ...................................................................................... 44

CONCLUSION....................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Aaron v. SEC*, 446 U.S. 680 (1980) ................................................................ 6

*Am. Hosp. Ass'n v. Azar*, 983 F.3d 528 (D.C. Cir. 2020) ...................................... 24, 29

*\*Am. Meat Inst. v. U.S. Dep't of Agric.*,
   760 F.3d 18 (D.C. Cir. 2014) (en banc) ("AMI") ............................................. passim

*Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928 (D.C. Cir. 1982) ...................... 39

*Beckles v. U.S.*, 580 U.S. 256, 266 (2017) .......................................................... 35

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................ 3

*Bender v. Jordan*, 439 F. Supp. 2d 139 (D.D.C. 2006) ............................................ 28

*Carlucci v. Doe*, 488 U.S. 93 (1988) ................................................................ 44

*\*Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*,
   447 U.S. 557 (1980) ..................................................................... 29, 30

*CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174 (2d Cir. 2023) ............. 45

*\*Chamber of Com. of United States v. SEC*, 85 F.4th 760 (5th Cir. 2023) ........ passim

*Cheffer v. Reno*, 55 F.3d 1517 (11th Cir. 1995) .................................................. 19

*Collins v. SEC*, 736 F.3d 521 (D.C. Cir. 2013) .................................................... 20

*\*Collins v. Yellen*, 594 U.S. 220 (2021) ........................................................... 45

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
   654 F.3d 276 (2d Cir. 2011) ............................................................. 36, 38

*CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832 (9th Cir. 2019) ............. 26

*Davenport v. Washington Educ. Ass'n*, 551 U.S. 177 (2007) .................................... 33

*Edelson v. Ch'ien*, 405 F.3d 620 (7th Cir. 2005) ................................................ 28

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ................... 44

*Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024),
   *aff'd*, 606 U.S. 461 (2025) ............................................................ 26

*Full Value Advisors, LLC v. SEC*, 633 F.3d 1101 (D.C. Cir. 2011) ........................... 23

*GAF Corp. v. Milstein*, 453 F.2d 709 (2d Cir. 1971) ............................................ 30

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .............................................. 35

*Guy v. Absopure Water Co., LLC*, No. 20-12734,
   2024 WL 1344240 (E.D. Mich. Mar. 29, 2024) ........................................... 8

*Henkel v. U.S. Dep't of Educ.*, No. 24-cv-01676-SLS,
   2025 WL 2049267 (D.D.C. July 22, 2025) ............................................ 3, 4

*In re E.S. Bankest, L.C.*, No. 04-17602-BKC-AJC, 2006 WL 3922112 (Bankr. S.D. Fla. Dec. 14, 2006) .................................................................................. 38

*In re Evergreen Sec., Ltd.*, 570 F.3d 1257 (11th Cir. 2009) ......................................... 43

*K&R Contractors, LLC v. Keene*, 86 F.4th 135 (4th Cir. 2023) .................................. 45

*Kaufmann v. Kijakazi*, 32 F.4th 843 (9th Cir. 2022) .................................................. 45

*Keim v. U.S.*, 177 U.S. 290 (1900) ............................................................................. 44

*Kimberly-Clark Corp. v. D.C.*, 286 F. Supp. 3d 128 (D.D.C. 2017) ............................ 25

*Leachco, Inc. v. CPSC*, 103 F.4th 748 (10th Cir. 2024) ............................................. 45

*\*Liu v. SEC*, 591 U.S. 71, 87 (2020) ................................................................... 11, 15

*\*Matiella v. Murdock St. LLC*, No. 21-cv-2112 (GMH),
2023 WL 4684854 (D.D.C. July 21, 2023) ...................................................... 2, 3, 4

*Matthews v. D.C.*, 507 F. Supp. 3d 203 (D.D.C. 2020) ......................................... 19, 20

*Monsalvo v. Bondi*, 604 U.S. 712 (2025) .................................................................. 36

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ........................................................ 29

*Nano Dimension Ltd. v. Murchinson Ltd.*, 102 F.4th 136 (2d Cir. 2024) .................... 10

*Nat'l Ass'n of Broadcasters v. Fed. Commc'ns Comm'n*,
147 F.4th 978 (D.C. Cir. 2025) ("NAB") ......................................................... 33

*Nat'l Ass'n of Mfrs. v. SEC.*, 800 F.3d 518 (D.C. Cir. 2015) ("NAM") ................. 26, 27

*Nwachukwu v. Karl*, 216 F.R.D. 176 (D.D.C. 2003) ................................................. 2, 3

*Pimentel v. City of Los Angeles*, 115 F.4th 1062 (9th Cir. 2024) ................................ 19

*R.J. Reynolds Tobacco Co. v. Food & Drug Admin.*, 696 F.3d 1205 (D.C. Cir. 2012),
*overruled on other grounds by AMI*, 760 F.3d 18 (D.C. Cir. 2014) ...................... 26

*Riley v. Tan'l Fed'n of the Blind*, 487 U.S. 781 (1988) .............................................. 23

*Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49 (1975) ....................................... 9, 10, 28

*S.E.C. v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290 (S.D.N.Y. 2015) ...................... 11

*SEC v. Abarbanel*, No. 1:21-cv-5429 (AS),
2025 WL 1903792 (S.D.N.Y. July 10, 2025) ........................................................ 4

*SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023) ............................................................. 18

*SEC v. Aronson*, 665 F. App'x 78 (2d Cir. 2016) ..................................................... 13

*SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703 (S.D.N.Y. 2022) ........................................ 34

*SEC v. Bausch & Lomb Inc.*, 565 F.2d 8 (2d Cir. 1977) .............................................. 6

*\*SEC v. Bilzerian*, 814 F. Supp. 116 (D.D.C. 1993),
*aff'd,* 29 F.3d 689 (D.C. Cir. 1994) ................................................................... 36

*SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20 (D.D.C. 2024) ........................... 17

*SEC v. Brown*, 878 F. Supp. 2d 109 (D.D.C. 2012)...................................................... 6

*SEC v. Buntrock*, No. 02-cv-2180, 2004 WL 1179423 (N.D. Ill. May 25, 2004)......... 11

*SEC v. City of Rochester, New York*, 731 F. Supp. 3d 455 (W.D.N.Y. 2024) ............ 24

*SEC v. Crowd Mach., Inc.*, No. 4:22-cv-0076-HSG,
    2023 WL 8438553 (N.D. Cal. Dec. 5, 2023) ............................................................ 13

*SEC v. Crystal World Holdings, Inc.*, No. 1:19-cv-02490 (CJN), 2025 WL 326593
    (D.D.C. Jan. 28, 2025) *appeal filed*, No. 25-5050 (D.C. Cir. March 3, 2025) ... 15, 16

*SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587 (S.D.N.Y. 1993)............... 38

*SEC v. E-Smart Technologies*, 139 F. Supp. 3d 170 (D.D.C. 2015). ......................... 14

*\*SEC v. First City Fin. Corp.*, 688 F. Supp. 705 (D.D.C. 1988) ................................. 14

*\*SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) ........................ passim

*SEC v. First Pac. Bancorp*, 142 F.3d 1186 (9th Cir. 1998) ...................................... 13

*SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023) .................................................................. 15

*SEC v. Johnson*, 595 F. Supp. 2d 40 (D.D.C. 2009)..................................................... 6

*SEC v. Liu*, No. 21-56090, 2022 WL 3645063 (9th Cir. Aug. 24, 2022)
    *cert. denied*, 143 S. Ct. 2495 (2023) ...................................................................... 13

*\*SEC v. MacDonald*, 699 F.2d 47 (1st Cir. 1983)................................................. 18, 19

*SEC v. Mannion*, 28 F. Supp. 3d 1304 (N.D. Ga. 2014) ........................................... 13

*SEC v. Musk*, No. 18-cv-8865 (LJL) 2022 WL 1239252 (S.D.N.Y. April 27, 2022) ... 43

*SEC v. Musk*, No. 22-1291, 2023 WL 3451402 (2d Cir. May 15, 2023),
    *cert. denied,* 144 S. Ct. 1457, 218 L. Ed. 2d 689 (2024) ....................................... 43

*SEC v. Musk*, No. 23-MC-80253-LB,
    2024 WL 1511903 (N.D. Cal. Feb. 10, 2024) ......................................................... 43

*SEC v. Musk*, No. 3:23-mc-80253-JSC,
    2024 WL 2875096 (N.D. Cal. May 14, 2024).......................................................... 43

*SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. 682 (D.D.C. 1978)........................... 6

*SEC v. Navellier & Assocs., Inc.*, 108 F.4th 19 (1st Cir. 2024),
    *cert. denied,* No. 24-949, 2025 WL 1603606 (U.S. June 6, 2025),
    *reh'g denied*, 2025 WL 2382100 (U.S. Aug. 18, 2025)............................................. 15

*SEC v. Sargent*, 329 F.3d 34 (1st Cir. 2003)................................................................ 6

*\*SEC v. Savoy Indus., Inc.*, 587 F.2d 1149 (D.C. Cir. 1978) ............................. passim

*SEC v. Seghers*, 298 Fed. App'x 319 (5th Cir. 2008) ................................................ 13

*SEC v. Shapiro*, 494 F.2d 1301 (2d Cir. 1974)........................................................... 13

*SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321 (6th Cir. 2013) ............................ 6

**SEC v. Sripetch*, 154 F.4th 980, 982 (9th Cir. 2025), *cert. filed*, No. 25-466 ........... 15

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ......................................................... 8

*SEC v. Teo*, 746 F.3d 90 (3d Cir. 2014) ................................................................. 10, 11

**SEC v. Wall Street Publishing Institute, Inc.*, 851 F.2d 365 (D.C. Cir. 1988) ... 23, 33

*SEC v. Whittemore*, 659 F.3d 1, 11 (D.C. Cir. 2011) .................................................... 14

*SEC v. Yang*, 2014 WL 2198323 (N.D. Ill. May 27, 2014) .......................................... 14

*Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) ......................... 32

*Shurtleff v. U.S.*, 189 U.S. 311 (1903) ......................................................................... 44

**Simba v. Fenty*, 754 F. Supp. 2d 19 (D.D.C. 2010) ............................................... 4, 11

*Timbs v. Indiana*, 586 U.S. 146 (2019) ........................................................................ 21

*Trimmer v. Barnes & Noble, Inc.*, 31 F. Supp. 3d 618 (S.D.N.Y. 2014) ....................... 8

*U.S. v. AT&T Inc.*, 290 F. Supp. 3d 1 (D.D.C. 2018) ................................................... 40

*U.S. v. Bajakajian*, 524 U.S. 321 (1998) ............................................................... 19, 20

*U.S. v. Bikundi*, 926 F.3d 761 (D.C. Cir. 2019) ..................................................... 20, 21

*U.S. v. Bronstein*, 849 F.3d 1101 (D.C. Cir. 2017) ...................................................... 35

