**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 25-cv-00105-SLS |
| v. | |
| ELON MUSK | |
| Defendant. | |

**REPLY IN SUPPORT OF DEFENDANT ELON MUSK'S**
**MOTION TO STRIKE PRAYERS FOR RELIEF II AND III AND**
**TO DISMISS COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... II

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.     THE SEC FAILS TO PLEAD FACTS SUPPORTING ITS REQUESTED
REMEDIES ............................................................................................................... 3

     A.     Defendant's Motion To Strike Is Not Premature ................................... 3

     B.     The SEC's Opposition Fails To Salvage Its Claim To A Permanent
Injunction ............................................................................................... 4

     C.     The SEC's Opposition Fails To Salvage Its Claim To Disgorgement ..... 7

          1.     The SEC's Deafening Silence On *Ripple Labs* ............................. 7

          2.     Every Case The SEC Cites Involves Either Realized Profits Or
Fraud ........................................................................................... 7

          3.     Disgorgement Would Violate The Eighth Amendment ............. 12

II.     THE SEC'S OPPOSITION DOES NOT SALVAGE ITS CONSTITUTIONALLY
INFIRM COMPLAINT ........................................................................................... 13

     A.     Section 13(d) Impermissibly Compels Disclosure Of Protected Speech ... 13

          1.     *Zauderer* Does Not Apply To Section 13(d)'s Compelled Speech ... 14

          2.     The SEC's Alternative Attempts To Avoid Strict Scrutiny Fail ... 16

          3.     Section 13(d) Cannot Survive Under Any Scrutiny ................... 17

     B.     Section 13(d) And Rule 13d-1 Are Unconstitutionally Vague ............... 18

     C.     The SEC's Selective Enforcement Violates The Constitution ............... 20

     D.     The SEC's Structure Violates Article II ................................................ 22

CONCLUSION .................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. SEC,*
   446 U.S. 680 (1980) ..................................................................................................... 5

*Ams. for Prosperity Found. v. Bonta,*
   594 U.S. 595 (2021) ...................................................................................................... 16

*Axon Enter., Inc. v. Fed. Trade Comm'n,*
   598 U.S. 175 (2023) ...................................................................................................... 23

*Bolger v. Youngs Drug Prods. Corp.,*
   463 U.S. 60 (1983) ........................................................................................................ 16

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
   447 U.S. 557 (1980) ..................................................................................................16, 18

*Chamber of Commerce of United States v. SEC,*
   85 F.4th 760 (5th Cir. 2023) ....................................................................................... 14

*Collins v. Yellen,*
   594 U.S. 220 (2021) ....................................................................................................22, 23

*Dellums v. U.S. Nuclear Regul. Comm'n,*
   863 F.2d 968 (D.C. Cir. 1988) ...................................................................................... 9

*Dooley v. United Food & Com. Workers,*
   2023 WL 2139200 (D.D.C. Feb. 21, 2023) ................................................................ 11

*Dreamland Baby Co. v. Consumer Prod. Safety Comm'n,*
   2025 WL 2758476 (D.D.C. Sept. 26, 2025) ............................................................... 23

*\*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
   561 U.S. 477 (2010) ...................................................................................................... 22

*Full Value Advisors, LLC v. SEC,*
   633 F.3d 1101 (D.C. Cir. 2011) ................................................................................16, 17

*Harris v. Bessent,*
   No. 25-cv-5037 (GGK) (D.C. Cir. Dec. 5, 2025) ..................................................... 23

*Janigan v. Taylor,*
   344 F.2d 781 (1st Cir. 1965) ......................................................................................... 10

*Kimberly-Clark Corp. v. D.C.*,
  286 F. Supp. 3d 128 (D.D.C. 2017) ........................................................ 15

*\*Liu v. SEC*,
  591 U.S. 71 (2020) ..................................................................... 3, 7, 9

*Lucia v. SEC*,
  585 U.S. 237 (2018) ........................................................................ 23

*Marshall v. Columbia Lea Reg'l Hosp.*,
  345 F.3d 1157 (10th Cir. 2003) ........................................................ 22

*Matiella v. Murdock Street LLC*,
  2023 WL 4684854 (D.D.C. July 21, 2023) .......................................... 3, 4

*Monsalvo v. Bondi*,
  604 U.S. 712 (2025) ........................................................................ 20

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) ........................................................................ 14

*\*NAACP v. Button*,
  371 U.S. 415 (1963) ........................................................................ 19

*Nat'l Ass'n of Mfrs. v. SEC*,
  748 F.3d 359 (D.C. Cir. 2014) .......................................................... 17

*\*Nat'l Ass'n of Mfrs. v. SEC*,
  800 F.3d 518 (D.C. Cir. 2015) .................................................... 14, 15

*NetChoice, LLC v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) ............................................................ 14

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024) ......................................................... 16

*Nwachukwu v. Karl*,
  216 F.R.D. 176 (D.D.C. 2003) ............................................................ 3

*Pacific Gas & Electric Co. v. Public Utilities Commission*,
  475 U.S. 1 (1986) ........................................................................... 18

*Padgett v. Vilsack*,
  2025 WL 1713254 (D.D.C. June 18, 2025) ............................................ 4

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
  153 F.4th 795 (9th Cir. 2025) .......................................................... 16

*R.J. Reynolds Tobacco Co. v. Food & Drug Admin.*,
    696 F.3d 1205 (D.C. Cir. 2012)..................................................................15

*Riley v. Nat'l Fed'n of the Blind*,
    487 U.S. 781 (1988) .................................................................................16

*Rondeau v. Mosinee Paper Corp.*,
    422 U.S. 49 (1975) .....................................................................................6

*SEC v. Ahmed*,
    72 F.4th 379 (2d Cir. 2023) .....................................................................10

*SEC v. Aronson*,
    665 Fed. App'x 78 (2d Cir. 2016) ............................................................8

*SEC v. AT&T, Inc.*,
    626 F. Supp. 3d 703 (S.D.N.Y. 2022) ......................................................17

*SEC v. Bilzerian*,
    29 F.3d 689 (D.C. Cir. 1994)...........................................................5, 9, 11

*SEC v. Brown*,
    878 F. Supp. 2d 109 (D.D.C. 2012) ...........................................................5

*SEC v. Coleman*,
    1993 WL 13653773 (D.D.C. Apr. 21, 1993).............................................5

*SEC v. Commonwealth Equity Servs.*,
    133 F.4th 152 (1st Cir. 2024)...................................................................12

*SEC v. Crowd Mach., Inc.*,
    2023 WL 8438553 (N.D. Cal. Dec. 5, 2023)..............................................8

*SEC v. Crystal World Holdings, Inc.*,
    2025 WL 326593 (D.D.C. Jan. 28, 2025)  .................................................9

*SEC v. E-Smart Techs.*,
    139 F. Supp. 3d 170 (D.D.C. 2015) .......................................................8, 9

*SEC v. First City Fin. Corp., Ltd.*,
    688 F. Supp. 705 (D.D.C. 1988)................................................................9

*SEC v. First City Fin. Corp., Ltd.*,
    890 F.2d 1215 (D.C. Cir. 1989).............................................5, 11, 12, 21

*SEC v. First Pac. Bancorp*,
    142 F.3d 1186 (9th Cir. 1998)...................................................................8