*U.S. v. Dubose*, 146 F.3d 1141 (9th Cir. 1998),
*as amended on denial of reh'g* (Aug. 31, 1998) .......................................................... 21

*U.S. v. Google, LLC*, 692 F. Supp. 3d 583 (E.D. Va. 2023) ........................................ 39

*U.S. v. Leeds*, No. 1:22-cv-00379-AKB, 2025 WL 743996 (D. Idaho Mar. 7, 2025) ... 19

*U.S. v. Marshall*, 77 F. Supp. 2d 764 (N.D. Tex. 1999) .............................................. 43

*U.S. v. McBride*, 908 F. Supp. 2d 1186 (D. Utah 2012) ................................................ 8

*U.S. v. Philip Morris USA*, 310 F. Supp. 2d 58 (D.D.C. 2004) .................................... 20

*U.S. v. Sterlingov*, 755 F. Supp. 3d 17 (D.D.C. 2024) ................................................. 19

*U.S. v. Wenger*, 292 F. Supp. 2d 1296 (D. Utah 2003),
*aff'd,* 427 F.3d 840 (10th Cir. 2005) ..................................................................... 24, 30

*Valibeigi v. District of Columbia*, No. 1:22-cv-3149-TJK,
2024 WL 4332626 (D.D.C., Sept. 27, 2024) ............................................................ 39, 40

*Vill. of Hoffman Ests. v. Flipside, Hoffman Est.*, 455 U.S. 489 (1982) ...................... 34

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) ....................................................... 32

**Zacharias v. SEC*, 569 F.3d 458 (D.C. Cir. 2009) .................................................... 15

**Zauderer v. Off. of Disciplinary Couns. of the Supreme Ct. of Ohio*,
471 U.S. 626 (1985) .............................................................................. 22, 23, 24

## Statutes

15 U.S.C. § 78d................................................................................................. 43, 44

15 U.S.C. § 78m............................................................................................... 25, 33

15 U.S.C. § 78u......................................................................................... 4, 11, 17, 21

## Other Dockets

*Okla. Firefighters v. Musk*, No. 1:22-cv-03026 (S.D.N.Y.)........................................... 22

*SEC v. Bandfield*, No. 1:14-cv-05271 (S.D.N.Y.) ...................................................... 41

*SEC v. Blech*, No. 12-cv-3703-AJN, (S.D.N.Y.)....................................................... 42

*SEC v. Lefkowitz*, No. 8:12-cv-1210-MSS-MAP (M.D. Fla.)........................................ 41

*SEC v. McKillop*, No. 1:19-cv-00852-RBW (D.D.C.) .................................................. 41

*SEC v. Musk*, No. 1:18-cv-8865 (S.D.N.Y.) .............................................................. 5

*SEC v. Sonfield*, No. 4:08-cv-02351 (S.D. Tex.) ........................................................ 42

## Rules and Regulations

"Modernization of Beneficial Ownership Reporting" Final Rule, 88 FR 76896 (Oct. 10, 2023) (effective Feb. 5, 2024) ...................................................................... 37

17 C.F.R. § 240.13d-1................................................................................................ 33

17 C.F.R. § 240.13d-101............................................................................................ 25

Fed. R. Civ. P. 12(b)................................................................................................... 3

Fed. R. Civ. P. 12(f).................................................................................................... 2

## Other Authorities

"Modernization of Beneficial Ownership Reporting," Securities Act Rel. No. 33-11030; Exchange Act Rel. No. 94211; File No. S7-06-22, 2022 WL 20814745 n.3 (Feb. 10, 2022) ........................................................................................... 37

111 Cong. Rec. 28257 (Oct. 22, 1965)........................................................... 30, 31

116 Cong. Rec. 3024 (Feb. 10, 1970) .................................................................. 32

116 Cong. Rec. 40188 (Dec. 7, 1970) .................................................................. 32

Random House Webster's Unabridged Dictionary 510 (2d ed. 2001)........................ 36

Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) ................. 17

Restatement (Third) of Restitution and Unjust Enrichment § 53 (2011) ................. 17

SEC Press Release 2022-22, "SEC Proposes Rule Amendments to Modernize
Beneficial Ownership Reporting" (Feb. 10, 2022) ............................................ 37, 39

*The Timing of Schedule 13D*, Forum on Corporate Governance Law, Harvard Law
School (2019), available at https://corpgov.law.harvard.edu/2019/06/23/the-timing-
of-schedule-13d/ ......................................................................................................... 38

# INTRODUCTION

Defendant Elon Musk violated Section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 13d-1 thereunder by failing to file a Schedule 13D (or if eligible, a Schedule 13G) within ten days of acquiring beneficial ownership of more than five percent of the outstanding shares of Twitter common stock. Compl. ¶ 1, ECF No. 1. Musk benefited from his violation because he kept purchasing Twitter shares even after he missed the deadline, which allowed him to underpay for those shares by at least $150 million. *Id.* Musk's violation also harmed investors because those who sold Twitter stock after Musk's deadline but before he finally disclosed his stake sold their shares "at artificially low prices and thus suffered substantial economic harm." *Id.* ¶ 5. By depriving investors of information to which they were entitled under Section 13(d) and Rule 13d-1 thereunder, Musk caused the precise investor harm Congress sought to prevent when enacting the statute.

Musk does not challenge the adequacy of the allegations supporting the SEC's claim, instead he moves to strike two types of requested relief—a permanent injunction and disgorgement—and raises various constitutional challenges.

Musk has not come close to carrying his burden to show that striking a plea for certain remedies would be appropriate. This Court should decide what relief is appropriate only after a finding of liability and only after discovery and briefing at the remedies stage of this litigation—not now.

Musk dedicates the rest of his brief to arguing that the Court should dismiss this case in its entirety on various constitutional grounds. None have merit. Section

13(d)'s requirements to disclose limited, factual, and uncontroversial information about an investor's share purchases do not violate the First Amendment. Rule 13d-1's deadline of "within 10 days" is not unconstitutionally vague because the ordinary meaning of the term "days" is calendar days, not business days, and Musk missed the deadline regardless. Seeking disgorgement is also not selective enforcement because the SEC regularly asks for disgorgement when alleging a defendant violated Section 13(d). And finally, the SEC's structure is constitutional.

The Court should deny Musk's motion in its entirety.

## LEGAL STANDARDS

### A.    Motion to Strike Pursuant to Rule 12(f)

Musk moves under Rule 12(f) to strike the SEC's request for an injunction and disgorgement. Rule 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "In considering a motion to strike, the court will draw all reasonable inferences in the pleader's favor and resolve all doubts in favor of denying the motion to strike." *Nwachukwu v. Karl*, 216 F.R.D. 176, 178 (D.D.C. 2003). "Motions to strike under Rule 12(f) are typically denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action." *Matiella v. Murdock St. LLC*, No. 21-cv-2112 (GMH), 2023 WL 4684854, at *16 (D.D.C. July 21, 2023). "[B]ecause courts view motions to strike with such disfavor, many courts will grant such motions only if the portions sought to be stricken are prejudicial or scandalous." *Nwachukwu*, 216 F.R.D. at 178.

### B.    Motion to Dismiss Pursuant to Rule 12(b)(6)

A complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "When deciding a Rule 12(b)(6) motion, the Court must 'treat the complaint's factual allegations as true' and 'must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Henkel v. U.S. Dep't of Educ.*, No. 24-cv-01676-SLS, 2025 WL 2049267, at *3 (D.D.C. July 22, 2025) (Sooknanan, J.) (cleaned up). The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which it may take judicial notice." *Id.* (cleaned up).

**ARGUMENT**

### I.    The Court Should Deny Musk's Motion to Strike Certain Relief

The Court should deny Musk's motion to strike the SEC's request for injunctive relief and disgorgement because the SEC has a legal basis to seek those remedies—the requests are not immaterial or impertinent—and the Complaint includes allegations sufficient to show that the SEC might be entitled to that relief. Musk has "not shown that Plaintiff's requests for relief are 'redundant, immaterial, impertinent, or scandalous' warranting this extraordinary measure." *See Matiella*, 2023 WL 4684854, at *17. He does not argue that the requested relief is unduly prejudicial or scandalous. *See Nwachukwu*, 216 F.R.D. at 180 (denying motion when movant "failed to raise any viable prejudice arguments"). And Musk does not argue that the requested relief is redundant. *See Matiella*, 2023 WL 4684854, at 17 (striking certain stand-alone counts for an injunction as redundant but denying

3

request to strike prayer for an injunction).

In short, the Court should decide what specific relief is appropriate later in the case, after a finding of liability and after the parties have fully briefed remedies.

## A.    A Permanent Injunction Is an Appropriate Remedy

Musk does not provide a single example where a court granted a motion to strike a request for an injunction at this stage of a case. To the contrary, Musk's cited authority underscores that "striking or dismissing Plaintiff's requests for injunctive relief is not appropriate at this early procedural stage." *See Matiella*, 2023 WL 4684854, at *17. A "defendant's motion to strike a prayer for relief is premature if such relief is provided for by law." *Simba v. Fenty*, 754 F. Supp. 2d 19, 23 (D.D.C. 2010). Here, the Exchange Act authorizes courts to permanently enjoin a defendant from violating the Act's provisions, including Section 13(d). *See* 15 U.S.C. § 78u(d)(1). The D.C. Circuit has affirmed imposing an injunction for these violations. *SEC v. Bilzerian*, 29 F.3d 689, 695 (D.C. Cir. 1994); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989) (same).

Musk's argument also fails for other reasons. He asks the Court to strike the request for an injunction based on arguments that "turn[] on factual showings the SEC must make—in other words, facts and circumstances still undecided at this stage of litigation." *See SEC v. Abarbanel*, No. 1:21-cv-5429 (AS), 2025 WL 1903792, at *2 (S.D.N.Y. July 10, 2025). For now, "the Court must 'treat the complaint's factual allegations as true' and 'must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Henkel*, 2025 WL 2049267, at *3. Musk's motion ignores this standard and instead asks the Court to make

improper factual inferences in his favor and render an ultimate decision on the merits, which is not appropriate at this stage of the litigation.

       ***Musk's Isolated Incident Argument Is Premature.*** Musk first asks the Court to make a factual determination that his Section 13(d) violation was an "isolated incident[]" insufficient to support a permanent injunction. Mem. ISO Motion to Strike and Dismiss, at 8, ECF No. 16-1 ("MTD"). Even if Musk's violation were "isolated," that fact alone would not be sufficient to deny an injunction. *See First City Fin. Corp.*, 890 F.2d at 1229 (holding that even if it is defendant's "first section 13(d) violation," that is "no bar to the issuance of an injunction").