*SEC v. Gentile,
    2020 WL 5793699 (D.N.J. Sept. 29, 2020) ...................................................................... 3

*SEC v. Gentile,
    939 F.3d 549 (3d Cir. 2019) ...................................................................................................... 4

SEC v. Govil,
    86 F.4th 89 (2d Cir. 2023) ........................................................................................................ 9

SEC v. Gulf & W. Indus., Inc.,
    502 F. Supp. 343 (D.D.C. 1980) .............................................................................................. 3

SEC v. Jarkesy,
    No. 22-cv-859 (Mar. 8, 2023) ................................................................................................22

SEC v. Johnson,
    595 F. Supp. 2d 40 (D.D.C. 2009) .......................................................................................... 5

SEC v. Liu,
    2022 WL 3645063 (9th Cir. Aug. 24, 2022) .......................................................................... 8

SEC. v. MacDonald,
    699 F.2d 47 (1st Cir. 1983) ................................................................................................... 10

SEC v. Mannion,
    28 F. Supp. 3d 1304 (N.D. Ga. 2014) ..................................................................................... 8

SEC v. Metter,
    706 F. App'x 699 (2d Cir. 2017) ........................................................................................... 12

SEC v. Morningstar Credit Ratings, LLC,
    578 F. Supp. 3d 563 (S.D.N.Y. 2022) ................................................................................ 3, 6

SEC v. Navellier & Assocs., Inc.,
    108 F.4th 19 (1st Cir. 2024) .................................................................................................. 10

*SEC v. Ripple Labs, Inc.,
    2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024) ..................................................................... 1, 7

SEC v. Savoy Indus., Inc.,
    587 F.2d 1149 (D.C. Cir. 1978) .............................................................................................. 6

SEC v. Seghers,
    298 Fed. App'x 319 (5th Cir. 2008) ....................................................................................... 8

SEC v. Shapiro,
    494 F.2d 1301 (2d Cir. 1974) ................................................................................................. 8

*SEC v. Sripetch*,
    154 F.4th 980 (9th Cir. 2025) ................................................................. 10

*\*SEC v. Steadman*,
    967 F.2d 636 (D.C. Cir. 1992) ................................................... 3, 4, 5, 6

*SEC v. Wall Street Publishing Inst., Inc.*,
    851 F.2d 365 (D.C. Cir. 1988) ........................................................ 16, 17

*SEC v. Yang*,
    2014 WL 2198323 (N.D. Ill. May 27, 2014) ............................................ 8

*Simba v. Fenty*,
    754 F. Supp. 2d 19 (D.D.C. 2010) .......................................................... 3

*Space Expl. Techs. Corp. v. Nat'l Lab. Rels. Bd.*,
    151 F.4th 761 (5th Cir. 2025) ............................................................... 23

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ............................................................................... 6

*In re Tesla Inc. Sec. Litig.*,
    No. 3:18-cv-4865, ECF No. 671 (N.D. Cal. Feb. 3, 2023) ...................... 4

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994) ............................................................................. 17

*United States v. Bajakajian*,
    524 U.S. 321 (1998) ............................................................................. 12

*United States v. Bikundi*,
    926 F.3d 761 (D.C. Cir. 2019) ............................................................. 13

*Vill. of Hoffman Ests. v. Flipside, Hoffman Est.*,
    455 U.S. 489 (1982) ............................................................................. 19

*Walmart, Inc. v. Chief Administrative Law Judge*,
    144 F.4th 1315 (11th Cir. 2025) ........................................................... 23

*Winter v. United States*,
    196 F.3d 339 (2d Cir. 1999) ................................................................ 22

*Young v. American Mini Theatres, Inc.*,
    427 U.S. 50 (1976) ............................................................................... 19

*Zacharias v. SEC*,
    569 F.3d 458 (D.C. Cir. 2009) ............................................................... 9

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) ..........................................................................................13, 15

## Statutes

5 U.S.C. § 706(2)(B) .................................................................................................23

15 U.S.C. § 78m.................................................................. 1-2, 5-6, 8, 11-13, 17-21

## Rules and Regulations

17 C.F.R. § 240.13d-1 .........................................................................................18, 20

17 C.F.R. § 240.13d-101 ...........................................................................................14

90 Fed. Reg. 8235 (Jan. 20, 2025).............................................................................23

Fed. R. Civ. P. 12(b)(6) ..............................................................................................3

Fed. R. Civ. P. 12(f).....................................................................................................3

## Other Authorities

*In the Matter of Essex Woodlands Management, Inc.*,
  Release No. 101161 (Sept. 25, 2024)......................................................................21

*SEC v. Bandfield*, No. 1:14-cv-05271 (S.D.N.Y.)....................................................11

*SEC v. Blech*, No. 12-cv-3703-AJN (S.D.N.Y.) ......................................................11

*SEC v. Lefkowitz*, No. 8:12-cv-1210-MSS-MAP (M.D. Fla.) ..................................11

*SEC v. McKillop*, No. 1:19-cv-00852-RBW (D.D.C.) ..............................................11

*SEC v. Sonfield*, No. 4:08-cv-02351 (S.D. Tex.) .....................................................11

## PRELIMINARY STATEMENT

The SEC's opposition underscores that this enforcement action is unprecedented in the agency's 91-year history. The SEC seeks a permanent injunction and $150 million in disgorgement for an alleged 11-day inadvertent late filing under Section 13(d)—relief that the SEC has never sought under comparable circumstances, despite claiming to "regularly" pursue Section 13(d) violations. This Court should grant Defendant's motions to strike and dismiss.

***The SEC Does Not And Cannot Identify A Single Comparable Case Supporting The Injunctive Relief And Disgorgement Sought.*** The SEC first seeks delay, arguing that this Court should not decide Defendant's motion to strike at this time. But courts routinely strike prayers for relief that lack legal and factual foundation at the pleading stage. This Court should do so here. The SEC's prayer for injunctive relief cannot withstand scrutiny because the SEC fails to plead *any* of the requisite *Steadman* factors. For disgorgement, the SEC faces an insurmountable obstacle it never addresses—*SEC v. Ripple Labs, Inc.*, 2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024). There, the U.S. District Court for the Southern District of New York rejected the SEC's claim for disgorgement where the SEC pleaded investors "could have" received more with additional information—*precisely* the SEC's theory here. And, the disgorgement cases the SEC does cite are inapposite. Each involves (i) fraud and deliberate misconduct, and/or (ii) realized profits from selling shares (*i.e.*, actual *ill-gotten gains*, not alleged *savings*). Opp. 12-19. Here, in contrast, the SEC does not allege Mr. Musk sold his Twitter shares, nor could it. And, rather than allege fraud or intentional misconduct, the SEC cherry-picks allegations that do not plead the deliberateness and state of mind required by law.

The SEC's constitutional arguments are similarly unavailing, necessitating dismissal.

***Section 13(d) Unconstitutionally Compels Disclosure Of Opinions.*** The SEC cannot

1

avoid heightened scrutiny; Schedule 13D is not commercial advertising and compels disclosure of forward-looking *opinions* about what an investor might do in the future, not *uncontroversial facts*. Strict scrutiny is required, but even under intermediate scrutiny, Section 13(d)'s compelled speech cannot stand.