       The Court, however, cannot at this stage find that this violation is isolated without ignoring the record and improperly making inferences in Musk's favor. In 2018, the SEC alleged that Musk violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by falsely tweeting that he had secured funding that would allow him to take Tesla private at a purchase price of $420, which "reflected a substantial premium over Tesla stock's then-current share price." Compl. ¶ 1, *SEC v. Musk*, No. 1:18-cv-8865, ECF No. 1 (S.D.N.Y. Sept. 27, 2018). Without admitting or denying the allegations, Musk consented to an order imposing a $20 million penalty, permanently enjoining him from violating Section 10(b), and requiring certain undertakings. *See* Final Judgment, *SEC v. Musk*, No. 1:18-cv-8865, ECF No. 14 (S.D.N.Y. Oct. 16, 2018).

       Every case cited in support of Musk's argument can be distinguished by the fact that he previously settled with the SEC. *See* MTD at 8 (citing *SEC v. Johnson*,

595 F. Supp. 2d 40, 46 (D.D.C. 2009) (involving a "first time offender"); *SEC v. Brown*, 878 F. Supp. 2d 109, 119 (D.D.C. 2012) (finding no "repeated" misconduct); *SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. 682, 716 (D.D.C. 1978) (defendants were not "involved in similar misconduct either before or after" the relevant events); *SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003) (case involved "a first-time violation"); *SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 18 (2d Cir. 1977) (same)).

  ***A Permanent Injunction Does Not Require Scienter Here.*** Musk next argues that the Court can only impose injunctive relief in this case if the SEC can demonstrate *scienter*. MTD at 8–9. But the Supreme Court has made clear that the SEC need not prove *scienter* before a court can impose an injunction "with respect to those provisions," like Section 13(d), "which may be violated even in the absence of *scienter*." *See Aaron v. SEC*, 446 U.S. 680, 701 (1980) (holding no showing of *scienter* required to enjoin negligence-based violations of Section 17(a)(2) and (3) of the Securities Act [17 U.S.C. § 77q(a)(2) & (3)]). The D.C. Circuit has similarly held that "the plain language of section 13(d)(1) gives no hint that intentional conduct need be found, but rather, [it] appears to place a simple and affirmative duty of reporting on certain persons" so "the defendant's state of mind is not solely determinative of whether an injunction is available to the SEC." *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1167 (D.C. Cir. 1978) (affirming injunction given the "paramount congressional intent to protect the public"); *see SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 333 (6th Cir. 2013) (explaining that "had the district court refused to grant the injunction based solely on a finding that [a defendant] did not have

scienter, it would have abused its discretion by making that single factor determinative").

In any event, the SEC's allegations could support a finding of *scienter*:

- "Musk and his wealth manager both understood that the federal securities laws required certain owners of more than five percent of a public company's common stock to publicly disclose their ownership stake to the public by filing a report with the SEC." Compl. ¶ 17.

- "In or around late February 2022, [Musk's] broker repeatedly suggested to Musk's wealth manager that Musk obtain legal advice . . . [but] [n]either Musk nor his wealth manager sought or obtained legal advice in February or March 2022 as to Musk's obligations under the federal securities laws to publicly disclose his Twitter holdings." Compl. ¶¶ 19, 20.

- "After the close of trading on March 14, 2022, the broker informed Musk's wealth manager that Musk held more than five percent of the outstanding shares of Twitter common stock [and within a week,] Musk's wealth manager informed Musk." Compl. ¶ 24.

- "On April 1, 2022, Musk's wealth manager consulted an attorney regarding Musk's disclosure obligations," which appears to be the first time Musk or his wealth manager sought legal counsel on the issue. Compl. ¶ 38.

At this stage, the Court must accept these allegations as true, view them in the light most favorable to the SEC, and draw all inferences in the SEC's favor. Under that standard, Musk understood that he had disclosure obligations when he acquired more than 5% of Twitter, and his broker repeatedly urged him to seek legal advice about those disclosure obligations. But even after Musk learned that he had acquired more than 5% of Twitter, he chose not to seek legal advice until weeks later. Under these facts, the Court could reasonably infer—and at this stage, the Court *must* infer—that Musk acted at least recklessly (and therefore with *scienter*) when he ignored his obligations and chose to avoid seeking legal advice. *See Guy v.*

*Absopure Water Co., LLC*, No. 20-12734, 2024 WL 1344240, at *2 (E.D. Mich. Mar. 29, 2024) (affirming that "deliberately [choosing] to avoid researching the laws' terms" can amount to willful conduct); *Trimmer v. Barnes & Noble, Inc.*, 31 F. Supp. 3d 618, 629 (S.D.N.Y. 2014) (denying defendant's motion for summary judgment because "defendants were warned" of an obligation and there was "no evidence that they conducted a diligent review or sought legal advice"); *U.S. v. McBride*, 908 F. Supp. 2d 1186, 1212 (D. Utah 2012) (concluding that defendant's "failure to seek a legal opinion concerning his reporting requirements was in reckless disregard of the known or obvious risk of failure to disclose his interest" as it related to tax disclosures); *see also SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) (holding injunction may be proper if defendant's "operations are so extremely or persistently sloppy as to pose a continuing danger to the investing public").

Even if an injunction required *scienter* (which it does not), the court should find that the SEC could make that showing based on allegations in the Complaint.

***Musk's Section 13(d) Violation Harmed Investors.*** Musk next asks the Court to strike the SEC's request for an injunction because Musk claims that his Section 13(d) violation as "technical in nature" that supposedly caused no harm to investors. MTD at 8. The D.C. Circuit rejected that same argument when raised by other litigants, explaining that "section 13(d) is a crucial requirement in the congressional scheme, and a violator, it is legislatively assumed, improperly benefits by purchasing stocks at an artificially low price because of a breach of the duty Congress imposed to disclose his investment position." *First City Fin. Corp.*,

890 F.2d at 1230. Here, Musk "circumvented that scheme, and the theory of the statute, . . . is that the circumventions caused injury to other market participants who sold stock without knowledge of [Musk's] holdings." *Id.*; *see also Savoy*, 587 F.2d at 1165–66 (rejecting an argument that Section 13(d) violations were "mere technical or inconsequential violations" when violator "was obviously making a bid for control and management"). Moreover, the SEC has alleged that Musk benefited from failing to timely disclose and that his violation harmed investors. Compl. ¶ 5.

**Musk's Occupation Is Not Relevant Because He Violated Securities Laws as an Investor.** Musk next argues that the SEC's complaint does not allege that his occupation provides opportunities to violate securities laws in the future. MTD at 9. But the fact Musk is not regularly employed in the securities industry "would not make injunctive relief inappropriate" because Musk's "securities laws violations did not arise from a position of authority in a brokerage firm, or from any other position for that matter"—they "resulted from actions he took *as an investor*." *See Bilzerian*, 29 F.3d at 695. Musk "will be able to commit similar violations so long as he is able to . . . finance his schemes." *See id.*

**Standards Governing Injunctions for Private Shareholder Litigation Do Not Apply to SEC Enforcement Actions.** Musk incorrectly argues that limitations on private litigant's ability to seek equitable relief for violations of Section 13(d) should apply here. MTD at 10 (citing *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 59 (1975)). The SEC's authority to seek injunctive relief to prevent future violations of securities laws extends well beyond the limited, implied

equitable rights of private litigants. 15 U.S.C. § 78u(d)(1) (authorizing the SEC to seek injunctions). "[U]nlike private suits that redress the claims of particular shareholders: the Commission is not an injured victim." *SEC v. Teo*, 746 F.3d 90, 102 (3d Cir. 2014) (distinguishing Section 13(d) claims brought by the SEC from private cases brought by investors and affirming disgorgement of around $17.4 million). Any such limitations "are not part of the jurisprudence or the statutory developments relating to SEC-initiated civil enforcement actions." *Id.* Indeed, Musk cites no opinion where a court held that a late-filed Schedule 13D prevents the SEC from seeking an injunction against future violations. *See generally* MTD.

In arguing otherwise, Musk relies on the Supreme Court's decision in *Rondeau*, which is inapplicable here on several grounds, including—primarily—that it involved a private action. In *Rondeau*, the Supreme Court held that private plaintiffs must show irreparable harm before a court could enjoin a violator of Section 13(d) from voting, pledging, or acquiring more shares. 422 U.S. at 51. The Court explained that the plaintiff in that case could not show irreparable harm because "Petitioner has not attempted to obtain control of" the company, "he has now filed a proper Schedule 13D, and there has been no suggestion that he will fail to comply with the Act's requirement of reporting any material changes." *Id.* at 59. Following that decision, courts have not granted equitable relief to private litigants for Section 13(d) violations "where corrective disclosures have been made" and the violator "did not attempt to obtain control of the issuer." *See Nano Dimension Ltd. v. Murchinson Ltd.*, 102 F.4th 136, 142 (2d Cir. 2024); *see also* MTD at 10–11, n.3.

The Court should reject Musk's invitation to apply the wrong legal standard, and instead it should apply the law of this Circuit permitting the SEC to seek an injunction to prevent future violations of Section 13(d), even after a defendant has filed a late Schedule 13D. *See First City Fin. Corp.*, 890 F.2d at 1220 (affirming injunction when defendant "filed the required disclosure statement on March 26, twelve days past the section 13(d) deadline").

### B.     Disgorgement Is an Appropriate Remedy

#### 1)     Musk's Disgorgement Arguments Are Premature

Deciding whether disgorgement might be appropriate before finding whether Musk is even liable for a securities violation "would be premature." *S.E.C. v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 310 (S.D.N.Y. 2015); *see SEC v. Buntrock*, No. 02-cv-2180, 2004 WL 1179423 at * 3 (N.D. Ill. May 25, 2004).

A "defendant's motion to strike a prayer for relief is premature if such relief is provided for by law." *Simba*, 754 F. Supp. 2d at 23. And Musk admits that "disgorgement under federal securities law is firmly established." MTD at 12. The Exchange Act authorizes this Court to order disgorgement of unjust enrichment for violations of Section 13(d). *See* 15 U.S.C. §§ 78u(d)(3), (5), and (7); *Liu v. SEC*, 591 U.S. 71, 87 (2020) (affirming that 15 U.S.C. § 78u(d)(5) authorizing "equitable relief" includes disgorgement). The D.C. Circuit has repeatedly affirmed that a court may order disgorgement for violations of Section 13(d). *First City Fin. Corp.*, 890 F.2d at 1230; *Bilzerian*, 29 F.3d at 696–97 (same); *see also Teo*, 746 F.3d at 109 (affirming disgorgement from Section 13(d) violations). The SEC has clear authority to seek disgorgement, so asking for it is neither "immaterial" nor "impertinent"—the Court

can deny Musk's motion to strike on this point alone. Musk's remaining arguments are premature, contrary to precedent, and inconsistent with the facts alleged.