**The SEC Misapprehends Vagueness Doctrine.**   In an attempt to deflect from its own vacillation on which deadline applies, the SEC repeatedly asserts that Mr. Musk "missed both deadlines," Opp. 35, but in the First Amendment context, vague statutes are invalid regardless of whether they plainly apply to a particular defendant.   The SEC's own contradictory enforcement orders, the 2023 amendment adding "business" to clarify "days," and widespread confusion among courts and practitioners prove the statute's vagueness.

**The SEC Seeks To Punish Protected Criticism.**   The SEC's selective enforcement is apparent from its opposition:   The SEC admits it "regularly" enforces Section 13(d), Opp. 39, yet does not identify a *single non-fraud case* where it sought anything approaching $150 million in relief.   The typical Section 13(d) case involves civil penalties of around $100,000—orders of magnitude less than what the SEC seeks here.   The temporal proximity between Mr. Musk's sustained criticism of the SEC and the Complaint—days before the new Administration took office—combined with the unprecedented relief sought, establishes a *prima facie* case of retaliation and selective enforcement that the SEC does not rebut.

**The Structure Of The SEC Violates Article II.**   Finally, in a fruitless attempt to avoid dismissal mandated by Article II, the SEC backtracks on decades of contrary representations to courts and ignores the clear harm from this ongoing enforcement proceeding.

**ARGUMENT**

## I.    THE SEC FAILS TO PLEAD FACTS SUPPORTING ITS REQUESTED REMEDIES

The SEC's opposition confirms that it fails to allege the most fundamental requirement of the injunctive relief sought—a "reasonable likelihood of future violations," *SEC v. Steadman*, 967 F.2d 636, 647-48 (D.C. Cir. 1992), and lacks every prerequisite for disgorgement under *Liu v. SEC*, 591 U.S. 71, 75 (2020).

### A.    Defendant's Motion To Strike Is Not Premature

The SEC repeatedly asserts that remedies questions should await trial, Opp. 3-4, 11, but courts routinely dismiss requests for injunctive relief at the pleading stage where, as here, the SEC fails to plausibly allege entitlement.    *See, e.g.*, *SEC v. Gentile*, 2020 WL 5793699, at *14 (D.N.J. Sept. 29, 2020); *SEC v. Morningstar Credit Ratings, LLC*, 578 F. Supp. 3d 563, 576-77 (S.D.N.Y. 2022).    The SEC's cited authority confirms that remedies must be "provided for by law," *Simba v. Fenty*, 754 F. Supp. 2d 19, 23 (D.D.C. 2010) (cited at Opp. 4, 11), yet the SEC does not identify any case awarding the relief it seeks here—a permanent injunction absent flagrant or willful lawbreaking and $150 million in disgorgement without victims, scienter, or profits.    Motions to strike "should be granted where," as here, there is no likelihood of success and "removal from the case would avoid wasting unnecessary time and money litigating the invalid [pleading]." *SEC v. Gulf & W. Indus., Inc.*, 502 F. Supp. 343, 345 (D.D.C. 1980).    And, although the SEC claims that Mr. Musk fails to show prejudice, Opp. 2-3, its own authorities makes clear that Rule 12(f) requires no such thing.    Opp. 3 (citing *Matiella v. Murdock Street LLC*, 2023 WL 4684854, at *6 (D.D.C. July 21, 2023); *Nwachukwu v. Karl*, 216 F.R.D. 176, 178 (D.D.C. 2003)).    Moreover, the SEC concedes that Rule 12(b)(6) applies even if Rule 12(f) does not, Opp. 3-4, and *Matiella* confirms that courts "have utilized both Rule 12(f) and Rule 12(b)(6)" when "faced with a request to find

that a complaint's demand for relief is legally insufficient." *Matiella*, 2023 WL 4684854, at *6. This Court should not "rubber-stamp the Commission's request for an obey-the-law injunction simply because it has been historically permitted." *SEC v. Gentile*, 939 F.3d 549, 565 (3d Cir. 2019).

**B.     The SEC's Opposition Fails To Salvage Its Claim To A Permanent Injunction**

In a belated attempt to support its claim to injunctive relief, the SEC tries to backfill its pleading deficiencies, but "it is well settled that a party cannot amend [its] complaint through motions briefing." *Padgett v. Vilsack*, 2025 WL 1713254, at *2 (D.D.C. June 18, 2025). "Injunctive relief is reserved for willful lawbreakers or those whose operations are so extremely or persistently sloppy as to pose a continuing danger to the investing public." *Steadman*, 967 F.2d at 648; *see also id.* ("The relevant factors we consider … include[s] … whether the violation was flagrant."). The SEC does not come close to pleading likelihood of future harm, deliberateness, flagrancy, or continued danger.

***The SEC Does Not Plead A Pattern Of Violations.***     The SEC attempts to manufacture a "pattern" of misconduct based on a 2018 consent decree nowhere mentioned in the Complaint. Opp. 5.   Even if this Court were to permit the SEC to revise its Complaint through its opposition, the SEC does not show repeated misconduct or a "reasonable likelihood of further violations in the future." *Steadman*, 967 F.2d at 647.   As the SEC itself recognizes, the 2018 consent decree did not include an admission of liability.   Opp. 5.   No jury or court has *ever* found Mr. Musk liable for a violation of the securities laws.   Indeed, a unanimous jury concluded that Mr. Musk was *not* liable for any of the conduct that previously had been charged by the SEC.   Jury Verdict, *In re Tesla Inc. Sec. Litig.*, No. 3:18-cv-4865, ECF No. 671 (N.D. Cal. Feb. 3, 2023).   Thus, the SEC does not plead a violation, much less a pattern of violations.   Further, even if the SEC's unpleaded characterization were correct (which it is not), two unrelated incidents over a decades-

long and storied career do not constitute the repeated violations warranting the "drastic remedy" of a permanent injunction. *Steadman*, 967 F.2d at 648; *SEC v. Johnson*, 595 F. Supp. 2d 40, 44 (D.D.C. 2009); *SEC v. Brown*, 878 F. Supp. 2d 109, 119 (D.D.C. 2012).

   ***The Violation Was Technical, Not Flagrant.***    The SEC seeks to avoid the requirement for injunctive relief by relying on the fact that Section 13(d) is a strict liability statute, Opp. 6, but injunctive relief is for "flagrant and deliberate" violations. *Steadman*, 967 F.2d at 647-48; *see also Aaron v. SEC*, 446 U.S. 680, 701 (1980) (scienter or lack of it is "one of the aggravating or mitigating factors" in determining whether to grant injunctive relief).   Here, the SEC does not plead *any* facts suggesting, much less showing, that Mr. Musk's alleged violation of Section 13(d) was "flagrant," or that Mr. Musk acted deliberately.

   *Bilzerian* and *First City*, on which the SEC relies, Opp. 8, are readily distinguishable. Those cases involved deliberate schemes to evade disclosure, including active concealment of defendants' intentions through subterfuge, false statements, and repeated violations. *SEC v. Bilzerian*, 29 F.3d 689, 691-92 (D.C. Cir. 1994) (multiple false disclosures to induce a "white knight" to repurchase stock at a premium); *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1218 (D.C. Cir. 1989) (defendant acquired stock through "nominee accounts" to "maintain the secrecy of its purchases").   The SEC alleges no such facts here.   The SEC does not plead that Mr. Musk was engaged in a secret control bid when he allegedly missed the filing deadline.   The SEC does not plead concealment.   The SEC does not plead false statements.   The SEC does not plead a scheme.   Rather, the SEC pleads only that on the first business day after his wealth manager contacted a lawyer and 11 days after the deadline, Mr. Musk filed the schedule required under Section 13(d).   Compl. ¶¶ 38, 40.   This is a quintessential technical violation that does not warrant injunctive relief.   *See SEC v. Coleman*, 1993 WL 13653773, at *3 (D.D.C. Apr. 21, 1993)

(denying injunction where "SEC has not demonstrated that [defendant's] reliance was not in good faith").