### 2)    The SEC's Complaint Provides Allegations Sufficient to Support a Request for Disgorgement

***Musk Unfairly Benefited by Failing to Disclose.*** The Complaint includes allegations that Musk received ill-gotten gains such that disgorgement might be appropriate. As alleged in the complaint, Musk failed to timely disclose that he had acquired more than five percent of the outstanding shares of Twitter common stock. Compl. ¶ 1. After he missed the deadline, Musk spent more than $500 million to buy more than 13 million shares of Twitter at around $38 to $40 per share. *Id.* ¶¶ 28–37. When Musk's position became public, "Twitter's stock price increased more than 27% over its previous day's closing price." *Id.* ¶ 4. By failing to timely disclose, Musk paid "significantly less . . . than if he had timely disclosed." *Id.* ¶ 44. Moreover, Musk was able buy those shares at a price significantly lower than what he would have paid if he purchased them as part of Musk's take-private transaction, in which he paid $54.20 per share. *See* 10/27/2022 Twitter Form 8-K.

These allegations are sufficient to show—particularly at this stage of litigation—that disgorgement might be appropriate. *Caledonian Bank Ltd.*, 145 F. Supp. 3d at 310.

***Courts Can Order Disgorgement of Unrealized Gains.*** In response, Musk argues that even if he purchased shares at artificially depressed prices, the Court cannot order disgorgement because he never sold those shares for a profit. MTD at 15–16. But that is not the law. "A manipulator is not relieved of its

disgorgement obligation simply because it chooses, for whatever reason, to retain manipulated securities." *SEC v. Crowd Mach., Inc.*, No. 4:22-cv-0076-HSG, 2023 WL 8438553, at *5 (N.D. Cal. Dec. 5, 2023) (ordering disgorgement even though defendant did not ultimately profit from scheme and not offsetting subsequent decline in value of ill-gotten crypto assets).

Disgorgement is not limited to "actual profits." MTD at 15. Courts can order disgorgement of unrealized, ill-gotten gains. *SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974). When deciding "a disgorgement amount, every circuit that has addressed the issue has held that disgorgement is properly based on a defendant's unrealized 'paper' profits at the time of the illegal transaction." *SEC v. Mannion*, 28 F. Supp. 3d 1304, 1308–09 (N.D. Ga. 2014); *see SEC v. Seghers*, 298 Fed. App'x 319, 336–37 (5th Cir. 2008); *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1192 n. 6 (9th Cir. 1998); *Shapiro*, 494 F.2d at 1309); *SEC v. Aronson*, 665 F. App'x 78, 81 (2d Cir. 2016) ("This Court has long held that disgorgement of 'unrealized gains' is proper in some circumstances."); *Crowd Mach., Inc.*, 2023 WL 8438553, at *5; *cf. SEC v. Liu*, No. 21-56090, 2022 WL 3645063, at *2 (9th Cir. Aug. 24, 2022), *cert. denied*, 143 S. Ct. 2495 (2023) (affirming disgorgement award, rejecting Liu's argument that he had no actual profits, and explaining that "net profits" means "deducting expenses from the revenues of an ongoing business enterprise").

At most, the cases cited by Musk show that courts sometimes calculate ill-gotten gains at the remedies stage by looking at actual profits. MTD at 15–16. But none of those cited cases struck a request for disgorgement at the pleadings stage

and none held that disgorgement requires a violator to sell and realize a profit. To the contrary, the court in *SEC v. Yang* "acknowledge[d] that it has the authority to order 'disgorgement' of paper 'profits' that existed at one time but were not realized." 2014 WL 2198323 (N.D. Ill. May 27, 2014) (but declining to exercise that authority). In *SEC v. E-Smart Technologies*, the defendant CEO did not receive *any* ill-gotten gains because she neither bought nor sold at manipulated prices—she received stock "months before the fraudulent communication" and never sold. 139 F. Supp. 3d 170, 189–90 (D.D.C. 2015). The remaining cases cited by Musk stand for the proposition that realized profits can—in appropriate circumstances—serve as a reasonable approximation of a defendant's ill-gotten gains at the remedies stage. *See SEC v. First City Fin. Corp.*, 688 F. Supp. 705, 727 (D.D.C. 1988), *aff'd* 890 F.2d 1215 (D.C. Cir. 1989) (calculating disgorgement based on realized gains because sell price received shortly after disclosure was good approximation of ill-gotten gains); *Bilzerian*, 29 F. 3d at 696–97 (same). None of the cases cited by Musk held that disgorgement is limited to realized profits.

Finally, courts should avoid adopting legal standards that could "lead to 'absurd results.'" *SEC v. Whittemore*, 659 F.3d 1, 11 (D.C. Cir. 2011). And here it would be absurd to allow Section 13(d) violators who acquire a target company (and thus keep the shares that they bought at an unfair discount) to retain ill-gotten gains but disgorge those *same gains* from violators who do not take over the target company and later sell their shares—especially since the purpose of Section 13(d) is to protect investors during potential changes in control or ownership of a company.

***This Circuit Does Not Require a Showing of Pecuniary Harm for***

***Disgorgement.*** Musk argues that for disgorgement, the SEC must plead sufficient

facts to show that individual investors suffered pecuniary harm. He is wrong on the

law and ignores that the Complaint *does* include such allegations.

The Supreme Court clarified that disgorgement is a "profits-focused remedy"

based on the principle that a defendant should not "make a profit out of his own

wrong." *Liu*, 591 U.S. at 80, 90. Disgorgement thus turns on whether the violator

has received a benefit, not on whether a victim has suffered a loss. And while D.C.

Circuit has "held that harm 'to third parties may be a useful measure of a violator's

wrongdoing . . . *whether . . . securities violations injured others is irrelevant to the*

*question whether disgorgement is appropriate.*'" *SEC v. Crystal World Holdings,*

*Inc.*, No. 1:19-cv-02490 (CJN), 2025 WL 326593, at *2 (D.D.C. Jan. 28, 2025), *appeal*

*filed*, No. 25-5050 (D.C. Cir. March 3, 2025) (quoting *Zacharias v. SEC*, 569 F.3d

458, 471 (D.C. Cir. 2009)).

While the Second Circuit held that the SEC is required to show pecuniary

harm before allowing disgorgement at the remedies stage, other Circuits disagree.

*Compare SEC v. Govil*, 86 F.4th 89, 105 (2d Cir. 2023) (disgorgement only allowed if

SEC shows victim suffered pecuniary harm) *with SEC v. Sripetch*, 154 F.4th 980,

982 (9th Cir. 2025), *cert. filed*, No. 25-466 ("disgorgement does not require a

showing that investors experienced pecuniary harm"); *SEC v. Navellier & Assocs.,*

*Inc.*, 108 F.4th 19, 41 (1st Cir. 2024), *cert. denied,* No. 24-949, 2025 WL 1603606

(U.S. June 6, 2025), *reh'g denied*, 2025 WL 2382100 (U.S. Aug. 18, 2025) (same).

This Circuit has not revisited that issue since *Liu*, but *Zacharias* undermines Musk's pecuniary harm argument. *See Crystal World Holdings, Inc.*, 2025 WL 326593, at *3 ("[U]ntil the Court of Appeals reconsiders *Zacharias*, in this circuit, the law is that the amount of pecuniary harm to victims does not cap the amount of disgorgement that can be awarded against a wrongdoer.").

Regardless, the SEC's complaint sufficiently alleges that Musk harmed investors. Compl. ¶¶ 5, 46. After the Section 13(d) deadline, Musk bought millions of shares of Twitter common stock without disclosing that he had acquired more than five percent of the company. *See* 4/5/2022 Musk Schedule 13D, ECF No. 18-6. Those transactions "caused injury to other market participants who sold stock without knowledge of" Musk's holdings, *First City Fin. Corp.*, 890 F.2d at 1230, and Musk paid them "significantly less . . . than if he had timely disclosed," Compl. ¶ 44.

***The Complaint Sufficiently Alleges Causation.*** Musk next argues that the SEC has not identified a causal nexus between his violation and his ill-gotten gains sufficient to order disgorgement. MTD at 18. But Musk acknowledges that the Complaint states that "Musk paid 'significantly less' '[a]s a result' of his alleged late disclosure." MTD at 19 (quoting Compl. ¶ 44). That is a clear allegation of causation. Musk's argument to the contrary asks the Court to ignore these well-pleaded facts and to improperly make assumptions in his favor. Moreover, the D.C. Circuit has held that it "is legislatively assumed" that a violator of Section 13(d) "improperly benefits by purchasing stocks at an artificially low price because of a breach of the duty Congress imposed to disclose his investment position." *First City*

*Fin. Corp.*, 890 F.2d at 1230. Section 13(d) thus reflects Congress's recognition that the failure to disclose causes the violator to receive an improper benefit.

To the extent that Musk quibbles with potential, theoretical approaches that the SEC might propose for estimating ill-gotten gains, MTD at 19, or to the extent he suggests that market prices for Twitter stock were impacted by "innumerable factors beyond a single investor's filings," MTD at 20, n.6, he can raise those arguments at the remedies stage. Those are not valid reasons to strike relief now.

***Disgorgement Does Not Require Scienter.*** The law does not require a court to find *scienter* before ordering disgorgement in cases like this. 15 U.S.C. § 78u(d)(8)(A)(i) (authorizing the SEC to seek disgorgement for claims without *scienter*); *see SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 58 (D.D.C. 2024) (discussing "non-scienter-based disgorgement claims"). Musk acknowledges that courts can order disgorgement of direct gains and prejudgment interest without a showing of *scienter*. MTD at 20–22. But he argues that to the extent the SEC seeks disgorgement of *consequential* gains, the SEC must prove *scienter. Id.*

Again, Musk's consequential gain and *scienter* arguments are premature. At the remedies stage parties can submit evidence and briefing to explain what ill-gotten gains are direct or consequential (if such a distinction is relevant).

Moreover, the SEC alleges that Musk received *direct* ill-gotten gains—not consequential gains—as explained below. *Compare* Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) (disgorgement for insider trading) *with id.* § 53 (consequential gains). In a frequently cited case, the First Circuit

measured direct ill-gotten gains from insider trading by comparing the price when

an insider purchased the stock with the price "a reasonable time after public

dissemination of the inside information." *SEC v. MacDonald*, 699 F.2d 47, 55 (1st

Cir. 1983). As an example: suppose an insider bought stock at $4 per share and

"throughout the entire month after the undisclosed information became public, the

stock sold at [$5 per share]." *Id.* Direct gains (and thus disgorgement) would be $1

per share. *Id.* But a further increase in that stock's price—a *consequential* gain—

would generally not be recoverable for insider trading. *Id.* at 52. If that same insider

held the stock and its price later rose to $10 per share (unrelated to the inside

information), the direct gain would still be $1 per share, but the additional $5 per

share would be consequential gains and generally not recoverable. *Id.*[1]

Applying that framework to this case, the SEC has alleged sufficient facts to

show Musk received direct ill-gotten gains. *See First City Fin. Corp.*, 890 F.2d at

1230 (endorsing *MacDonald*'s analysis because there is "no relevant distinction

between disgorgement of inside trading profits and disgorgement of post-section

13(d) violation profits"). The Complaint explains that Musk "continu[ed] purchasing

shares at artificially low prices" while he was in violation of Section 13(d), "allowing

---

[1] The issue of consequential gains occasionally arises in SEC enforcement cases. For
example, the Second Circuit explained that courts have "broad discretion" to award
disgorgement of consequential gains in fraud cases. *SEC v. Ahmed*, 72 F.4th 379,
406 (2d Cir. 2023). That court remanded to the trial court to consider whether a
disgorgement order could include as consequential gains "actual returns on [] frozen
assets" beyond prejudgment interest, or whether those "actual returns" were so
"unduly remote" from the fraud as to not qualify even as consequential gains. *Id.*

him to underpay by at least $150 million." Compl. ¶ 1. Those are direct gains.