**The SEC Does Not Plead A Future Opportunity To Violate The Law.**    Likewise, the Complaint is bereft of allegations that there is a likelihood that Mr. Musk will violate Section 13(d) in the future.    *Steadman*, 967 F.2d at 647-48.    The SEC's unpleaded speculation that Mr. Musk's wealth alone satisfies this prong, Opp. 9, would lead to the absurd result that any wealthy individual automatically faces a *permanent injunction* for *any* securities violation, while an individual of lesser means would not.    Moreover, the SEC does not plead that Mr. Musk regularly acquires 5% positions in public companies or that his businesses regularly engage in activities that would trigger Section 13(d).    *Cf. Steadman*, 967 F.2d at 648 (defendant's mutual funds created "opportunities to violate the securities laws in the future").    In any event, Twitter is now private, obviating Mr. Musk's (and everyone else's) Section 13(d) disclosure obligations.    *See Morningstar Credit Ratings, LLC*, 578 F. Supp. 3d at 576 (denying injunction where defendant no longer operated in regulated capacity).

**The Traditional Equitable Standard Applies.**    The SEC insists that it should be subject to a lesser burden of proof to seek and obtain injunctive relief than private Section 13(d) plaintiffs, Opp. 9, but this Court should reject this claim.    In *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024), the Supreme Court expressly rejected a relaxed injunction standard for government agencies.    Thus, the Supreme Court's holding in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 59 (1975), that "none of the evils to which the Williams Act was directed has occurred or is threatened" once the required disclosure has been made, applies *equally* in this SEC enforcement action.    *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1165 (D.C. Cir. 1978).    Because the SEC has not pleaded irreparable harm (and, indeed, has expressly pleaded that the required disclosure was

made over three years ago, Compl. ¶ 40), this Court should strike the claim to injunctive relief.

### C.    The SEC's Opposition Fails To Salvage Its Claim To Disgorgement

#### 1.    The SEC's Deafening Silence On *Ripple Labs*

The SEC's opposition spans 45 pages and cites 17 cases in the disgorgement section alone, Opp. 11-22, yet the SEC ignores entirely *SEC v. Ripple Labs, Inc.*, 2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024), a recent and directly applicable decision that undercuts any claim to disgorgement here.    There, the SEC alleged that the defendant sold securities in unregistered transactions, depriving investors of adequate information about their investments.    *Id.* at *5.    The court held that disgorgement was unavailable where investors merely "could have" received better terms with more information.    *Id.* at *5-7.    The court explained that disgorgement requires *actual pecuniary harm to victims* and that speculative "could have" scenarios are insufficient.    *Id.* at *6-7.

Here, the SEC's theory is identical to that rejected theory:    Investors who sold their stock "could have" received higher prices if Mr. Musk had disclosed earlier.    Compl. ¶ 46; Opp. 16. But these unnamed investors did not suffer *actual pecuniary harm*; they received *exactly* what they bargained for—the market price for Twitter shares on the days they chose to sell.    *Accord Ripple Labs, Inc.*, 2024 WL 3730403, at *6 (paying the "sticker price" is not pecuniary harm).    Someone who "might have" obtained a higher price with earlier disclosure is not a "victim" as required by *Liu*.    591 U.S. at 75, 79.    The SEC does not distinguish *Ripple Labs* because it is indistinguishable.

#### 2.    Every Case The SEC Cites Involves Either Realized Profits Or Fraud

The SEC cites numerous cases in which courts ordered disgorgement in securities cases, Opp. 12-19, but every one of those cases involves at least one of two distinguishing features, both

absent here: (i) the defendant sold securities and realized actual profits (*i.e.*, ill-gotten gains); and/or (ii) the defendant committed fraud or acted with scienter.

***No Profits.*** The SEC's "paper profits" cases, which predominantly pre-date *Liu*, all involve fraud and are thus inapposite. Opp. 12-13; *see SEC v. Crowd Mach., Inc.*, 2023 WL 8438553, at *5 (N.D. Cal. Dec. 5, 2023) ("assets *taken by fraud*"); *SEC v. Shapiro*, 494 F.2d 1301, 1305 (2d Cir. 1974) (insider trading); *SEC v. Mannion*, 28 F. Supp. 3d 1304, 1305 (N.D. Ga. 2014) ("various *fraudulent* schemes"); *SEC v. Seghers*, 298 Fed. App'x 319, 323 (5th Cir. 2008) ("*fraud*" allegations); *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1192 (9th Cir. 1998) (same); *SEC v. Liu*, 2022 WL 3645063, at *2 (9th Cir. Aug. 24, 2022) (same); *SEC v. Aronson*, 665 Fed. App'x 78, 81 (2d Cir. 2016) (same, with parallel criminal proceedings). These cases rest on preventing fraudsters from enjoying "a heads-I-win[-]tails-you-lose opportunity," *Shapiro*, 494 F.2d at 1309, a deterrence rationale that evaporates without scienter. Imposing disgorgement on those who act without scienter would perversely punish good-faith actors while doing nothing to discourage intentional violations.

The SEC calls it "absurd" that those who acquire companies after inadvertent Section 13(d) violations would escape disgorgement while those who resell shares at profit would face it, Opp. 14, but this distinction honors well-established equitable principles. The former lack scienter and profits; the latter acted deliberately for gain. The SEC's contrary approach would produce true absurdity: forcing defendants who made no money from an inadvertent violation to disgorge phantom profits.

The cases the SEC cites as purportedly permitting disgorgement of unrealized gains, Opp. 12-13, further undermine its position. In *SEC v. Yang*, 2014 WL 2198323 (N.D. Ill. May 27, 2014) the court believed it had "the authority to order 'disgorgement' of paper 'profits' that existed

8

at one time but were not realized," but declined to exercise it because Yang "made no profits." *Id.* at *2.   In *SEC v. E-Smart Technologies*, 139 F. Supp. 3d 170 (D.D.C. 2015), the defendant received no ill-gotten gains because he neither bought nor sold at manipulated prices; rather, he received stock "months before the fraudulent communication" and never sold.   *Id.* at 189-90. The remaining cases the SEC cites, Opp. 14, stand only for the proposition that realized profits can—in appropriate circumstances—serve as a reasonable approximation of a defendant's ill-gotten gains at the remedies stage.   *See SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705, 727 (D.D.C. 1988), *aff'd* 890 F.2d 1215 (D.C. Cir. 1989) (calculating disgorgement based on realized gains because sell price received shortly after disclosure approximated ill-gotten gains); *Bilzerian*, 29 F. 3d at 696-97 (same).   None of the cases cited by the SEC holds that disgorgement is available when a defendant never sold shares and thus never realized any profit.