The SEC has not alleged that Musk received consequential gains. If Twitter stock today were worth $100 per share, for example, that hypothetical increase in the stock price long after the disclosure was made might be considered consequential gains. *See MacDonald*, 699 F.2d at 52. But the SEC has not alleged anything like that here and is not seeking disgorgement on that basis.

Finally, even if *scienter* were required, the SEC alleged facts sufficient to show or infer that Musk was at least reckless. *See supra*, 6–9.

### 3)    The SEC's Request for Disgorgement Is Constitutional

Like many of Musk's other arguments, his Excessive Fines Clause argument is premature: "Eighth Amendment challenges are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine." *Matthews v. D.C.*, 507 F. Supp. 3d 203, 210 n.3 (D.D.C. 2020) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995)). No case cited by Musk's motion relied on the Eighth Amendment to strike requested relief at this stage of a case. *See U.S. v. Bajakajian*, 524 U.S. 321, 325 (1998) (review of sentence imposed after guilty plea); *U.S. v. Leeds*, No. 1:22-cv-00379-AKB, 2025 WL 743996, *13 (D. Idaho Mar. 7, 2025) (discussing remedies after summary judgment); *U.S. v. Sterlingov*, 755 F. Supp. 3d 17, 33 (D.D.C. 2024) (after conviction, granting Government's proposed forfeiture order of $395 million and finding that it would not violate the Excessive Fines Clause); *Pimentel v. City of Los Angeles*, 115 F.4th 1062, 1065 (9th Cir. 2024). Should Musk argue that a particular amount of disgorgement is unconstitutional, the appropriate time to raise that argument will be in remedies briefing.

In any event, the Eighth Amendment's Excessive Fines Clause does not apply to civil disgorgement. Analysis of "the Excessive Fines Clause entails two steps: (1) determining whether the government extracted payments for the purpose of punishment; and (2) assessing whether the extraction was excessive. The first step determines whether the Excessive Fines Clause applies, and the second determines if the Clause was violated." *U.S. v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019).

Musk's argument fails step one because "it is well-established that disgorgement of ill-gotten proceeds is not punishment." *U.S. v. Philip Morris USA*, 310 F. Supp. 2d 58, 63 (D.D.C. 2004) (citing *Bilzerian*, 29 F.3d at 696). "[I]nsofar as the relief sought by the Government can be properly characterized as 'disgorgement,' it does not implicate the Excessive Fines Clause." *Id.*

Even if the Court were to reach step two, any reasonable order for disgorgement would not be excessive. "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount . . . must bear some relationship to the gravity of the offense that it is designed to punish." *Matthews v. D.C.*, 507 F. Supp. 3d 203, 210 (D.D.C. 2020) (quoting *Bajakajian*, 524 U.S. at 334). Courts analyze proportionality using "four factors: (1) the essence of the crime and its relation to other criminal activity; (2) whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct." *Collins v. SEC*, 736 F.3d 521, 526 (D.C. Cir. 2013). Courts also consider if the penalty is "proportioned to

the wrong" and "not [] so large as to deprive [an offender] of his livelihood." *Timbs v. Indiana*, 586 U.S. 146, 151 (2019).

Even assuming that these factors apply to a civil remedy like disgorgement, Musk's conduct is precisely the type that Congress sought to prevent. For factors one and two, Musk "purchas[ed] stocks at an artificially low price because of a breach of the duty Congress imposed to disclose his investment position." *First City Fin. Corp.*, 890 F.2d at 1230.

Under the third factor, Congress through the Exchange Act has authorized courts to order disgorgement "of any unjust enrichment," 15 U.S.C. § 78u(d)(3)(ii), and separately authorized imposing a civil penalty up to "the greater of" certain limits or "the gross amount of pecuniary gain to such defendant as a result of the violation," 15 U.S.C. § 78u(d)(3)(B)(i). Because the Exchange Act allows courts to order *both* disgorgement *and* civil penalties, any disgorgement of unjust enrichment will not exceed the total monetary relief authorized by statute for a violation of securities law.

Under the fourth factor, disgorgement that "corresponds one-to-one to the amount [a defendant] derived from" their illegal conduct is not "'grossly disproportional'" to the offenses. *Bikundi*, 926 F.3d at 795; *see U.S. v. Dubose*, 146 F.3d 1141, 1145 (9th Cir. 1998), *as amended on denial of reh'g* (Aug. 31, 1998).

Finally, an order of disgorgement in this case would "not be so large as to deprive [an offender] of his livelihood." *Timbs*, 586 U.S. at 151. In separate, private litigation, Musk has argued that any ill-gotten gains from failing to comply with

Section 13(d) and Rule 13d-1 are negligible "in light of Musk's eventual **$44 billion** purchase of Twitter." Defs.' Mem. ISO Mot. to Dismiss, *Okla. Firefighters v. Musk*, No. 1:22-cv-03026, ECF No. 108, at 13 (S.D.N.Y. Jul. 3, 2024) (emphasis in original). Disgorgement also would not deprive Musk of his livelihood, considering that his ill-gotten gain was—according to Musk—"**less than 0.5% of Twitter's total purchase price** . . . **and 0.1% of his net worth**." *Id.* Musk's own filings show that disgorgement would not be unconstitutionally excessive.

## II.    The Court Should Deny Musk's Motion to Dismiss

The Court should reject Musk's various constitutional challenges and deny his motion to dismiss. Section 13(d) comports with the First Amendment. The term "days" is not unconstitutionally vague. The SEC has not engaged in selective enforcement against Musk by seeking disgorgement in this case. And the Commission's structure is constitutional.

### A.    Section 13(d) Does Not Violate the First Amendment

The Court should reject Musk's argument that Section 13(d) and Rule 13d-1's disclosure requirements violate the First Amendment. While Musk urges the Court to apply strict scrutiny, that is not the appropriate standard, and Musk cites no case that has ever held that any SEC disclosure rule is subject to strict scrutiny. The decision in *Zauderer v. Off. of Disciplinary Couns. of the Supreme Ct. of Ohio*, 471 U.S. 626, 650–51 (1985), provides the correct standard, and Section 13(d) and Rule 13d-1 clear that standard because they require purely "factual" and "uncontroversial" information, are "reasonably related" to a legitimate state interest, and are not "unjustified or unduly burdensome" so as to "chill[] protected

commercial speech." Even if intermediate scrutiny applies, those provisions are still constitutional.

      1)    ***Zauderer*'s Standard of Review Applies**

***Section 13(d) and Rule 13d-1 Are Subject to the Lesser Scrutiny Applicable to Commercial Speech.*** Musk's First Amendment argument starts and ends in the wrong place, ignoring that the less stringent, compelled commercial speech standard applies here because "[s]peech relating to the purchase and sale of securities . . . forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech." *SEC v. Wall Street Publishing Institute, Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988); *see Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011) ("Securities regulation involves a different balance of concerns and calls for different applications of First Amendment principles.") (cleaned up). In the commercial speech context, "disclosure requirements" warrant lesser scrutiny than "outright prohibitions on speech," *Zauderer*, 471 U.S. at 650, especially when such requirements are "not a veiled attempt to suppress unpopular ideas or information or [to] manipulate the public debate through coercion rather than persuasion," *Full Value Advisors*, 633 F.3d at 1108 (quotation omitted); *see also Riley v. Tan'l Fed'n of the Blind*, 487 U.S. 781, 796 n.9 (1988) (referring to securities regulation and observing that "[p]urely commercial speech is more susceptible to compelled disclosure requirements").

      Applying these principles, most courts have held that the commercial speech framework—and in particular the *Zauderer* standard—govern First Amendment

challenges to SEC disclosure requirements. *See Chamber of Com. of United States v. SEC*, 85 F.4th 760, 770 (5th Cir. 2023) (applying *Zauderer* and rejecting a First Amendment challenge to SEC rule requiring companies to explain why they repurchased shares); *SEC v. City of Rochester, New York*, 731 F. Supp. 3d 455 (W.D.N.Y. 2024) (applying *Zauderer* and holding that a rule requiring municipal advisors to disclose "all actual and potential material conflicts of interest" was consistent with the First Amendment); *U.S. v. Wenger*, 292 F. Supp. 2d 1296, 1304 (D. Utah 2003), *aff'd,* 427 F.3d 840 (10th Cir. 2005) (applying *Zauderer* and finding that disclosure requirements of Section 17(b) of the Securities Act of 1933 were constitutional); *see also Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 540 (D.C. Cir. 2020) (explaining compelled commercial speech is reviewed under *Zauderer*); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc) ("AMI") (explaining when courts should apply *Zauderer*).

### 2)    The Statute and Rule Satisfy *Zauderer*'s Standard

Section 13(d) and Rule 13d-1 satisfy *Zauderer*'s test because (a) the disclosures are factual and non-controversial; (b) they are "reasonably related" to Congress's interest to provide information to investors and alert the market to potential changes in control; and (c) they do not unduly burden speech.

### *The Required Disclosures Are Factual and Non-Controversial.*

*Zauderer* review applies when a regulation requires disclosure of "purely factual and uncontroversial information." 471 U.S. at 651; *see also AMI*, 760 F.3d at 27. Here, Section 13(d) and Rule 13d-1 require disclosure of purely factual information about securities and do not require the filer to state an opinion or other non-factual

24

government position. *See Kimberly-Clark Corp. v. D.C.*, 286 F. Supp. 3d 128, 141 (D.D.C. 2017) (finding that requiring a label "should not be flushed" on certain wipes forced companies to convey non-factual government opinion rather than purely factual information). For example, Schedule 13D requires a filer to disclose, among other things, name, citizenship, the number of shares beneficially owned, the source of funds, and the purpose of the acquisition. *See* 15 U.S.C. § 78m(d)(1)(A)–(E) (describing facts to be disclosed); 17 C.F.R. § 240.13d-101 (same).