*No Victims.*   The SEC's second insurmountable problem is that disgorgement must be "for victims," which "presupposes pecuniary harm."   *Liu*, 591 U.S. at 84-85; *SEC v. Govil*, 86 F.4th 89, 103 (2d Cir. 2023).   The Complaint alleges no victims or pecuniary harm.   At most, the SEC speculates that investors could have sold for more after disclosure.   Opp. 16; Compl. ¶ 45.   But hypothetical better prices do not constitute *harm*.   The SEC invokes pre-*Liu* precedent finding that disgorgement does not require third-party harm, Opp. 15 (citing *Zacharias v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009)), but *Liu* gutted that holding by requiring disgorgement be "for victims," 591 U.S. at 75, and so it is "no longer binding," *Dellums v. U.S. Nuclear Regul. Comm'n*, 863 F.2d 968, 978 n.11 (D.C. Cir. 1988).   *SEC v. Crystal World Holdings, Inc.*, 2025 WL 326593 (D.D.C. Jan. 28, 2025) (cited Opp. 15-16), declined to reconcile its holding with *Liu*, instead relying on *Zacharias*, while acknowledging that other circuits applying *Liu* have limited

9

disgorgement to actual pecuniary harm.    *Id.* at *2-3.    In any event, *Crystal World Holdings* involved actual money fraudulently obtained—not theoretical savings.    *Id.* at *1-2.

The SEC's out-of-circuit precedents undermine its position because each requires elements absent here:    *Sripetch* calls disgorgement a "profits-based remedy" for "conscious wrongdoers," *SEC v. Sripetch*, 154 F.4th 980 (9th Cir. 2025), and *Navellier* limits disgorgement to defendants who "profited from [] wrongdoing" and "engaged in concerted wrongdoing," *SEC v. Navellier & Assocs., Inc.*, 108 F.4th 19 (1st Cir. 2024).    In contrast, Mr. Musk is not alleged to have acted with scienter or to have made any profits from a delayed filing.

The SEC argues its Complaint "sufficiently alleges that Musk harmed investors," Opp. 16 (citing Compl. ¶¶ 5, 46), but these paragraphs contain only conclusory assertions, not well-pleaded allegations of harm.    Both paragraphs allege that investors "sold their shares at artificially low prices" resulting in "substantial economic harm"—but this is a *legal* conclusion, not a particularized *fact* allegation.    The SEC does not plead which investors sold, when they sold, how many shares they sold, or how much money they purportedly lost.    These are essential facts for disgorgement, and the SEC has not alleged them.

***No Scienter.***    The SEC concedes that disgorgement of consequential gains requires scienter, Opp. 17-19, yet any theoretical gains here would necessarily be consequential.    Twitter's stock price movement resulted from Mr. Musk's "hands"—his entrepreneurship and market presence—not "the value of the thing itself."    *SEC v. Ahmed*, 72 F.4th 379, 405 (2d Cir. 2023). As the First Circuit recognized (in a case cited by *SEC. v. MacDonald*, 699 F.2d 47, 48 (1st Cir. 1983), on which the SEC relies, Opp. 18-19), if an artist acquires paint by fraud and creates a valuable portrait, "we would not suggest that the defrauded party would be entitled to the portrait, or to the proceeds of its sale."    *Janigan v. Taylor*, 344 F.2d 781, 787 (1st Cir. 1965).    The SEC

heavily relies on *First City*, 890 F.2d at 1218, and *MacDonald*, 699 F.2d at 48, but those cases involved allegations of scienter and fraudulent conduct, and therefore do not and cannot support the SEC's argument that scienter is not required.

The SEC now tries to inject scienter into its Complaint through briefing, Opp. 19, but "it is axiomatic that Plaintiffs cannot amend their Complaint via their briefs." *Dooley v. United Food & Com. Workers*, 2023 WL 2139200, at *4 (D.D.C. Feb. 21, 2023) (citation omitted). Although the SEC alleges Mr. Musk knew disclosure was required above five percent, Opp. 7; Compl. ¶ 17, it does not allege that Mr. Musk knew *when* to file. Indeed, the SEC's own allegations undercut scienter: Mr. Musk filed on the first trading day after his wealth manager consulted an attorney, Opp. 7; Compl. ¶¶ 38, 40, an allegation consistent with good faith, not deliberate wrongdoing

The SEC's enforcement history confirms scienter's necessity. In every other Section 13(d) case, the SEC sought civil penalties around $100,000—not hundreds of millions in disgorgement. The handful of Section 13(d) cases in which the SEC sought disgorgement all involved fraud, or, at a bare minimum, deliberate misconduct.

| Defendant/ Respondent | Resolution | Duration of Violation | Nature of Conduct | Penalty | Disgorgement |
|---|---|---|---|---|---|
| *James K. McKillop* | Consent Decree | 46 violations over 9 years | Deliberate misconduct | $75,000 | $117,000 |
| *Robert Bandfield* | Default Judgment | Never filed | Deliberate misconduct | None | None |
| *Steven Peacock* | Consent Decree | Never filed | Deliberate misconduct | None | $609,763 |
| *David Blech* | Consent Decree | Never filed | Scienter-based fraud | None | $2,073,098 |
| *Roger Brewer & Marc Lane* | Default Judgment | Never filed | Part of scienter-based fraud scheme | $100,000 | $2,761,953.01 |
| *Paul A. Bilzerian* | Judgment | 18 days late | Scienter-based fraud | None | $33,140,787 |
| *First City Financial Ltd.* | Judgment | 12 days late | Deliberate misconduct | None | $2,700,000 |

Table 1; s*ee also* MTD 21-22 (collecting cases).   The SEC does not explain why this case warrants different treatment.

  ***No Causation.***   The SEC ignores the causation problem:   The Complaint does not allege how Twitter's stock price would have moved had Mr. Musk filed on the purported deadline rather than when he actually filed.   MTD 19.   The SEC instead argues that causation is "legislatively assumed" for Section 13(d) violations, Opp. 16-17, but this misreads *First City*.   That case held that Congress assumed late filers "improperly benefit[] by purchasing stocks at an artificially low price," 890 F.2d at 1230, establishing only the theoretical basis for liability—not that disgorgement is automatically warranted regardless of pleaded allegations.   *See SEC v. Commonwealth Equity Servs.*, 133 F.4th 152, 171-72 (1st Cir. 2024) (finding no causation due to improper assumptions). The SEC cannot bypass its burden to allege actual causation between the violation and the $150 million sought.   Legislative assumptions about improper benefit do not eliminate the requirement to allege that Mr. Musk's late filing actually caused $150 million in ill-gotten gains.   Critically, Congress cannot "silently rewrite" the meaning of "improper benefit" because Section 78u(d)(5) "incorporat[es] … longstanding equitable principles" that "must, absent other indication, be deemed to contain the limitations upon its availability that equity typically imposes."   *Liu*, 591 U.S. at 85-87.

### 3.  Disgorgement Would Violate The Eighth Amendment

  The SEC argues disgorgement is not punitive and thus beyond the Excessive Fines Clause, Opp. 20, but constitutional analysis looks past labels to substance.   Post-*Kokesh*, courts recognize disgorgement can be "essentially punitive" and thus a fine.   *SEC v. Metter*, 706 F. App'x 699, 703 (2d Cir. 2017).   A "fine" is "payment to a sovereign as punishment," *United States v. Bajakajian*, 524 U.S. 321, 327-28 (1998), which describes the SEC's demand precisely.   Post-

*Liu*, the SEC's request cannot be "properly characterized" as equitable disgorgement because it lacks all the hallmarks of equitable relief—no profits, no victims, no scienter.