Musk argues that those requirements go beyond "purely factual" by requiring investors to explain "the purpose or purposes of the acquisition of securities." MTD at 33–34 (citing Schedule 13D, Item 4). But this *Zauderer* factor considers whether the rule requires a speaker to parrot a non-factual *government* opinion—not whether the disclosure requires a speaker to accurately convey their own intentions. *Kimberly-Clark Corp.*, 286 F. Supp. 3d at 141 (collecting cases). The Fifth Circuit, for example, considered and rejected a challenge to an SEC rule "requir[ing] issuers to disclose their reasons for repurchasing shares." *Chamber of Com.*, 85 F.4th at 767. Like Musk in this case, petitioners "assert[ed] that the rationale-disclosure requirement compels issuers to disclose their reasons for repurchasing stock and that by its very nature, an issuer's subjective opinion about the business benefits of its actions cannot be a purely factual disclosure." *Id.* at 769. The Fifth Circuit rejected that argument, explaining that "a law requiring companies to explain the reasons behind their actions compelled the disclosure of purely factual information." *Id.* at 770. Section 13(d)'s requirement to accurately describe the reason for

acquiring securities likewise seeks "purely factual" information.

Nor is the disclosed information controversial. Musk argues that disclosing "strategic plans" is "inherently controversial," MTD at 34, but cites no case in support. Instead, Musk appears to assume that the issue is "controversial" because some might disagree with Congress's policy choice to require the disclosure. Not so. Nothing about Section 13(d) or Rule 13d-1 requires Musk "take sides in a heated political controversy," such as the wisdom of these provisions, or "convey a message fundamentally at odds with [his] mission." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845, 858 (9th Cir. 2019); *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 282 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025) (statement not "controversial" solely because the "speaker dislikes or disagrees with the message he must convey"). Courts have found disclosures controversial when, for example, a required disclosure "conveys moral responsibility for the Congo war," *See Nat'l Ass'n of Mfrs. v. SEC.*, 800 F.3d 518, 530 (D.C. Cir. 2015) ("NAM"), or requiring cigarette packs to include a graphic image that was an "unabashed attempts to evoke emotion (and perhaps embarrassment) and browbeat consumers into quitting," *R.J. Reynolds Tobacco Co. v. Food & Drug Admin.*, 696 F.3d 1205, 1217 (D.C. Cir. 2012), *overruled on other grounds by AMI*, 760 F.3d 18 (D.C. Cir. 2014). Nothing close to those examples is at issue here.

In one case cited by Musk, the D.C. Circuit applied a higher standard of review—*Central Hudson*'s intermediate standard, rather than *Zauderer*—to an SEC rule requiring companies to use the specific phrase "not been found to be 'DRC

[Democratic Republic of the Congo] conflict free'" to describe some of their products. *See NAM*, 800 F.3d at 530. The court ruled that *Zauderer* did not apply in part because "the conflict minerals disclosure regime [was] not like other disclosure rules the SEC administers" and the stated government interest was "quite different from the economic or investor protection benefits that [SEC] rules ordinarily strive to achieve." *NAM*, 800 F.3d at 521. As explained in the section below, Section 13(d) and Rule 13d-1 serve these more "ordinar[y]" interests of disclosing information about securities acquisitions to the securities markets, and not an interest like "ameliorating the humanitarian crisis in the" Democratic Republic of Congo. *NAM*, 800 F.3d at 521. Nothing in Section 13(d) or Rule 13d-1 requires issuers to convey such a controversial message as "a metaphor that conveys moral responsibility for the Congo war." *Id.* at 530. Indeed, nothing in these provisions require purchasers to use any particular language to describe their purchases or their securities holdings, leaving them free to craft their own message. *See Chamber of Com.*, 85 F.4th at 772 (rejecting First Amendment challenge when issuers could provide a "privately crafted explanation" for share repurchases).

**Section 13(d) and Rule 13d-1 are Reasonably Related to an Adequate Government Interest.** The government has a strong "interest served by the disclosure mandate" that falls within *Zauderer*'s scope. *AMI*, 760 F.3d at 26. The "purpose of section 13(d) is to alert investors to potential changes in control, and to give them an opportunity to evaluate the effect of the potential change." *Savoy*, 587 F.2d at 1166; *see id.* ("Congress was concerned with providing disclosure to

investors"); *Rondeau*, 422 U.S. at 59 n.8 ("Without knowledge of who the bidder is and what he plans to do, the shareholder cannot reach an informed decision.");

*Bender v. Jordan*, 439 F. Supp. 2d 139, 160 (D.D.C. 2006) ("[T]he overriding purpose of Congress in enacting this legislation was to protect the individual investor when substantial shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed.") (citing *Edelson v. Ch'ien*, 405 F.3d 620, 626 (7th Cir. 2005)). The D.C. Circuit observed that "the key provisions of the Senate and House Reports reflect a congressional intent to promote full disclosure by persons who have reached a certain level in terms of their acquisitions." *Savoy*, 587 F.2d at 1167. The government interests in disclosures required by Section 13(d) and Rule 13d-1 are adequate under *Zauderer*, and Musk does not contend otherwise.

Section 13(d) and Rule 13d-1 disclosures are reasonably related to this interest. "To the extent that the government's interest is in assuring that consumers receive particular information . . ., the means-end fit is self-evidently satisfied when the government acts only through a reasonably crafted mandate to disclose 'purely factual and uncontroversial information.'" *AMI*, 760 F.3d at 26. "[T]his particular method of achieving a government interest will almost always demonstrate a reasonable means-ends relationship, absent a showing that the disclosure is 'unduly burdensome' in a way that 'chill[s] protected commercial speech.'" *Id.*

***The Disclosures Do Not Unduly Burden Free Speech.*** The Section 13 filing requirements do not place an undue burden on speech because they require only a minimal disclosure of information necessary for other market participants to accurately price securities. The "unduly burdensome" prong under *Zauderer* focuses on whether the disclosure requirements "unduly burden *expressive* activity." *Moody v. NetChoice, LLC*, 603 U.S. 707, 727 n.3 (2024). Even assuming that requiring filers to submit a form could somehow burden expressive activity, the Section 13 filing requirements do not place an *undue* burden because the "rule neither requires [investors] to endorse a particular viewpoint nor prevents them from adding their own message" in the disclosure or elsewhere. *Am. Hosp. Ass'n*, 983 F.3d at 541; *see also Chamber of Com.*, 85 F.4th at 772 ("A requirement that compels speech solely within the narrow confines of SEC filings is not the type of forced disclosure that would meaningfully 'chill protected commercial speech.'"). Rather, Section 13(d) requires a straightforward disclosure of limited information about certain securities transactions, without any effect on other speech or expressive activity.

### 3)    Musk's Challenge Also Fails Under *Central Hudson*

If the Court concludes that *Zauderer* does not apply, then it should still deny Musk's motion because Section 13(d) satisfies the intermediate scrutiny review that applies to other types of restrictions on commercial speech. *See Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). Under *Central Hudson*, courts assess whether the regulation is in proportion to a substantial government interest, "an inquiry comprised of assessing whether the chosen means directly advances the state interest involved and whether it is

narrowly tailored to serve that end." *AMI*, 760 F.3d at 25 (cleaned up) (quoting *Central Hudson*, 447 U.S. at 564). "Notwithstanding the reference to 'narrow tailoring,' the [Supreme] Court has made clear that the government's burden on the final *Central Hudson* factor is to show a 'reasonable fit,' or a 'reasonable proportion,' between means and ends." *Id.* at 26 (citations omitted).

First, Congress (and the Commission) have a substantial interest in the disclosure requirements established by Section 13(d) and Rule 13d-1. "Congress has a substantial interest through the securities laws in making capital markets more open and efficient." *Wenger*, 427 F.3d at 850. Congress passed Section 13(d) to "alert investors to potential changes in control, and to give them an opportunity to evaluate the effect of the potential change." *Savoy*, 587 F.2d at 1166; *see* 111 Cong. Rec. 28260 (Oct. 22, 1965) (explaining that Section 13(d)'s disclosures are needed "if we are to have true corporate democracy as well as an efficient, orderly, and sound economy"). Thus, "the purpose of section 13(d) is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control,'" reflecting a "paramount congressional intent to protect the public." *Savoy*, 587 F.2d at 1167 (quoting *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971)). Changes in control can materially impact stock prices and Congress decided that investors in public companies have a right to know.

Section 13(d)'s disclosure requirements are "a 'reasonable fit,' or a 'reasonable proportion,' between means and ends." *AMI*, 760 F.3d at 26–27 (citations omitted).

The statute "reflect[s] a congressional intent to promote full disclosure by persons who have reached a certain level in terms of their acquisitions." *Savoy*, 587 F.2d at 1167. Those requirements are appropriately tailored and apply only to persons who choose to participate in publicly traded markets, and even then, only to those who acquire significant stakes in public companies. They reflect the considered judgment of Congress, the President, and the SEC as to what information investors need to stay informed about potential changes in control.

Musk makes two arguments in response. First, Musk argues that the government's only interest in Section 13(d) disclosures relates to investors who plan to make a "coercive tender offer," but Musk's cited legislative history does not support that argument. MTD at 28 (citing 111 Cong. Rec. 28257). While Senator Williams in the cited legislative history describes actions by corporate raiders, he clarified that was "just one reason why" he introduced the bill that eventually became Section 13(d). 111 Cong. Rec. 28258.[2]

Second, Musk argues that Section 13(d) is "not narrowly tailored to achieve" any government interest because the "five-percent threshold is both overinclusive and underinclusive." MTD at 30. But the statute and regulation need only be a

---

[2] Sen. Williams went on to explain that "[s]ubstantial open market or negotiated accumulation of shares . . . may otherwise relate to shifts in control of which investors should be aware." 111 Cong. Rec. 28259. And "[where] these accumulations are made in the open market there are real dangers of manipulation to the prejudice of investors, and in any case, the public is entitled to the protection resulting from advance disclosure of large-scale acquisitions" even outside the limited circumstances of a tender offer. *Id.*

"'reasonable fit,' or a 'reasonable proportion,' between means and ends" to satisfy *Central Hudson*'s intermediate standard. *AMI*, 760 F.3d at 26. Section 13(d)'s five percent threshold is a reasonable fit to achieve the goal of informing the marketplace of potential changes in control.[3] The threshold measured by a percentage of beneficial ownership here directly and logically relates to Congress's goal, distinguishing this case from the examples cited by Musk where thresholds bore little relation to the stated goals. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 966–67 (1984) (rejecting underlying premise that charities' "high solicitation costs are an accurate measure of fraud").