The SEC argues that disgorgement "corresponds one-to-one to the amount [a defendant] derived from" illegal conduct and thus cannot be excessive, Opp. 21, but this argument assumes Mr. Musk "derived" $150 million from his late filing—an assumption the SEC does not plead facts to support.   The Complaint alleges only that Mr. Musk paid less than he would have paid with timely disclosure.   Compl. ¶ 44.   It does not allege he derived $150 million in profits.   The difference is constitutionally significant: punishing someone for money they never made is the very definition of excessive.

The SEC also suggests that this Court should consider whether disgorgement would "deprive Musk of his livelihood," Opp. 22, but this is contrary to the law of a majority of circuits, which "assess proportionality without considering a defendant's ability to pay," *United States v. Bikundi*, 926 F.3d 761, 796 & n.5 (D.C. Cir. 2019).   The D.C. Circuit itself has upheld a disgorgement determination without consideration of this factor.   *Id*. at 796.   Because the SEC is not entitled to disgorgement and that relief would violate the Constitution, it should be stricken from the Complaint.

## II.    THE SEC'S OPPOSITION DOES NOT SALVAGE ITS CONSTITUTIONALLY INFIRM COMPLAINT

The SEC's Complaint suffers from four independent constitutional defects, each of which requires dismissal.

### A.    Section 13(d) Impermissibly Compels Disclosure Of Protected Speech

The SEC attempts to sidestep strict scrutiny by invoking *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) (Opp. 22-29), but that doctrine applies only to *uncontroversial*, *factual* disclosures in *commercial advertising*—none of which describes Schedule 13D.

### 1.    *Zauderer* Does Not Apply To Section 13(d)'s Compelled Speech

*Zauderer*'s lower standard of review does not apply here.    *First*, "the Supreme Court's opinion in *Zauderer* is confined to advertising."    *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 522 (D.C. Cir. 2015) ("*NAM II*").    Schedule 13Ds are not advertising—they do not promote products, solicit customers, or propose any commercial transaction.    Rather, Schedule 13Ds are mandatory reports filed with a governmental agency.    *Chamber of Commerce of United States v. SEC*, 85 F.4th 760 (5th Cir. 2023), on which the SEC relies *passim*, is both out-of-circuit and relied on now-vacated authority for the proposition that *Zauderer* extends beyond advertising.    *See Chamber of* Commerce, 85 F.4th at 770 (citing *NetChoice, LLC v. Paxton*, 49 F.4th 439, 483 (5th Cir. 2022)); *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (vacating and remanding).    Under the D.C. Circuit's holding in *NAM II*, it is clear that because Schedule 13D does not concern advertising, *Zauderer* is inapplicable and the SEC cannot rest on the lesser scrutiny it permits in those narrow circumstances.

*Second*, even if *Zauderer* could extend beyond advertising, it permits reduced scrutiny only for disclosure of "purely factual" information.    The SEC refers again to *Chamber of Commerce*, which (still relying on the since-vacated *NetChoice* decision) held that requiring companies to disclose "reasons for repurchasing stock" was "purely factual."    Opp. 24-25.    But those reasons were *backward-looking explanations of completed transactions*, not disclosures of *forward-looking plans and proposals*.    Explaining why one did something that is completed requires recounting *facts*:    the considerations weighed, the information available, and the objectives that were pursued.

Item 4 of Schedule 13D is fundamentally different.    It requires disclosure of "plans or proposals which the reporting person *may* have" regarding future actions.    17 C.F.R. § 240.13d-101 (emphasis added).    An investor must disclose prospective plans such as (i) whether he "may"

seek to acquire additional shares; (ii) whether he may seek board representation; (iii) whether he may propose operational or corporate governance changes; and (iv) what his plans and proposals are for the company.    These are forward-looking opinions about contingent future actions—not facts about completed transactions that can be verified or refuted.    Future plans exist only in the speaker's mind and constantly evolve based on changing circumstances.    Compelling disclosure of speculative future intentions is thus compelling *opinion*, not *fact.    See, e.g.*, *NAM II*, 800 F.3d at 537-38 (Srinivasan, J., dissenting) (if a compelled statement "communicates a matter of opinion, it of course would not be purely factual") (internal quotation marks omitted).

*Third*, the SEC sets up a strawman, arguing that information is not "controversial" simply because "some might disagree with Congress's policy choice to require the disclosure," Opp. 26, but this is not Mr. Musk's point.    Disclosure of investment strategies is controversial not because investors dislike disclosing them, but because it forces investors to crystallize tentative strategic thinking into definitive public positions before critical information-gathering is complete and risks revealing proprietary investment strategies that competitors can exploit.    The SEC cites *NAM II*, 800 F.3d at 530, and *R.J. Reynolds Tobacco Co. v. Food & Drug Admin.*, 696 F.3d 1205, 1217 (D.C. Cir. 2012), as examples of "controversial" disclosures that "convey[] moral responsibility" or "browbeat consumers," Opp. 26, but controversy is not limited to moral condemnation. Rather, information is controversial when it forces speakers to take positions on contested issues— precisely what Item 4 requires when compelling disclosure of strategic assessments about potential changes in corporate control or governance.    As another case cited by the SEC (Opp. 25) explains, "a requirement can be controversial because it expresses 'a matter[] of opinion.'"    *Kimberly-Clark Corp. v. D.C.*, 286 F. Supp. 3d 128, 141 (D.D.C. 2017) (quoting *Zauderer*, 471 U.S. at 651).

## 2.     The SEC's Alternative Attempts To Avoid Strict Scrutiny Fail

The SEC invokes two further alternative theories to avoid strict scrutiny, neither of which is supported by law.    *First*, the SEC suggests that *Central Hudson* applies, Opp. 29-30, but "the core notion of commercial speech" is "speech which does no more than propose a commercial transaction."    *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (cleaned up).    The SEC never explains how Schedule 13D could constitute commercial speech given that it does not propose any transaction, advertise any service, or solicit any business.    Moreover, *Central Hudson* addresses speech *restrictions*, not speech *compulsions*.    Courts apply strict scrutiny when the government compels disclosure outside the narrow context of commercial advertising.    *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615-18 (2021) (applying exacting scrutiny to strike down compelled donor disclosures); *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 798 (1988) (applying strict scrutiny to compelled fundraising disclosures); *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119-21 (9th Cir. 2024) (applying strict scrutiny to requirement that businesses "opine on potential speech-based harms" from their services); *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 817 (9th Cir. 2025) ("In two recent cases, our court has applied strict scrutiny to evaluate government reporting requirements.").    The SEC does not cite a single case applying *Central Hudson* to compelled disclosures and does not explain why Schedule 13D should be treated more favorably than charitable or business disclosures.