Musk next argues that Section 13(d)'s disclosure requirements are not narrowly tailored because there are some exceptions. But underinclusivity only "creates a First Amendment concern when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 451 (2015). Under Section 13(d)(6)(D), Congress authorized the SEC to provide for exceptions to the statutory 10-day deadline, including when an acquisition was "not

---

[3] In 1970, Congress amended the Act, which among other things, lowered the reporting requirement from 10% beneficial ownership down to 5%. Pub. L. 91-567 (1970). Congress "found through [its] investigations . . . that it is possible with only 10 percent to determine what will happen to a corporation . . . because 10 percent in some corporations gives you almost control." 116 Cong. Rec. 40188 (Dec. 7, 1970); 116 Cong. Rec. 3024 (Feb. 10, 1970) ("Stock holdings of between 5 and 10 percent in [large] companies are in many instances a controlling interest."); *see* Sonner, Jr., A.A. "Who's 'In Control'?—S.E.C." 21 Bus. La. 559, 568–69 (1966) (providing an example where corporate control acquired by less than 10% stock ownership).

entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer." 15 U.S.C. § 78m(d)(6)(D); *see also* 17 C.F.R. § 240.13d-1(b). Those exceptions—by definition—align with the government's interests "to alert investors to potential changes in control." *Savoy*, 587 F.2d at 1166. And contrary to Musk's arguments, the exceptions make the disclosure requirements a *more*—not a less—reasonable fit by focusing on prompt disclosures from investors seeking to change or influence control of the company. If the Court decides that *Central Hudson*'s standard applies, Section 13(d) and Rule 13d-1 are constitutional.

### 4)    Strict Scrutiny Does Not Apply

Musk's motion to dismiss argues that Section 13(d) and Rule 13d-1 are subject to strict scrutiny. MTD at 26–33. But that is wrong. The "rationale of strict scrutiny is that content discrimination raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace of ideas." *Nat'l Ass'n of Broadcasters v. Fed. Commc'ns Comm'n*, 147 F.4th 978, 1002 (D.C. Cir. 2025) ("NAB") (cleaned up) (citing *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188 (2007)). "When 'that risk is inconsequential . . . strict scrutiny is unwarranted.'" *Id.* The D.C. Circuit has stated with respect to securities regulation in particular, the power to regulate "[s]peech relating to the purchase and sale of securities . . . is at least as broad with respect to the general rubric of commercial speech." *Wall Street Publ'g Inst.*, 851 F.2d at 373. "If speech employed directly or indirectly to sell securities were totally protected, any regulation of the securities market would be infeasible—and that result has long since been rejected." *Id.*

Musk argues that Section 13(d)'s requirements are "content-based" because

the scope of disclosures differ depending on many factors, including whether the

investor seeks to change or influence "the control of the issuer." MTD at 26–27. But

courts regularly reject the argument that SEC disclosures that differ based on

content are subject to strict scrutiny. SEC regulations "require the disclosure of

certain content (*e.g.*, corporate earnings or executive compensation) and do not

require the disclosure of others (*e.g.*, future acquisition targets or forthcoming

product lines). Yet these have routinely withstood First Amendment challenges

without any suggestion that strict, or even intermediate, scrutiny applied." *SEC v.*

*AT&T, Inc.*, 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022); *see Chamber of Com.*, 85

F.4th at 768 (rejecting argument that strict scrutiny applies to SEC disclosure rule).

The Court should decline Musk's invitation to apply strict scrutiny.[4]

## B.    Section 13(d) and Rule 13d-1 Are Not Void for Vagueness

Musk incorrectly argues that the term "days" in the relevant provisions

creates a constitutional vagueness problem. He argues that the deadline "within ten

days" in Section 13(d) and Rule 13d-1 was impossible for a person of "ordinary

intelligence" to understand because the term "day" could have meant calendar days

or business days. MTD at 35–38; *see Vill. of Hoffman Ests. v. Flipside, Hoffman*

*Est.*, 455 U.S. 489, 498 (1982) (holding that the vagueness doctrine requires "that

laws give the person of ordinary intelligence a reasonable opportunity to know what

---

[4] Even if strict scrutiny applies, Section 13(d) and Rule 13d-1 satisfy that standard
because the government interests are compelling, and the provisions are narrowly
tailored to effectively advance those interests, for the reasons explained above.

is prohibited." (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972)). The Court need not reach this constitutional issue because even if the standard had been ten *business* days, the complaint sufficiently alleges—and the uncontroverted facts prove—that Musk still missed the deadline.

Should the Court decide the constitutional question at this stage, it should find that the statute and rule are not vague. When deciding whether a statute or rule is unconstitutionally vague, "words receive their plain, obvious and common sense meaning, unless context furnishes some ground to control, qualify or enlarge it." *U.S. v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quotation marks omitted). "Even as the vagueness inquiry refers to a law's meaning to the 'ordinary person,' a statutory term is not rendered unconstitutionally vague because it does not mean the same thing to all people, all the time, everywhere." *Id.* (cleaned up). "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning specifies *no standard of conduct at all*." *Id.* (cleaned up and emphasis added); *see also Beckles v. U.S.*, 580 U.S. 256, 266 (2017) ("An unconstitutionally vague law invites arbitrary enforcement in this sense if it 'leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.'").

Under this test, the phrase "within ten days" in Section 13(d) and Rule 13d-1 provides sufficient notice to a person of ordinary intelligence about what is required, and it provides a legally fixed standard for judges and jurors to apply. The Supreme Court last term considered the "ordinary meaning" of the word "day" in a statute

setting a time period not to exceed "60 days." *Monsalvo v. Bondi*, 604 U.S. 712, 725 (2025). The Court held that the ordinary interpretation of "day" is "calendar days," *id.*, and at least in the immigration context, when the last calendar day falls on a weekend or holiday, the deadline extends to the next business day, *id.* at 731. Despite an opinion dissenting on how to treat a deadline falling on a weekend, all nine Justices agreed that "when interpreting the term 'days'" courts "should start with the presumption that it means what it means in ordinary usage: 'a division of time equal to 24 hours and representing the average length of the period during which the earth makes one rotation on its axis.'" *Id.* at 750 (Alito, J., dissenting) (quoting Random House Webster's Unabridged Dictionary 510 (2d ed. 2001)). The Court was unanimous that the ordinary meaning of "days" means calendar days.

Courts in this Circuit have likewise held that the phrase "within ten days" in Section 13(d) and Rule 13d-1 means *ten calendar days. First City*, 890 F.2d at 1219 (if the defendant crossed the five percent threshold on March 4, then it "would have been obliged to file a Schedule 13D disclosure statement on March 14"); *SEC v. Bilzerian*, 814 F. Supp. 116, 119 (D.D.C. 1993), *aff'd*, 29 F.3d 689 (D.C. Cir. 1994) (finding that "defendant became the beneficial owner of in excess of five percent of Hammermill stock on June 27, 1986, and was thus required to file a Schedule 13D by July 7, 1986"); *see also CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 284 (2d Cir. 2011) (holding that if defendants "crossed the 5 percent threshold by April 10, 2007 . . . [they] would have been required to file a section 13(d) disclosure within ten days, *i.e.,* by April 20, 2007").

Musk's cherry-picking of examples where the SEC, commentators, or courts erroneously used the phrase "business days" does not render the statutory 10-day deadline unconstitutionally vague. Musk first points to a handful of related settled administrative orders (all released the same day) where the SEC incorrectly used the phrase "ten business days" to describe Section 13(d)'s deadline, but the distinction between calendar and business days did not make a difference as to liability. MTD at 37 n.17. To the extent those releases created any ambiguity at all, the SEC had clarified the issue by February 10, 2022 (as Musk was building up his position in Twitter), when the SEC released a proposed update to Rule 13d-1 that was explicit and unambiguous: "Consistent with the current '10-day' deadline in Rule 13d-1(a), the proposed 'five-day' deadline for filing the initial Schedule 13D would be measured in *calendar days.*" *See* "Modernization of Beneficial Ownership Reporting," Securities Act Rel. No. 11030, Exchange Act Rel. No. 94211, File No. S7-06-22, 2022 WL 20814745 n.3 (Feb. 10, 2022) (emphasis added); SEC Press Release 2022-22, "SEC Proposes Rule Amendments to Modernize Beneficial Ownership Reporting" (Feb. 10, 2022). At the time of Musk's violation, the investing public had more than sufficient notice that "10 days" meant ten calendar days.[5]

Some examples that Musk cites cut against his position and actually support that the deadline was calculated by calendar days, not business days. For instance,

---

[5] In response to comments from industry and the public, the SEC ultimately adopted a final rule that set a new deadline of five business days. *See* "Modernization of Beneficial Ownership Reporting" Final Rule, 88 FR 76896 (Oct. 10, 2023) (effective Feb. 5, 2024). That new deadline does not apply in this case.

he points to a 2019 blog post, which explained that while there had some

inconsistencies among commentators on whether Section 13(d)'s deadline was

calculated in calendar or business days, the author found "clarity" from "the text of

the Williams Act and the SEC's rules, the history of the Williams Act, and the

prudential considerations that justify the disclosure rules" that "all point in the

same direction: the calendar-day approach." Doshi, Samir H., *The Timing of

Schedule 13D*, Forum on Corporate Governance Law, Harvard Law School (2019),

available at https://corpgov.law.harvard.edu/2019/ 06/23/the-timing-of-schedule-13d/

(last accessed: Dec. 1, 2025).

The other examples cited by Musk show—at most—imprecise language by

courts when the distinction between business and calendar days did not matter. For

example, Musk cites to a district court opinion that in one place used the phrase "no

later than 10 business days" but later used the phrase "within ten days." *SEC v.

Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 589, 607 (S.D.N.Y. 1993). The

Section 13(d) deadline was not at issue in that case, and to the extent that district

court erroneously used the phrase "business days," the Second Circuit later clarified

that the deadline was measured in calendar days. *CSX*, 654 F.3d at 284. Musk also

cites a footnote in a bankruptcy court's opinion from 2006 which used the term

"business days" when describing a Schedule 13D submitted into evidence—but

again, the deadline was not at issue in that case. *In re E.S. Bankest, L.C.*, No. 04-

17602-BKC-AJC, 2006 WL 3922112, at *2 n.1 (Bankr. S.D. Fla. Dec. 14, 2006).

While Musk exaggerates the extent to which blog posts, prior SEC releases,

or stray sentences in district court opinions created supposed confusion, it was nonetheless clear to a person of "ordinary intelligence" that the term "day" receives its "ordinary meaning" as a "calendar day." *Monsalvo*, 145 S. Ct. at 1241. The SEC's release on February 10, 2022, made clear that Rule 13d-1 in force at the time referred to calendar days. 2022 WL 20814745 n.3. And regardless, Musk missed the deadline whether counted by business or calendar days.

### C.    The Doctrine of Selective Enforcement Does Not Apply

The Court should reject Musk's selective enforcement argument. Even if a selective enforcement defense is available in civil matters,[6] to assert it, Musk "must demonstrate (1) he was similarly situated in material respects to other individuals against whom the law was not enforced, and (2) the selective enforcement infringed a constitutional right." MTD at 39 (quoting *Valibeigi v. District of Columbia*, No. 1:22-cv-3149-TJK, 2024 WL 4332626, at *3 (D.D.C., Sept. 27, 2024)). Musk fails both prongs.