The content-based nature of Schedule 13D also compels strict scrutiny.    MTD 26-27. The SEC's sole response is that securities disclosures deserve special treatment, Opp. 23, 33-34.[1]

---

[1]     The SEC cites *SEC v. Wall Street Publishing Inst., Inc.*, 851 F.2d 365 (D.C. Cir. 1988), and *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101 (D.C. Cir. 2011), claiming that securities disclosures receive reduced scrutiny.    Opp. 23.    But *Wall Street Publishing* addressed restrictions on investment magazines—publications that marketed investment advice to

But the D.C. Circuit expressly rejected this theory in *NAM I*, warning that such special First Amendment treatment "would allow Congress to easily regulate otherwise protected speech using the guise of securities laws."  748 F.3d at 372.[2]  Where, as here, the government compels disclosure of opinions and strategic assessments through mandatory filings, strict scrutiny applies.

### 3.    Section 13(d) Cannot Survive Under Any Scrutiny

Even under the SEC's preferred intermediate scrutiny—requiring only that Section 13(d) be "narrowly tailored" to serve a "substantial" government interest (Opp. 29-30)—the statute cannot survive.   The SEC bears the burden to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994).   The SEC, however, offers only legislative history from 1970 stating that stockholdings "between 5 and 10 percent" could result in control and in "some" corporations 10 percent provides "almost control."   Opp. 32 n.3.   These are conclusions, not evidence.   The SEC provides no studies correlating 5% ownership with control threats, no data showing market harm below that threshold, and no analysis of how markets have evolved since 1970.   The SEC rests entirely on stale congressional pronouncements.

Section 13(d)'s arbitrary exemptions further eviscerate the SEC's defense.   Institutional investors routinely exceed 5% ownership while filing only simplified Schedule 13G forms.   The

_____

subscribers—not mandatory government filings about investment strategies.   *See Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 372 (D.C. Cir. 2014) ("*NAM I*") (rejecting a broad reading of *Wall Street Publishing*).   And *Full Value Advisors* upheld certain non-public disclosures for hedge fund advisers—it did not apply *Zauderer* or suggest mandatory regulatory filings constitute "advertising."   633 F.3d at 1106-07.

2    The SEC's citation to *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703 (S.D.N.Y. 2022), Opp. 34, is inapt because it concerned false statements in voluntary earnings calls—classic commercial speech where companies marketed securities to investors.   626 F. Supp. 3d at 745.

SEC acknowledges this distinction but offers little explanation.   Opp. 31-32.   If 5% ownership truly threatens corporate control, then why does the same stake pose different risks depending on who holds it?   Moreover, if the statute truly targets "rapid" accumulations that threaten control, Opp. 30, then the disclosure requirements should vary based on the speed of acquisition—yet Section 13(d) applies the same ten-day deadline whether an investor accumulates 5% in a single day or over several months, further demonstrating the poor fit between the government's stated interest and its chosen means.

Even accepting the SEC's stated interest, Opp. 30, the agency never explains why this requires disclosure of speculative "plans or proposals" rather than just ownership facts.   Forcing investors to reveal tentative thoughts about what they might someday do advances no legitimate purpose.   Even under *Central Hudson*, regulations must "directly advance[]" the government's interest and be "not more extensive than is necessary."   447 U.S. at 566.   Compelling disclosure of opinions that may never materialize fails both requirements.

The SEC misapprehends the constitutional burden, arguing disclosure requirements do not "unduly burden" speech because investors remain free to "craft their own message."   Opp. 27. As the Supreme Court explained in *Pacific Gas & Electric Co. v. Public Utilities Commission*, 475 U.S. 1 (1986), the ability to speak *more* does not cure compelled speech violations.   *Id.* at 16. The government cannot force someone to speak and then claim no burden exists because the speaker remains free to say more.   In the face of the SEC's failure to provide evidence, inability to explain statutory inconsistencies, and refusal to consider alternatives, Section 13(d) cannot withstand scrutiny.

### B.    Section 13(d) And Rule 13d-1 Are Unconstitutionally Vague

The SEC cannot salvage an unconstitutionally vague statute that fails to specify whether "days" means calendar or business days by pointing the finger back at Mr. Musk.

***The SEC's Argument That Mr. Musk Missed The Deadline Misses The Point.*** The SEC argues that the Court "need not reach this constitutional issue" of vagueness because Mr. Musk "missed the deadline" whether calculated in calendar or business days, Opp. 35, but a statute "may be invalid if it prohibits privileged exercises of First Amendment rights *whether or not the record discloses that the petitioner has engaged in privileged conduct*." *NAACP v. Button*, 371 U.S. 415, 432 (1963) (emphasis added). For regulations of speech, even if there is "no uncertainty about the impact of the [law] on [the defendant's] own rights," a challenger may assert vagueness where the law chills protected expression by others. *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 59-60 (1976). The SEC does not dispute that Section 13(d) compels speech. Opp. 22-34. The SEC's repeated assertion that Mr. Musk missed both alleged deadlines, Opp. 35, is therefore irrelevant and should be ignored.

***The SEC's Own Conduct Proves The Rule Was Vague.*** The SEC issued multiple enforcement orders describing the deadline as "ten business days." MTD at 37 n.17. The SEC now dismisses these as errors that "did not make a difference as to liability," Opp. 37, but that argument is willfully obtuse. *Formal SEC enforcement orders represent the agency's authoritative interpretation.* When an enforcing agency cannot correctly state its own deadline in published, coordinated enforcement actions, the rule fails the constitutional requirement that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Vill. of Hoffman Ests. v. Flipside, Hoffman Est.*, 455 U.S. 489, 498 (1982) (citation omitted).

The SEC's February 2022 proposed rule—issued while Mr. Musk was purchasing Twitter stock—acknowledged the ambiguity by "clarifying" that "days" means "calendar days." Opp. 37. But agencies clarify ambiguous rules, not clear ones. The SEC's 2023 amendment

changing "ten days" to "five business days" confirms that clarification was necessary.     If "days" unambiguously meant calendar days, then the amendment would not have been necessary.

**The SEC Cannot Rely On** Monsalvo **To Cure Its Vagueness.**     The SEC cites *Monsalvo v. Bondi*, 604 U.S. 712 (2025), for the proposition that "days" presumptively means "calendar days," Opp. 36, but *Monsalvo* actually proves that Rule 13d-1 was unconstitutionally vague. There, the Supreme Court confronted whether "60 days" extended when the deadline fell on a weekend, acknowledging that "the statute is susceptible to both understandings."     604 U.S. at 725.     The Court ultimately held that "days" incorporated a specialized legal convention extending deadlines falling on weekends.     *Id.* at 731.     *Monsalvo* thus confirms that "days" can mean different things in different contexts—exactly Mr. Musk's point.     Unlike *Monsalvo*, here the SEC had previously used "business days" in multiple enforcement orders—creating the very ambiguity *Monsalvo* acknowledges exists.

### C.     The SEC's Selective Enforcement Violates The Constitution

The SEC argues it "regularly" seeks disgorgement for Section 13(d) violations, Opp. 41, but the cases it cites prove the opposite:     The SEC seeks modest penalties for inadvertent late filings and reserves disgorgement for fraud and deliberate schemes.     *See supra*, p. 11.     Here, the SEC seeks remedies *1,500 times larger* than the typical Section 13(d) case with no explanation why.     This extraordinary disparity, following *years* of Mr. Musk's protected criticism of the SEC, establishes both differential treatment and a constitutional violation.