### 1)    The SEC Regularly Enforces Section 13(d)

Musk's selective enforcement argument stumbles out of the gate because the law requires that he identify other individuals "similarly situated in material respects . . . *against whom the law was not enforced*." *Valibeigi*, 2024 WL 4332626 at

---

[6] The D.C. Circuit has not ruled on whether selective enforcement defense is available in civil matters. *Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 932 n.8 (D.C. Cir. 1982); *see also U.S. v. Google, LLC*, 692 F. Supp. 3d 583, 593 (E.D. Va. 2023) ("Courts that have grappled with this precise issue have similarly questioned whether selective enforcement should be extended to civil actions.").

*3 (emphasis added). Musk admits, however, that "the SEC regularly seeks and obtains monetary penalties against individuals for late filings under Section 13(d)." MTD at 39. That concession alone is enough to doom Musk's argument.

To displace the "strong presumption that prosecutors act lawfully when carrying out their duties," Musk must identify someone who violated Section 13(d) and was not charged, and he "must plausibly allege that there are 'no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions'" between the two situations. *Valibeigi*, 2024 WL 4332626, at *3. Musk's motion, however, does not identify any Section 13(d) violator whom the SEC did not charge and "was similarly situated in material respects." *Valibeigi*, 2024 WL 4332626, at *3. He needed to show at least one person similarly situated "across *a range* of relevant prosecutorial factors." *Id.*; *see also U.S. v. AT&T Inc.*, 290 F. Supp. 3d 1, 4 (D.D.C. 2018) (analyzing factors in anti-trust context). The relevant factors here include ill-gotten gains and harm to investors of more than $150 million, as well as withholding from the market that Musk was building a large stake in a public company that he had been publicly criticizing. Musk fails to carry his burden on this prong.

Musk instead advances a novel legal theory, arguing that if the SEC seeks a remedy against him that differs from what the SEC sought from other violators of Section 13(d), the doctrine of selective enforcement should allow him to escape all liability. That is not the law. The question for selective enforcement is whether similarly situated individuals *have been similarly charged*, not a line-by-line

comparison of prayers for relief. Musk does not cite any case where a court dismissed a claim under his proposed theory of selectively seeking disgorgement.

Even if such a theory was cognizable, it fails on its own terms. Musk claims— incorrectly—that "the SEC has **never** sought disgorgement in a Section 13(d) case— **except** in this case against Mr. Musk—in which it does not allege intentional, deliberate, or willful misconduct or investor harm." MTD at 40. The premise of Musk's argument is wrong because the Complaint *does* allege investor harm. Compl. ¶ 46 ("Musk's violation resulted in substantial economic harm to investors selling Twitter common stock between March 25, 2022 and April 1, 2022"); *id.* ¶ 5.

Moreover, the SEC regularly seeks—and courts regularly order— disgorgement when appropriate for violations of Section 13(d). *See, e.g.*, *First City Financial*, 890 F.2d at 1230 (affirming order for disgorgement for late filing in violation of Section 13(d)); Compl., *SEC v. McKillop*, No. 1:19-cv-00852-RBW, ECF No. 1 (D.D.C. Mar. 29, 2019) (seeking disgorgement based on strict liability claims, including violations of Section 13(d)); Final Judgment, *SEC v. McKillip*, No. 1:19-cv-00852-RBW, ECF No. 3 (D.D.C. Apr. 2, 2019) (ordering disgorgement of $117,000 and prejudgment interest); Compl., *SEC v. Bandfield*, No. 1:14-cv-05271, ECF No. 1 (S.D.N.Y. Sept. 9, 2014) (seeking disgorgement for violation of Section 13(d) and related claims); Compl., *SEC v. Lefkowitz*, No. 8:12-cv-1210-MSS-MAP, ECF No. 1 (M.D. Fla. May 30, 2012) (seeking disgorgement for violations of Section 13(d) and other violations); Final Judgment as to Def. Peacock, *SEC v. Lefkowitz*, No. 8:12-cv-1210-MSS-MAP, ECF No. 140 (M.D. Fla. Feb. 10, 2015) (ordering $746,621 in

disgorgement and prejudgment interest for strict liability violations including Section 13(d)); Compl., *SEC v. Blech*, No. 12-cv-3703-AJN, ECF No. 1 (S.D.N.Y. May 9, 2012) (seeking disgorgement from Chassman for violations, including under Section 13(d)); Final Judgment, *SEC v. Blech*, No. 12-cv-3703-AJN, No. 31 (S.D.N.Y Aug. 22, 2013) (ordering Chassman to pay $415,248 in disgorgement and prejudgment interest); Compl., *SEC v. Sonfield*, No. 4:08-cv-02351, No. 1 (S.D. Tex. July 29, 2008) (seeking disgorgement from Lane and Brewer charged with reporting violations, including Section 13(d)); Final Judgment, *SEC v. Sonfield*, No. 4:08-cv-2351, No. 180 (S.D. Tex. July 28, 2016) (ordering Lane and Brewer jointly and severally liable for $6,405,601.18 in disgorgement and prejudgment interest).

### 2) A Prayer for Disgorgement Does Not Infringe Musk's Constitutional Rights

Musk also fails to show that the SEC's request for disgorgement somehow violates a constitutional right. Musk argues that the "temporal proximity" between his public critiques of the SEC and the filing of this case are sufficient to prove that this lawsuit infringes upon his First Amendment rights. MTD at 41–42. Musk does not cite any case that held that "temporal proximity" between statements critical of the government and the filing of an enforcement action is sufficient to show a constitutional violation. Of course, temporal proximity alone cannot be enough—otherwise, a target of an investigation could avoid all liability simply by criticizing the investigating agency before it files a complaint.

Instead, as other courts have observed, criticism does not provide a reason to suspect the person criticized acts for biased reasons. *See In re Evergreen Sec., Ltd.*,

570 F.3d 1257, 1279 (11th Cir. 2009); *U.S. v. Marshall*, 77 F. Supp. 2d 764, 768

(N.D. Tex. 1999) ("The mere fact that a defendant has made derogatory remarks

about a judge is insufficient to convince a sane and reasonable mind that the

attacked judge is biased or prejudiced.") (citation omitted).

Courts have rejected similar arguments about supposed SEC bias when

Musk raised them in the past. *SEC v. Musk*, No. 22-1291, 2023 WL 3451402, at *2

(2d Cir. May 15, 2023), *cert. denied,* 144 S. Ct. 1457 (2024); *SEC v. Musk*, No. 3:23-

mc-80253-JSC, 2024 WL 2875096, at *3 (N.D. Cal. May 14, 2024); *SEC v. Musk*, No.

23-MC-80253-LB, 2024 WL 1511903, at *4 (N.D. Cal. Feb. 10, 2024); *SEC v. Musk*,

No. 18-cv-8865 (LJL), 2022 WL 1239252 at **8–9 (S.D.N.Y. April 27, 2022). Musk

does not explain how this action, which brings a single strict liability claim, is any

different.

### D.    The Commission's Structure Is Constitutional

Lastly, Musk argues that the Court must dismiss his case because of what

Musk claims to be unconstitutional removal protections for SEC Commissioners.

But SEC Commissioners do not have any statutory removal protections, and Musk

has not explained how purported removal protections caused him any actual harm.

### 1)    Musk Has Not Shown Any Limits to Removal

Musk's Article II structure argument fails because no statute grants SEC

Commissioners removal protections. The statute authorizing the President to

appoint Commissioners to the SEC provides that SEC Commissioners are "to be

appointed by the President by and with the advice and consent of the Senate." 15

U.S.C. § 78d(a). Subject to certain exceptions, "[e]ach commissioner shall hold office

43

for a term of five years and until his successor is appointed." *Id.* Under long-settled canons of statutory interpretation, when Congress grants the authority to appoint, that authority inherently includes the right to remove. "[A]s a matter of statutory interpretation, . . . absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'" *Carlucci v. Doe*, 488 U.S. 93, 99 (1988) (quoting *Keim v. U.S.*, 177 U.S. 290, 293–94 (1900)) (collecting cases). The power to remove, as a matter of statutory construction, "should not be held to be taken away by mere inference or implication" because to the extent the President's removal power even could "have been taken away by an act of Congress, court[s] . . . require explicit language to that effect." *Shurtleff v. U.S.*, 189 U.S. 311, 315 (1903). Musk points to no such "explicit language" in the Exchange Act or in any other statute that limits the President's authority to remove Commissioners.

Musk instead points to a case where the Supreme Court assumed—but did not hold—that Commissioners enjoyed removal protections. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 487 (2010). The assumption in that case cannot overcome the President's inherent removal authority and the plain text of relevant statutes. As such, Musk has not demonstrated that there are any statutory limitations on the President's ability to remove SEC Commissioners.

### 2) Musk Does Not Show Harm from Commissioners' Purported Removal Protections

Even if Musk had shown that Congress tried to impose limits on the President's power to remove SEC Commissioners, Musk has not shown how any purported restrictions on the President's power to remove SEC Commissioners

would make any difference in this case. A challenge to the "President's authority to *remove*" is not a claim there was any "constitutional defect in the statutorily prescribed method of appointment." *Collins v. Yellen*, 594 U.S. 220, 257 (2021). "As a result, there is no reason to regard any of the actions taken by [the Commissioners] as void," unless Musk can point to specific facts to show that but-for the alleged unconstitutional removal protections, the Commission would not have authorized this enforcement action. *See id.*; *accord Leachco, Inc. v. CPSC*, 103 F.4th 748, 756–58 (10th Cir. 2024); *CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 180 (2d Cir. 2023); *K&R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023); *Kaufmann v. Kijakazi*, 32 F.4th 843, 849–50 (9th Cir. 2022).

Musk does not claim that the President sought to remove any SEC Commissioners. And Musk provides no evidence that, but for the purported limits on President's removal authority, the Commission would not have authorized filing this action—or would have withdrawn that authorization.[7]

## CONCLUSION

For these reasons, the Court should deny Musk's Motion to Strike and Dismiss.

---

[7] Even if Musk could identify a statutory provision that imposed an unconstitutional removal restriction, without a finding that the provision caused Musk any harm, the correct response would be severing that restriction from the statute, *Walmart, Inc. v. Chief Administrative Law Judge*, 144 F.4th 1315, 1348–49 (11th Cir. 2025), not a dismissal of this lawsuit.

Dated: December 1, 2025                    Respectfully submitted,


                                           By: /s/ Zachary A. Avallone

                                           Melissa J. Armstrong (Texas Bar No. 24050234)
                                                Tel. No. 202.551.4724
                                                Email: armstrongm@sec.gov
                                           Zachary A. Avallone (DC Bar No. 1023361)
                                                Tel. No. 202.551.4479
                                                Email: avallonez@sec.gov

                                           United States Securities and Exchange
                                           Commission
                                           100 F Street, N.E.
                                           Washington, D.C. 20549