**The SEC Fails To Cite A Similar Case.**     The SEC states that it "regularly seeks and obtains monetary penalties against individuals for late filings under Section 13(d)," Opp. at 40, yet it does not identify a *single case* seeking disgorgement of hundreds of millions of dollars for a single alleged 11-day-late filing.     In September 2024, the SEC resolved ten Section 13(d) violations against individuals with penalties ranging from $10,000 to $200,000—not $150 million.

MTD at 40.    Essex Woodlands filed nearly twenty days late—almost *double* Mr. Musk's alleged delay—yet paid only $225,000.    The SEC offers no explanation why an eleven-day delay warrants remedies 600 times larger than a twenty-day delay.

**The Cases The SEC Cites (Opp. 40-41) Prove Disparate Treatment.**    *First City* involved a defendant who "deliberately violated section 13(d)" as part of a scheme to evade disclosure. 890 F.2d at 1228.    The remaining cases the SEC cites are either consent decrees without substantive analysis or default judgments against recidivists and fraudsters.    *See supra*, p. 11. *McKillop* involved over 45 violations spanning nine years by an unregistered broker.    No. 1:19-cv-00852, ECF No. 1 ¶¶ 4, 21 (D.D.C. Mar. 26, 2019).    *Bandfield* was a default judgment against defendants who deliberately structured ownership to evade reporting requirements but never filed any Schedule 13D.    No. 1:14-cv-05271, ECF No. 1 ¶ 4 (E.D.N.Y. Sept. 9, 2014).    *Lefkowitz* involved a knowing illegal scheme to circumvent registration requirements.    No. 8:12-cv-1210, ECF No. 1 ¶¶ 3, 54-56, 67 (M.D. Fla. July 25, 2012).    *Blech* concerned a recidivist who committed securities fraud using nominee accounts to evade reporting requirements.    No. 12-cv-3703, ECF No. 1 ¶¶ 1, 48-61, 75 (S.D.N.Y. May 10, 2012).    *Sonfield* was a default judgment for penny stock manipulation where defendants never filed required disclosures.    No. 4:08-cv-2351, ECF No. 180 at 2 (S.D. Tex. July 28, 2016).    Not one example involves a single late filing promptly corrected without allegations of fraud, deliberate misconduct, or recidivism.

The SEC's actual practice is seeking modest penalties for simple late filings and disgorgement only in instances of fraud or deliberate misconduct.    Not one case involves disgorgement for a single inadvertent late filing promptly corrected after consulting counsel.

This case alone deviates from that pattern.[3]   The SEC "may not utilize invidious or legally impermissible criteria in singling out those responsible persons from whom it will collect." *Winter v. United States*, 196 F.3d 339, 350 (2d Cir. 1999).

### D.     The SEC's Structure Violates Article II

The SEC claims its Commissioners lack statutory removal protection, Opp. 43-44, but the Commission's litigation history repudiates this revisionist position.   In *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010), the government stipulated that SEC Commissioners are protected by for-cause tenure, and the Supreme Court decided the case "with that understanding."   *Id.* at 487.   In *SEC v. Jarkesy*, the government likewise assumed Commissioners could only be removed for cause.   Pet. for Writ of Cert. at 20, *SEC v. Jarkesy*, No. 22-cv-859 (Mar. 8, 2023).   The SEC cannot claim removal protection when defending its administrative law judges, then deny such protection when its own structure faces challenge. Either Commissioners enjoy the removal protection the agency has long asserted—making the structure unconstitutional under current precedent—or *Free Enterprise Fund* rests on a false premise and the SEC has misrepresented its independence for decades.

Even accepting the SEC's harm requirement, Opp. 44-45, Mr. Musk satisfies it.   Unlike *Collins v. Yellen*, 594 U.S. 220 (2021), which involved "retrospective relief" for past dividend payments, *id.* at 257, this case presents ongoing enforcement proceedings—a "here-and-now

---

[3]    The SEC invokes a presumption that prosecutors act lawfully, Opp. 40, but such presumptions yield to evidence of disparate treatment and retaliatory motive.   *See, e.g.*, *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003) (presumption of prosecutorial regularity may be overcome by clear evidence to the contrary).   The stark disparities here— remedies 1,500 times larger than typical cases, following protected speech, and reliance on a jury-rejected settlement—establish a *prima facie* case warranting discovery into the SEC's enforcement decisions, internal communications about Mr. Musk, and comparative treatment of similarly situated violators.

injury" that cannot be remedied after the case ends, *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 191 (2023).    *See also Dreamland Baby Co. v. Consumer Prod. Safety Comm'n*, 2025 WL 2758476, at \*12 (D.D.C. Sept. 26, 2025) (distinguishing between retrospective relief, which requires showing of harm, and prospective relief).    "[W]hen an agency's structure violates the separation of powers, the harm is immediate—and the remedy must be, too."    *Space Expl. Techs. Corp. v. Nat'l Lab. Rels. Bd.*, 151 F.4th 761, 767 (5th Cir. 2025).

Moreover, in *Collins*, the Supreme Court recognized "clear" harm where "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way."    594 U.S. at 260.    Here, the SEC filed suit days before President Trump's inauguration against a vocal critic who had become a key advisor.    Executive Order 14147 specifically identifies the SEC as appearing to have weaponized enforcement against political opponents.    90 Fed. Reg. 8235 (Jan. 20, 2025).    Had the President possessed unrestricted removal power, he could have installed Commissioners who would recognize this as an eleventh-hour political strike.    The SEC's opposition ignores this Executive Order, *Space Exploration Technologies*, and this Court's authority under 5 U.S.C. § 706(2)(B) to set aside agency action "contrary to constitutional right."[4]

The SEC exercises quintessentially executive power—substantive rulemaking, investigating violations, bringing enforcement actions, and imposing monetary relief.    *See Harris v. Bessent*, No. 25-cv-5037 (GGK) (D.C. Cir. Dec. 5, 2025).    Such power cannot be insulated from presidential control.    Dismissal is the appropriate remedy.

---

[4]    The SEC's reliance on *Walmart, Inc. v. Chief Administrative Law Judge*, 144 F.4th 1315, 1348-49 (11th Cir. 2025), Opp. 45 n.7, is misguided.    Severance cannot retroactively validate an enforcement decision made by Commissioners who lacked constitutional authority to authorize it in the first place.    *See Lucia v. SEC*, 585 U.S. 237, 251-52 (2018).

## CONCLUSION

For the foregoing reasons and those set forth in Mr. Musk's opening brief, this Court should strike the SEC's prayers for injunctive relief and disgorgement, and dismiss the Complaint in its entirety with prejudice.

Dated:   December 8, 2025              QUINN EMANUEL URQUHART
                                       & SULLIVAN, LLP


                                        /s/   Alex Spiro
                                       Alex Spiro (*pro hac vice*)
                                       295 5th Ave, 9th Floor
                                       New York, NY 10016
                                       (212) 849-7000
                                       alexspiro@quinnemanuel.com

                                       Sarah Heaton Concannon (D.C. Bar No. 1780045)
                                       Rachel G. Frank (D.C. Bar No. 1659649)
                                       1300 I Street NW, Suite 900
                                       Washington, DC 20005
                                       (202) 538-8000
                                       sarahconcannon@quinnemanuel.com
                                       rachelfrank@quinnemanuel.com

                                       *Attorneys for Elon Musk*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of December 2025, I filed the foregoing motion electronically with the Clerk of Court using the ECF system.


*/s/  Alex Spiro*
Alex Spiro