**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |
|---|
| SECURITIES AND EXCHANGE COMMISSION, |
| *Plaintiff*, |
| v. |
| ELON MUSK, |
| *Defendant*. |

Civil Action No. 25 - 105 (SLS)

Judge Sparkle L. Sooknanan

**<u>MEMORANDUM OPINION</u>**

For almost a century, the Securities Exchange Act of 1934 has required periodic reporting and disclosures from investors. In 1968, Congress added Section 13(d) to the Act, which requires an investor who acquires more than five percent of a company's outstanding common stock to disclose certain information to the public, including whether the purchase was for the purpose of acquiring control of the company. Congress enacted Section 13(d) with a primary goal of market transparency. Its disclosures alert investors of a potential change in control of a company so they can evaluate the effect of the potential change. And it guards against what Congress perceived to be investors improperly benefitting by purchasing securities at an artificially low price while they seek to acquire control of a company.

In 2022, Elon Musk acquired control of the company then called Twitter, Inc., a prominent social-media company. In January through March of that year, Mr. Musk purchased large quantities of Twitter stock. Eventually, his stake in Twitter grew large enough that it triggered the disclosure requirement in Section 13(d). Mr. Musk allegedly failed to timely make the required disclosure, allowing him to continue to purchase Twitter shares at artificially low prices—followed

by him ultimately acquiring control of the company. The Securities and Exchange Commission (SEC) sued Mr. Musk for the alleged failure, seeking civil penalties, disgorgement, and injunctive relief. Mr. Musk has moved to dismiss the SEC's Complaint, as well as to strike portions of the Complaint's prayer for relief.

In his motion, Mr. Musk does not dispute that the Complaint adequately alleges that he disregarded the disclosure requirements of Section 13(d). Rather, he attacks the constitutionality of those requirements. He argues that Section 13(d) cannot be enforced against him because it burdens his constitutional rights under the First Amendment by forcing him to speak against his will; that Section 13(d) is unconstitutionally vague; that the SEC is selectively enforcing Section 13(d) against him; and that the SEC Commissioners are insulated by unconstitutional protections from removal. A straightforward application of the law reveals that none of these arguments warrant dismissal of this lawsuit. For the reasons below, the Court denies Mr. Musk's motion in its entirety.

## BACKGROUND

### A.    Statutory and Regulatory Background

Congress passed the Securities Exchange Act of 1934 "principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). In 1968, Congress added Section 13(d), 15 U.S.C. § 78m(d), to that Act. Pub. L. No. 90–439, 82 Stat. 454 (1968). Section 13(d) "requires any person who has directly or indirectly obtained the beneficial ownership of more than 5 percent of any registered equity security to disclose within 10 days certain information to the issuer, the exchanges on which the security

trades, and to the Securities and Exchange Commission."[1] *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1217 (D.C. Cir. 1989). Among other things, such a beneficial owner must disclose "the number of shares of such securities which are beneficially owned" and "if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities." 15 U.S.C. § 78m(d)(1)(C)–(D).

To comply with Section 13(d)'s disclosure requirements, the SEC requires regulated parties to file a Schedule 13D form. *Taseko Mines Ltd. v. Raging River Capital*, 185 F. Supp. 3d 87, 90 (D.D.C. 2016); *see* 17 C.F.R. § 240.13d–1(a). The Schedule 13D directs a filer to "[s]tate the purpose or purposes of the acquisition of securities of the issuer," including "any plans or proposals which the reporting persons may have which relate to or would result in" "[t]he acquisition by any person of additional securities of the issuer" or "[c]ausing a class of securities of the issuer to be delisted from a national securities exchange." 17 C.F.R. § 240.13d–101.

Section 13(d) contains exceptions to its reporting requirements. Relevant here, Section 13(d) does not apply to "any acquisition or proposed acquisition of a security which the Commission, by rules or regulations or by order, shall exempt . . . as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer." 15 U.S.C. § 78m(d)(6)(D); *see also id.* § 78m(d)(5) (similar). Accordingly, SEC regulations generally permit "[a] person who would otherwise be obligated . . . to file" a Schedule 13D to instead file a so-called Schedule 13G if the person "[h]as not acquired the securities with any

---

[1] Section 13(d) provides that the disclosure must occur "within ten days after [the relevant] acquisition or within such shorter time as the [SEC] may establish by rule." 15 U.S.C. § 78m(d)(1). In 2023, the SEC adopted a rule shortening the deadline to five business days. Modernization of Beneficial Ownership Reporting, 88 Fed. Reg. 76896, 76897 (Nov. 7, 2023). The conduct alleged in the Complaint occurred before this amendment, and the Parties appear to agree that the shorter deadline should not be applied in this case. *See* Compl. at 3 n.2.

purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect." 17 C.F.R. § 240.13d–1(c). The Schedule 13G obligates a qualifying investor to certify that the acquired securities "were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities." *Id.* § 240.13d–102. At all times relevant to this case, a person permitted to file a Schedule 13G in lieu of a Schedule 13D was required to do so within ten days.[2] *See* 17 C.F.R. § 240.13d–1(c) (2011).

### B.    Factual Background

The Court draws the facts, accepted as true, from the Plaintiff's Complaint. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

Mr. Musk is the Chief Executive Officer of Tesla, Inc., as well as an executive at various other companies. Compl. ¶ 8, ECF No. 1. In January 2022, Mr. Musk directed his personal wealth manager to start purchasing large amounts of the common stock of Twitter, Inc., a social media company. *See* Compl. ¶¶ 9, 14. On January 31, 2022, the wealth manager instructed a broker to begin buying those shares on Mr. Musk's behalf without exceeding five percent of Twitter's outstanding common stock. Compl. ¶ 14. The wealth manager cautioned the broker "to make the purchases in a way that would minimize any increase in Twitter's stock price that might result from the purchases." Compl. ¶ 15. Accordingly, beginning on January 31, 2022, and throughout February 2022, the broker bought large amounts of Twitter stock on Mr. Musk's behalf. Compl. ¶ 18.

---

[2] This deadline was also shortened in 2023 to "five business days." Modernization of Beneficial Ownership Reporting, 88 Fed. Reg. at 76897.

In late February 2022, the broker repeatedly suggested to the wealth manager that Mr. Musk should obtain legal advice regarding Mr. Musk's disclosure obligations under the federal securities laws if he became the beneficial owner of at least five percent of Twitter stock. Compl. ¶ 19. Neither Mr. Musk nor his wealth manager sought nor obtained such legal advice during this period. Compl. ¶ 20. On March 8, 2022, Mr. Musk's wealth manager instructed the broker to continue buying Twitter stock on Mr. Musk's behalf that would push him past the five percent ownership threshold. Compl. ¶ 22.

On March 14, 2022, the broker purchased approximately 2.8 million shares of Twitter stock on Mr. Musk's behalf, causing Mr. Musk to beneficially own more than five percent of Twitter's outstanding shares. Compl. ¶ 23. That same day, the broker informed the wealth manager that Mr. Musk had crossed the five-percent threshold, and the wealth manager informed Mr. Musk the same within a week. Compl. ¶ 24.

Between March 14, 2022, and March 24, 2022, Mr. Musk continued to purchase Twitter stock. Compl. ¶ 26. At close of trading on March 24, 2022, Mr. Musk beneficially owned more than seven percent of the outstanding Twitter stock. Compl. ¶ 27. On March 25, 2022, Mr. Musk purchased about 3.5 million Twitter shares at an average cost of $38.20. Compl. ¶ 28. At the end of trading that day, Mr. Musk owned about eight percent of Twitter stock. *Id.*

On March 27, 2022, Mr. Musk told a member of Twitter's Board of Directors, whom the Complaint identifies as Board Member A, that he owned at least seven percent of Twitter's stock. Compl. ¶ 30. Mr. Musk asked Board Member A whether he had ever considered taking Twitter private. *Id.*

Mr. Musk purchased more Twitter shares on March 28, 29, and 31: approximately 2.6 million at an average cost of $38.77, 2.9 million at $40.30, and 2 million at $38.82, respectively.

Compl. ¶¶ 32–33, 35. On March 31, 2022, Mr. Musk spoke with an individual the Complaint identifies as Board Member B, whom Mr. Musk told he was considering acquiring Twitter. Compl. ¶ 34. That same day, Mr. Musk also met with Twitter's CEO as well as the chair of Twitter's board, and Mr. Musk told them the same thing. Compl. ¶ 36.

On April 1, 2022, Mr. Musk purchased another approximately 2.2 million Twitter shares at an average cost of $39.34 per share, bringing his ownership up to over nine percent of outstanding stock. Compl. ¶ 37. That day, Mr. Musk's wealth manager consulted an attorney about Mr. Musk's securities-law disclosure obligations. Compl. ¶ 38.

Three days later, on April 4, 2022, Mr. Musk filed a Schedule 13G with the SEC, disclosing that he beneficially owned more than nine percent of the outstanding shares of Twitter common stock. Compl. ¶¶ 40–41. This was Mr. Musk's first public disclosure of his greater-than-five-percent ownership of Twitter stock. Compl. ¶ 40. After that filing, Twitter's stock price increased more than twenty-seven percent, closing at $49.97 per share. Compl. ¶ 42. The next day, April 5, 2022, Mr. Musk filed a Schedule 13D with the SEC. Compl. ¶ 43.

All of this culminated in Mr. Musk acquiring Twitter in a take-private transaction. Compl. ¶ 8. He made the offer to purchase Twitter on April 13, 2022, and on April 25, 2022, he signed a merger agreement in which he agreed to acquire the company. *Id.*

### C.    Procedural Background

In January 2025, the SEC filed a Complaint against Mr. Musk alleging that he violated Section 13(d) (15 U.S.C. § 78m(d)) and Rule 13d–1 (17 C.F.R. § 240.13d-1) by failing to timely file a Schedule 13D or 13G. *See generally* Compl. Among other relief, the Complaint asks the Court to permanently enjoin Mr. Musk from violating Section 13(d) and Rule 13d–1, as well as to order Mr. Musk to pay disgorgement of his alleged unjust enrichment. Compl. at 9–10.

In August 2025, Mr. Musk moved to transfer this case to the Western District of Texas. Mot. Transfer, ECF No. 15. He also moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), or in the alternative, to strike the SEC's requests for injunctive relief and disgorgement under Federal Rule of Civil Procedure 12(f). Mot. Strike & Dismiss, ECF No. 16. The SEC then moved for summary judgment on liability. Mot. Summ. J., ECF No. 18.

On October 2, 2025, this Court denied Mr. Musk's Motion to Transfer. Order, ECF No. 23. Now, the Court must resolve Mr. Musk's Motion to Strike and Dismiss, which is fully briefed and ripe for review. *See* Mem. P & A (Mot. Dismiss), ECF No. 16-1; Opp'n, ECF No. 24; Reply, ECF No. 25.

## LEGAL STANDARD

Under Rule 12(b)(6), a court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss under Rule 12(b)(6), courts "must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotations omitted). But courts need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Rule 12(f) permits a Court to strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are not generally favored." *SEC v. Gulf & W. Indus., Inc.*, 502 F. Supp. 343, 345 (D.D.C. 1980). Thus, such motions "are typically denied 'unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form

of significant prejudice to one or more of the parties to the action.'" *Matiella v. Murdock St. LLC*, No. 21-cv-2112, 2023 WL 4684854, at *16 (D.D.C. July 21, 2023) (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, Nos. 19-cv-3379 et al., 2020 WL 5016922, at *10 (D.D.C. Aug. 25, 2020)).

## DISCUSSION

The Court first addresses Mr. Musk's arguments in favor of dismissing the SEC's Complaint. He argues: (A) that Section 13(d) is unconstitutional under the First Amendment, (B) that Rule 13d–1 is unconstitutionally vague, (C) that the SEC is selectively enforcing Section 13(d) against him, and (D) that the SEC Commissioners are insulated by unconstitutional protections from removal. The Court then resolves Mr. Musk's request to strike portions of the Complaint's prayer for relief.

### A.    First Amendment

The First Amendment protects the most sacred of rights. "The freedom of thought protected by the First Amendment against state action 'includes both the right to speak freely and the right to refrain from speaking.'" *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "First Amendment concerns are paramount when the Government compels a speaker to endorse a position contrary to his beliefs, or to 'affirm[] a belief and an attitude of mind' he opposes." *Id.* (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943)).

Mr. Musk argues that Section 13(d) cannot be enforced against him because it unconstitutionally "forc[es] filers to speak against their will and disclose their investment positions and intent." Mot. Dismiss 26. Presumably Mr. Musk is referring to Section 13(d)'s requirement that certain purchasers of securities must disclose "if the purpose of the purchases or perspective

purchases is to acquire control of the business of the issuer of the securities." 15 U.S.C. § 78m(d)(1)(C).[3]

As with many First Amendment challenges, much hinges on the Court's selection of the test for resolving Mr. Musk's argument. And there is certainly no shortage of potentially relevant First Amendment tests. Mr. Musk and the SEC principally argue about three: (1) the *Zauderer* test, under which the government may compel disclosure of "truthful, uncontroversial information so long as the disclosure requirement is not 'unjustified or unduly burdensome' and does not 'chill[] protected commercial speech,'" *United States v. Philip Morris USA Inc.*, 682 F. Supp. 3d 32, 48 (D.D.C. 2023) (quoting *Zauderer v. Office of Disciplinary Couns.*, 471 U.S. 626, 651 (1985)); (2) the *Central Hudson* test, which asks whether the government's interest is substantial, whether the regulation directly advances that interest, and whether the regulation is more extensive than necessary, *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 357 (2002) (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980)); and (3) strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest," *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)).

---

[3] Mr. Musk does not clearly identify the provisions in Section 13(d) and Rule 13d–1 that he believes are unconstitutional. "In general, 'when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem' by disregarding the 'problematic portions while leaving the remainder intact.'" *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021) (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006)). Thus, insofar as Mr. Musk concedes that Section 13(d) and Rule 13d–1 constitutionally compel *some* disclosure, severability principles might save the SEC's Complaint even if Mr. Musk were correct about the First Amendment. The SEC, however, does not raise severability, and the Court ultimately concludes that Mr. Musk's challenge is not meritorious on its own terms. Accordingly, the Court declines to address whether Mr. Musk could be held liable for untimely disclosure even if aspects of the Section 13(d) regime were unconstitutional. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation.").

The Court concludes that strict scrutiny does not apply and that the challenged aspects of Section 13(d) survive the *Central Hudson* test. Thus, the Court need not conclusively resolve whether *Zauderer* or any other less strict test governs.

### 1.    Applicable Standard

Mr. Musk argues that the constitutionality of Section 13(d) must be assessed under strict scrutiny. Mot. Dismiss 26–27. The SEC argues that Section 13(d)'s constitutionality should be assessed under the permissive *Zauderer* test. Opp'n 23–24. The Court declines to apply either test and instead applies the *Central Hudson* test.

### a.    Strict Scrutiny

Mr. Musk urges application of strict scrutiny, arguing that Section 13(d) makes a content-based distinction: if a qualifying investor purchases securities with the purpose of acquiring control of the issuer, she must disclose that purpose in a Schedule 13D; if an investor lacks that plan, she may instead so certify in a Schedule 13G. Mot. Dismiss 26–27. This argument, however, has been foreclosed by the D.C. Circuit. The Circuit has held that "[s]ecurities regulation involves 'a different balance of concerns' and 'calls for different applications of First Amendment principles'" than other regulations. *Full Value Advisors*, 633 F.3d at 1109 (quoting *Nike, Inc. v. Kasky*, 539 U.S. 654, 678 (2003) (Breyer, J., dissenting)). The "distinct category" of "[s]peech relating to the purchase and sale of securities" is one "in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech." *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988). In other words, in this Circuit, the applicable standard is no more restrictive than the *Central Hudson* test. The D.C. Circuit's approach accords with the Supreme Court's identification of "the exchange of information about securities" as an

example of commerce-related "communications that are regulated without offending the First Amendment." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978).[4]

The Court notes that even if it were writing on a blank slate, it is doubtful that strict scrutiny would be the appropriate standard. Mr. Musk argues that Section 13(d) is a content-based regulation on speech subject to strict scrutiny because "it specifically targets the communicative content of an investor's strategy and intentions and imposes different filing requirements based on those strategies and intentions." Mot. Dismiss 26. But this argument proves too much. Under the logic of Mr. Musk's position, *all* disclosure requirements would be content-based regulations subject to strict scrutiny—after all, a disclosure requirement by definition compels disclosure regarding one topic rather than another. Yet courts have upheld many disclosure requirements without applying strict scrutiny. *See, e.g.*, *Zauderer*, 471 U.S. at 651 (compelled disclosure of "the terms under which [a lawyer's] services will be available"); *Am. Meat Inst. v. UDSA*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc) (compelled disclosure of country-of-origin information for meat

---

[4] If anything, the D.C. Circuit has suggested that the First Amendment is even *more* permissive with respect to securities regulations than regulations touching on other commercial speech. In *SEC v. Wall Street Publishing Institute, Inc.*, the Circuit reasoned that "[w]here the federal government extensively regulates a field of economic activity, communication of the regulated parties often bears directly on the particular economic objectives sought by the government, and regulation of such communications has been upheld." 851 F.2d 365, 372 (D.C. Cir. 1988) (citation omitted). And "[i]n areas of extensive federal regulation—like securities dealing—[the Circuit] d[id] not believe that the Constitution requires the judiciary to weigh the relative merits of particular regulatory objectives that impinge upon communications occurring within the umbrella of an overall regulatory scheme." *Id.* at 373.

Still, the Court recognizes that there are good reasons to refrain from reading *Wall Street Publishing* as establishing securities regulations as a First Amendment-free zone. "[T]he argument that a certain subset of speech may be considered completely outside of the First Amendment framework because the speech occurs in an area of extensive government regulation is a proposition whose continuing validity is at best questionable in light of the Supreme Court's most recent commercial speech cases." *Wash. Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 60 (D.D.C. 1998), *vacated in part on other grounds sub nom.*, *Wash. Legal Found. v. Henney*, 202 F.3d 331 (D.C. Cir. 2000); *see also Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 555 (D.C. Cir. 2015).

products); *Full Value Advisors*, 633 F.3d at 1104 (compelled disclosure of investment positions);

*SEC v. City of Rochester*, 731 F. Supp. 3d 455, 473–74 (W.D.N.Y. 2024) (compelled disclosure

of potential conflicts of interest in contingent-fee arrangements). It is notable that Mr. Musk cites

no case concluding that a compelled-disclosure law is content-based and accordingly applying

strict scrutiny. And even if strict scrutiny were appropriate for some disclosure requirements,

Section 13(d)'s securities-transaction related disclosure would be an odd candidate for breaking

that new ground. Even Mr. Musk does not argue that Section 13(d) lends itself to "invidious,

thought-control purposes"—the fear that motivates heightened review of content-based laws.

*Reed*, 576 U.S. at 167 (quoting *Hill v. Colorado*, 530 U.S. 703, 743 (2000) (Scalia, J., dissenting));

*see also Riley v. Nat'l Fed. of the Blind, Inc.*, 487 U.S. 781, 796 (1988) ("Our lodestars in deciding

what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as

a whole and the effect of the compelled statement thereon.").[5]

To the extent Mr. Musk is arguing that it is the compelled disclosure of his intentions (as

opposed to other information) that raises First Amendment concerns, that hardly narrows the

wide-reaching consequences of his position. Many laws require regulated parties to state or explain

---

[5] Mr. Musk's briefing curiously describes Section 13(d) as discriminating based on the content of his "strategy," "thoughts," and "intentions"—rather than the content of his speech. *See* Mot. Dismiss 26–27. This awkward framing provides a clue that Section 13(d) resists characterization as a content-based regulation as that concept has been used by the Supreme Court. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (defining content-based laws as "those that target speech based on its communicative content").

Further, contrary to Mr. Musk's suggestion, the Court sees no reason why there are heightened First Amendment concerns simply because Section 13(d) and Rule 13d–1 have a "bifurcated structure," Mot. Dismiss 27, that permits some investors to file a Schedule 13G instead of a Schedule 13D. Many disclosure requirements, including the examples in the following paragraph, could be rewritten to bifurcate required disclosures depending on the regulated party's then-existing intent. Similarly, the bifurcated regime at issue here could be rewritten to instead consist of one filing that directs an investor to state whether or not she intends to acquire control of the issuer. Mr. Musk provides no reason why these would be differences of a constitutional dimension.

their purposes, plans, or intentions. *See, e.g.*, 8 U.S.C. § 1202(c) (an applicant for a nonimmigrant visa must state "the purpose and length of his intended stay in the United States"); 26 U.S.C. § 274(d) (a taxpayer may not claim certain deductions for business-related expenses unless the taxpayer "substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement," among other things, "the business purpose of the expense"); 52 U.S.C. § 30104(b)(5) (political committees must file reports including the "purpose of [an] operating expenditure" in excess of $200); Del. Code. Ann. tit. 8, § 102(a)(3) (certificates of incorporation must provide "[t]he nature of the business or purposes to be conducted or promoted"); D.C. Mun. Regs. tit. 12A, § 3307.2 (developers whose construction affects adjoining property "shall provide written notice, and a copy of the proposed work plan, to the owner of the adjoining property advising said owner of the intended work and the need for protection for the adjoining property"); *id.* tit. 24, § 706.11 (application for assembly on public property must include "[t]he purpose of the event"). The Court would be surprised if such laws are properly considered content-based regulations required to run the gauntlet of strict scrutiny.

### b. *Zauderer*

The SEC argues *Zauderer* is the appropriate test. Opp'n 23. There are good reasons to believe that the SEC is correct. *Zauderer*'s permissive standard is based on the "material differences between disclosure requirements and outright prohibitions on speech." 471 U.S. at 650. And both the Fifth and Tenth Circuits have applied *Zauderer* to securities-law disclosure requirements. *Chamber of Com. of the U.S. v. SEC*, 85 F.4th 760, 769 (5th Cir. 2023); *United States v. Wenger*, 427 F.3d 840, 849–50 (10th Cir. 2005). That said, the D.C. Circuit has observed that the Supreme Court "has refused to apply *Zauderer* when the case before it did not involve voluntary commercial advertising." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 522–23 (D.C. Cir.

2015). Mr. Musk takes this as a holding that *Zauderer* is limited to compelled disclosures in advertising. Reply 14. The Court disagrees. The Circuit has explained that it "has not so limited the standard, applying it, for example, to court-mandated disclosures on websites." *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (citing *United States v. Philip Morris USA Inc.*, 855 F.3d 321 (D.C. Cir. 2017)). Still, as discussed below, Mr. Musk's challenge fails even under the stricter *Central Hudson* test. Thus, although the *Zauderer* test appears appropriate here, the Court need not decide whether it supplies the proper framework for analyzing the constitutionality of Section 13(d).

### 2.    Application of *Central Hudson*

"Under *Central Hudson*, protected speech may be regulated if the governmental interest is 'substantial.'" *Philip Morris*, 855 F.3d at 327 (quoting *Central Hudson*, 447 U.S. at 566). If so, then the Court must "determine whether the 'regulatory technique [is] in proportion to [the] interest,' an inquiry comprised of assessing whether the chosen means 'directly advance[s] the state interest involved' and whether it is narrowly tailored to serve that end." *Am. Meat Inst.*, 760 F.3d at 25 (quoting *Central Hudson*, 447 U.S. at 564). The Court addresses each of these requirements in turn.

*Governmental Interest*. As the D.C. Circuit has recognized, "the purpose of section 13(d) is to alert investors to *potential* changes in control, and to give them an opportunity to evaluate the effect of the potential change." *SEC v. Savoy Indus.*, 587 F.2d 1149, 1166 (D.C. Cir. 1978); *see also* Modernization of Beneficial Ownership Reporting, 87 Fed. Reg. 13846, 13850 (Mar. 10, 2022) (describing Section 13(d)'s purpose as "to provide information to the public and the subject issuer about accumulations of a covered class by persons who had the potential to change or influence control of such issuer"). The theory of the statute is that individuals "improperly benefit[]

by purchasing stocks at an artificially low price" in the absence of disclosure. *First City Fin.*, 890 F.2d at 1230.

Mr. Musk suggests that the only legitimate interest served by Section 13(d) is the prevention of coercive tender offers. Mot. Dismiss 28. And he argues that because he issued no tender offer, only inadequate interests in transparency and curing information asymmetry remain. *Id.* But the Court sees no reason why the government's interest in "alert[ing] the marketplace to every large, rapid aggregation or accumulation of securities" is insubstantial. *See SEC v. First City Fin. Corp.*, 688 F. Supp. 705, 725 (D.D.C. 1988). Even assuming that "eliminating information asymmetry represents a contested economic policy choice," Mot. Dismiss 29 (emphasis omitted), the government is entitled to come down on one side of that debate and conclude that there is "injury to other market participants who s[ell] stock without knowledge of [an investor's] holdings," *First City Fin.*, 890 F.2d at 1230. As for the securities-market-transparency rationale, the D.C. Circuit has held that Congress's belief "that good government requires greater transparency" is "a value judgment based on the common sense of the people's representatives," which has been "repeatedly endorsed by the Supreme Court as sufficient to justify disclosure statutes." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 16 (D.C. Cir. 2009) (applying strict scrutiny). These interests are hardly less substantial than other "pedestrian" interests that the Supreme Court has "affirmed as substantial." *Kansas v. United States*, 16 F.3d 436, 443 (D.C. Cir. 1994); *see also Chamber of Com.*, 85 F.4th at 771 ("The SEC has a legitimate interest in promoting the free flow of commercial information.").

*Proportionality*. Next the Court must "assess the relationship between the government's identified means and its chosen ends," including whether Section 13(d) directly advances its ends and whether it is narrowly tailored to those ends. *Am. Meat Inst.*, 760 F.3d at 25. It is true that

"[w]hen the Supreme Court has analyzed *Central Hudson*'s 'directly advance' requirement, it has commonly required evidence of a measure's effectiveness." *Id.* at 26. "[I]t is also true that in other First Amendment cases the Supreme Court has found 'various unprovable assumptions' sufficient to support the constitutionality of state and federal laws[.]" *Taylor*, 582 F.3d at 15–16 (quoting *Nat'l Cable & Telecomms. Ass'n v. FCC*, 555 F.3d 996, 1000 (D.C. Cir. 2009)). Here, it is common sense—nearly definitional—that compelled disclosure of an investor's takeover intent directly advances the statutory purpose of alerting the investing public to potential changes in control. Indeed, the Circuit has characterized the provision as "a crucial requirement in the congressional scheme." *First City Fin. Corp.*, 890 F.2d at 1230. Without Section 13(d), "investors cannot assess the potential for changes in corporate control and adequately evaluate the company's worth." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971). And because Section 13(d) is meant to alert the public to *potential* changes in control, it makes no difference that an intent to acquire control may not be realized. *Contra* Reply 18.

The Court turns to narrow tailoring. "Notwithstanding the [Supreme Court's] reference to 'narrow tailoring,' the Court has made clear that the government's burden on the final *Central Hudson* factor is to show a 'reasonable fit,' . . . or a 'reasonable proportion,' . . . between means and ends." *Am. Meat Inst.*, 760 F.3d at 26 (first quoting *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989); and then quoting *Edenfield v. Fane*, 507 U.S. 761, 767 (1993)). Here, Section 13(d) uses disclosure of information about investors who obtain a substantial portion of an issuer's outstanding shares, including any intent to acquire control of the issuer, to advance its interest in alerting investors to potential changes in control. The Court cannot imagine a more reasonable fit.

Mr. Musk's argument to the contrary nibbles at the edges of this intuitive means-end proportionality. He contends that Section 13(d)'s five-percent threshold for reporting "bears little relation to an investor's actual ability to influence corporate control." Mot. Dismiss 30. He says that Section 13(d) compels disclosure of takeover plans that may never come to fruition. *Id.* at 31–32. And he notes that some investors authorized to file Schedule 13G reports have a higher triggering threshold for reporting or have a longer period in which to report. *Id.* at 32–33.

But notably, none of those purported defects are implicated by the facts alleged in the SEC's Complaint. According to the SEC's Complaint, Mr. Musk's purchase of five percent of Twitter's outstanding shares in fact presaged his acquisition of Twitter. Put differently, Section 13(d)'s five-percent threshold and compulsory disclosure of takeover intent were reasonably proportional to its legitimate ends as applied in this case—after all, those features are designed to alert the investing public to conduct exactly like what Mr. Musk is alleged to have done. Thus, insofar as Mr. Musk brings an as-applied challenge to Section 13(d), it fails. *See* Mot. Dismiss 28; *United States v. Gray*, 652 F. Supp. 3d 112, 132 (D.D.C. 2023) ("[A]n as-applied challenge under the First Amendment 'asks a court to assess the statute's constitutionality with respect to the particular set of facts before it.'" (quoting *Hodge v. Talkin*, 799 F.3d 1145, 1156 (D.C. Cir. 2015))).

The Motion to Dismiss might also be read as asserting a facial challenge to Section 13(d). *See* Mot. Dismiss 28. Typically, a litigant "cannot succeed on a facial challenge unless he establishes that no set of circumstances exist under which the law would be valid, or he shows that the law lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (cleaned up). That standard is different in First Amendment cases, in which "[t]he question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation

to the statute's plainly legitimate sweep.'" *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). Mr. Musk's arguments are not aimed at answering that comparative question—and even on their own terms, they miss the mark.

First, the five-percent threshold does not render Section 13(d)'s disclosure requirement disproportionate to its purposes. Mr. Musk contends that threshold "bears little relation to an investor's actual ability to influence corporate control" because "an investor with just over five-percent ownership typically lacks sufficient voting power to implement the very plans or proposals Section 13(d) requires him or her to disclose." Mot. Dismiss 30–31. But this again ignores that a principal purpose of Section 13(d) is "to alert investors to *potential* changes in control." *Savoy Indus.*, 587 F.2d at 1166. Mr. Musk offers no reason to doubt that five-percent ownership gives rise to that potential in a substantial number of cases, especially when the investor discloses that she purchased the shares with the purpose of acquiring control. In fact, when Congress lowered the reporting threshold from ten to five percent in 1970,[6] the accompanying Senate and House reports reflect that legislators were responding to concerns about circumvention and the inadequacy of the existing threshold. As the reports explained:

> The reduction for [sic] 10 to 5 percent would provide public disclosure of impending corporate takeovers at a more meaningful level. The Securities and Exchange Commission has informed the committee that in some instances persons or companies undertaking an acquisition have limited their purchases of stock in the open market to 8 or 9 percent as a means of avoiding the disclosure requirements of Public Law 90–439. This practice deprives investors of the material information which is necessary to enable them to make a decision whether to accept or reject the tender offer.
>
> An investment of between 5 and 10 percent of the securities of a company can have a significant impact on the public market for that company's stock. Shareholders of the target company are entitled to full disclosure when over 5 percent of their company's stock is to be acquired by an outside group. These acquisitions may lead

---

[6] Pub. L. No. 91–567, 84 Stat. 1497 (1970).

to important changes in the management or business of the company and the
shareholders should be fully informed.

S. Rep. No. 91–1125, at 3 (1970); H.R. Rep. No. 91–1655, at 3 (1970) (same). And in the debates

on the bill, legislators expressed similar concerns. 116 Cong. Rec. 3024 (1970) (statement of Sen.

Harrison Williams) ("Stock holdings of between 5 and 10 percent in such companies are in many

instances a controlling interest."); *id.* at 40188 (statement of Rep. William Springer) ("[W]e have

had these very serious mergers by companies buying up other companies, so we have now made

it impossible for them to secretly buy in by cutting it in half and making it 5 percent."); *id.*

(statement of Rep. John Monagan) ("[L]owering the trigger mechanism to 5 percent is a proper

recognition of the impact that acquisition of 5 percent of a company's stock can have upon the

control and marketing of the securities involved, and shareholders and management are entitled to

be fully informed at the earliest point.").

Mr. Musk describes the views of legislators in the enacting Congress as "stale." Reply 17.

But the question is whether the fit between the means Congress employed and its chosen ends "is

not necessarily perfect, but reasonable." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 687 F.3d

403, 415 (D.C. 2012) (quoting *Pearson v. Shalala*, 164 F.3d 650, 656 (D.C. Cir. 1999)). Cutting

edge market research might reveal that a different triggering threshold better balances the

competing interests of "providing adequate disclosures to investors" and "not unduly burdening

those engaging in change of control transactions." Modernization of Beneficial Ownership

Reporting, 87 Fed. Reg. at 13850. However, given Congress's considered decision to lower the

threshold after experience with a higher one, this Court cannot say that decision was outside the

range of constitutionally permissible choices.

Second, it is of no moment that Section 13(d) compels disclosure of takeover plans that

may never materialize. Mr. Musk argues that the tentativeness of such plans undercuts that

19

Section 13(d) is tailored to its objectives. Mot. Dismiss 31–32. The reason why this is unpersuasive should now be familiar: Section 13(d) is intended "to alert investors to *potential* changes in control." *Savoy Indus.*, 587 F.2d at 1166. And that potential arises when an investor owning a substantial percent of outstanding shares discloses that she is purchasing shares with the purpose of acquiring control. That she may ultimately change course or fail does not mean that Section 13(d) is overbroad.

Third, exceptions to Section 13(d) do not prove that it is fatally underinclusive. Mr. Musk observes that by rule some investors have higher triggering thresholds and longer reporting deadlines. Mot. Dismiss 32–33 (citing 17 C.F.R. § 240.13d–1(b) to (c)). The Supreme Court has said that "[u]nderinclusivity creates a First Amendment concern when the [government] regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*." *Williams-Yulee v. Fla. Bar.*, 575 U.S. 433, 451 (2015). Here, the exceptions Mr. Musk identifies differ from the base case in a significant way: they apply to investors who purchase securities "in the ordinary course of the person's business and not with the purpose or with the effect of changing or influencing the control of the issuer, nor in connection with or as a participant in any transaction having such purpose or effect." 17 C.F.R. § 240.13d–1(b)(1)(i); *id.* § 240.13d–1(c)(1) (similar); *see also* 15 U.S.C. § 78m(d)(5), (6)(D). Those investors instead file a Section 13G, which requires them to certify that purchased shares "were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities." 17 C.F.R. § 240.13d–102. Treating investors who lack plans to influence control of an issuer differently from those who have such plans is entirely consistent with the purpose of Section 13(d) and demonstrates no underinclusivity.

Finally, Mr. Musk suggests what he believes to be less restrictive alternatives to Section 13(d)—namely, raising the five-percent threshold or compelling disclosure of ownership percentages without disclosure of an investor's takeover intent. Mot. Dismiss 33. These options show nothing more than that Congress could have tweaked its preferred balance between alerting the market and burdening investors. Mr. Musk may well have regulated differently had he served in the enacting Congress. But that does not mean the statute Congress passed is unconstitutional.

\*       \*       \*

The Court does not doubt that Mr. Musk would prefer to avoid having to disclose information that might raise stock prices while he makes a play for corporate control. But the balance Congress struck in Section 13(d) does not violate the First Amendment. As the D.C. Circuit has observed, "some may doubt the usefulness of th[e] statute generally or the section 13(d) requirement specifically, but it is hardly up to the judiciary to second-guess the wisdom of Congress' approach to regulating takeovers." *First City Fin. Corp.*, 890 F.2d at 1230.

## B.    Unconstitutional Vagueness

Next, Mr. Musk argues that Rule 13d–1 is unconstitutionally vague.[7] Mot. Dismiss 35. "An enactment violates the Due Process Clause if it is 'so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.'" *Ramsingh v. TSA*, 40 F.4th 625, 636 (D.C. Cir. 2022) (quoting *Beckles v. United States*, 580 U.S. 256, 262 (2017)). "If . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply" than if it does not "threaten[] to inhibit the exercise of

---

[7] More precisely, Mr. Musk argues that Rule 13d–1 was unconstitutionally vague at the time of his alleged violation. Mot. Dismiss 35. As noted above, *supra* n.1, the SEC has since amended Rule 13d–1 and changed the challenged language.

constitutionally protected rights." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

The purported vagueness is Rule 13d–1's directive to file a Schedule 13D "within 10 days after" the investor's qualifying purchase of securities. 17 C.F.R. § 240.13d–1(a) (2011). Mr. Musk says that "days" could mean either calendar days or business days. Mot. Dismiss 37. This ambiguity does not require dismissal of the SEC's Complaint.

In general, "an individual 'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Ramsingh*, 40 F.4th at 636 (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 495). And here, the Complaint alleges that Mr. Musk violated Rule 13d–1 under either the calendar-days or the business-days interpretation. According to the Complaint, Mr. Musk reached Rule 13d–1's five-percent threshold on March 14, 2022. Under the calendar-days interpretation, his reporting deadline would have been March 24, 2022; under the business-days interpretation, it would have been March 28, 2022. Yet the Complaint alleges that Mr. Musk did not file a Schedule 13G until April 4, 2022, and did not file a Schedule 13D until April 5, 2022. Under traditional vagueness principles, that would be enough to reject Mr. Musk's argument.

The Supreme Court has recognized, however, that a litigant who argues that a law implicating First Amendment freedoms is unconstitutionally vague may bring a facial challenge. *See Vill. of Hoffman Ests.*, 455 U.S. at 495 n.7. Here, even as a facial challenge, Mr. Musk's argument fares no better. The meaning of "days" is, at most, an ambiguity of the most prosaic sort. It is true that "days" can have two meanings: calendar days and business days. *Cf. Monsalvo v. Bondi*, 604 U.S. 712, 725 (2025) (discussing differing definitions of "days"). But the existence of two well-defined possible meanings of a word has never been enough to show unconstitutional

ambiguity, even if it is a close call as to which meaning is correct. Here, even assuming that reasonable people could disagree about whether Rule 13d–1 requires filing a Schedule 13D within ten calendar days or ten business days, that is a far cry from showing that Rule 13d–1 "specifies no standard of conduct at all." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (cleaned up). Mr. Musk's vagueness challenge fails.

### C.    Selective Enforcement

Next up is Mr. Musk's claim of selective enforcement. The equal protection component of the Due Process Clause of the Fifth Amendment constrains the government from making a "decision whether to prosecute . . . on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)); *see also United States v. AT & T Inc.*, 290 F. Supp. 3d 1, 3 (D.D.C. 2018) ("Executive Branch enforcement decisions are 'subject to constitutional constrains,' including a prohibition on selectively prosecuting individuals for exercising their constitutional rights." (quoting *Armstrong*, 517 U.S. at 464)). Mr. Musk relies on that principle to urge dismissal because this action, he says, constitutes unconstitutional selective enforcement of Section 13(d). Mot. Dismiss 38.

Two premises of this argument are underdeveloped. First, it is unclear whether a defendant in a civil action can raise a selective-enforcement argument. *See Attorney Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 932 n.8 (D.C. Cir. 1982) ("We need not reach the question of to what extent the selective prosecution defense may be inappropriate in a civil suit context[.]"); *United States v. Google, LLC*, 692 F. Supp. 3d 583, 593 (E.D. Va. 2023) (collecting cases). Mr. Musk does not address this question at all despite the SEC raising it in its Opposition. Opp'n 39 n.6. Second, the Court has not found any case dismissing a Complaint for selective enforcement under

Federal Rule of Civil Procedure 12(b)(6)—or even entertaining such an argument in a Rule 12(b)(6) posture. Despite having very able counsel, Mr. Musk cites no such case. Mr. Musk's glaring omissions on these two points would be sufficient to deny his motion. *See Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.").

But granting these premises for the sake of argument, the Court must apply the "'rigorous standard' that defendants must meet before even obtaining discovery on a selective enforcement defense." *AT & T*, 290 F. Supp. 3d at 3 (quoting *Armstrong*, 517 U.S. at 468). "Under that standard, defendants must put forward 'some evidence tending to show the existence of the essential elements of the defense, discriminatory effect *and* discriminatory intent.'" *Id.* at 3–4 (quoting *Armstrong*, 517 U.S. at 468). As some courts have elaborated these elements, the defendant must show that "(1) [he] h[as] been singled out while other similarly situated violators were left untouched, and (2) that the government selected [the] defendant[] for prosecution invidiously or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent the exercise of their constitutional rights." *Google*, 692 F. Supp. 3d at 594 (quoting *United States v. Smithfield Foods, Inc.*, 969 F. Supp. 975, 985 (E.D. Va. 1997)).

Mr. Musk falls well short of carrying his burden. The D.C. Circuit has held that "defendants are 'similarly situated' for purposes of a selective enforcement claim 'when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.'" *AT & T*, 290 F. Supp. 3d at 4 (quoting *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000)). Mr. Musk's argument on this point veers off in an unusual direction. Rather than seeking to demonstrate that there are "similarly situated violators" of Section 13(d) who "were left untouched," *Google*, 692 F. Supp. 3d at 594

(quoting *Smithfield Foods*, 969 F. Supp. at 985), Mr. Musk admits that "the SEC regularly seeks and obtains monetary penalties against individuals for late filings under Section 13(d)," Mot. Dismiss 39. He rests his argument instead on an assertion that he "is the only individual or entity from whom the SEC has ever sought disgorgement under similar circumstances." *Id.* at 39–40 (emphasis omitted). Whether an assertion of selective prosecution can succeed based on different relief sought is another assumption questioned by the SEC, Opp'n 40, and nevertheless unsubstantiated by Mr. Musk in his Reply.

The Court will again assume that such an assertion could prevail. Still, Mr. Musk has not "put forward 'some evidence tending to show'" another Section 13(d) enforcement action in which the SEC did not request disgorgement that "present[s] no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions." *AT & T*, 290 F. Supp. 3d at 3–4 (first quoting *Armstrong*, 517 U.S. at 468; and then quoting *Branch Ministries*, 211 F.3d at 145). He makes two arguments: (1) that this action is the only one in which the SEC has sought disgorgement without alleging "intentional, deliberate, or willful misconduct or investor harm," Mot. Dismiss 40; and (2) that the amount sought to be disgorged in this action is inordinately large compared to typical remedies obtained by the SEC, Reply 20.

As to Mr. Musk's first argument, the Complaint in fact alleges that Mr. Musk's violation of Section 13(d) "resulted in substantial economic harm to investors selling Twitter common stock between March 25, 2022 and April 1, 2022," because he was able to underpay "Twitter investors by more than $150 million." Compl. ¶¶ 5, 46. And more fundamentally, Mr. Musk's contention that the SEC has never sought disgorgement absent certain allegations does not constitute "evidence," *AT & T*, 290 F. Supp. 3d at 3 (quoting *Armstrong*, 517 U.S. at 468), of a "similarly

situated violator[]" who was "left untouched" by a request for disgorgement, *Google*, 692 F. Supp. 3d at 594.

The Court is also not convinced by Mr. Musk's argument about the amount the SEC seeks to disgorge. As the Supreme Court has explained, the SEC may seek to disgorge an amount tethered to "a defendant's net profits from wrongdoing." *Liu v. SEC*, 591 U.S. 71, 85 (2020). Here, the SEC's request to disgorge $150 million corresponds to the Complaint's allegation that Mr. Musk's violation of Section 13(d) allowed him to net that amount. *See* Compl. ¶ 5. Mr. Musk observes that in 2024, the SEC obtained civil penalties from individual violators of Section 13(d) ranging from $10,000 to $200,000. Mot. Dismiss 40. But he adduces no evidence indicating that those individuals also made over $100 million in profits from their wrongdoing, which is undoubtedly a "legitimate prosecutorial factor[] that might justify making different prosecutorial decisions." *AT & T*, 290 F. Supp. 3d at 4 (quoting *Branch Ministries*, 211 F.3d at 145).

A similar lack of evidence makes Mr. Musk's reference to the only enforcement action he specifically identifies—the SEC's 2024 case against Essex Woodlands Management, Inc.— unpersuasive. Mot. Dismiss 40. Mr. Musk contends that the SEC's case against Essex Woodlands "bears a striking resemblance to this action" because that entity made their Section 13(d) filing about twenty days late, yet the SEC compelled Essex Woodlands to pay only $225,000. *Id.* But Mr. Musk does not provide any detail regarding the amount that Essex Woodlands wrongfully profited. He does not even say whether, like Mr. Musk, Essex Woodlands eventually acquired control of the company at issue there. Given these gaps, Mr. Musk has not carried his burden to show that the Essex Woodlands case involved materially identical legitimate prosecutorial factors.

To be clear, this is not to say that Mr. Musk is forbidden from asserting a selective enforcement defense as this case progresses. The Court now concludes only that Mr. Musk has not

yet "put forward 'some evidence tending to show the existence of the essential elements of the defense.'" *AT & T*, 290 F. Supp. 3d at 3–4 (quoting *Armstrong*, 517 U.S. at 468). That is enough to reject that this argument provides a basis to dismiss the Complaint. If Mr. Musk later meets his evidentiary burden—and he can establish the as-yet merely assumed premises noted above—then Mr. Musk may develop this argument as a defense.[8]

### D.    Unconstitutional Removal Protections

Mr. Musk also contends that the Complaint should be dismissed because the SEC Commissioners are insulated from presidential control by an unconstitutional statutory restriction on removal. Mot. Dismiss 42.

As an initial matter, Mr. Musk neglects to acknowledge that whether the statute governing removal of SEC Commissioners, 15 U.S.C. § 78d(a), confers protections against removal (constitutionally or otherwise) is an open question. In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Supreme Court held that removal protections for members of the Public Company Accounting Oversight Board were unconstitutional because "multilevel protection from removal is contrary to Article II's vesting of the executive power in the President." 561 U.S. 477, 484 (2010). Board members were removable only by SEC Commissioners, and protections from removal for SEC Commissioners provided a second level of insulation from the President. *Id.* at 495–96. Yet in *Free Enterprise Fund*, the existence of removal protections for SEC Commissioners was merely assumed. The parties agreed that the restrictions existed, and the

---

[8] Because the Court concludes that Mr. Musk fails to show that he has been singled out from similarly situated Section 13(d) violators, the Court need not address whether Mr. Musk has sufficiently made a prima facie case that the SEC selected him "for prosecution invidiously or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent the exercise of their constitutional rights." *United States v. Google, LLC*, 692 F. Supp. 3d 583, 594 (E.D. Va. 2023) (quoting *United States v. Smithfield Foods, Inc.*, 969 F. Supp. 975, 985 (E.D. Va. 1997)).

Supreme Court "decide[d] the case with that understanding." *Id.* at 487. And in a recent petition for certiorari, the government said that it took "no position" on this question. Petition for a Writ of Certiorari at 20, *SEC v. Jarkesy*, 603 U.S. 109 (2024) (No. 22-859).

Here, the SEC states that "no statute grants SEC Commissioners removal protections," and that Mr. Musk has not shown the existence of such protections. Opp'n 43–44. In his Reply, Mr. Musk does not attempt to show that his statutory interpretation is correct and instead points to *Free Enterprise Fund* and the petition for certiorari in *Jarkesy*. Reply 22. At this point, the Parties' briefing is woefully inadequate for the Court to determine who is correct about this significant statutory question. Regardless, even assuming that Mr. Musk is correct about both the statute and the Constitution—*i.e.*, that the Commissioners are entitled to statutory removal protections and that such protections are unconstitutional[9]—he is not correct that the SEC's Complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

The Court's starting point is the Supreme Court's decision in *Collins v. Yellen*, 594 U.S. 220 (2021). In that case, shareholders of Fannie Mae and Freddie Mac sued to stop the so-called "third amendment," a deal reached by the Department of Treasury and the Director of the Federal Housing Finance Agency (FHFA) according to which the companies would transfer "enormous amounts of wealth to Treasury." *Id.* at 226–27. The Supreme Court held that the FHFA Director's for-cause restriction on removal was unconstitutional. *Id.* at 250–51. The Court then turned to the appropriate relief. *Id.* at 257.

The shareholders requested that the third amendment be "completely undone" because it was "adopted and implemented by officers who lacked constitutional authority and their actions

---

[9] Mr. Musk provides one paragraph of analysis on the constitutional question in his Motion to Dismiss, Mot. Dismiss 42–43, and two sentences in his Reply, Reply 23. The SEC makes no argument regarding the constitutional question. Opp'n 43–44.

were therefore void *ab initio*." *Id.* The Court rejected that request as "neither logical nor supported

by precedent." *Id.* The Court reasoned:

> All the officers who headed the FHFA during the time in question were properly *appointed*. Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Id.* at 257–58.

Still, the Court explained that just because the Director's actions were not void *ab initio*,

"[t]hat does not necessarily mean . . . that the shareholders have no entitlement to retrospective

relief."[10] *Id.* at 259. In the Court's words:

> Although an unconstitutional provision is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment), it is still possible for an unconstitutional provision to inflict compensable harm. And the possibility that the unconstitutional restriction on the President's power to remove a Director of the FHFA could have such an effect cannot be ruled out. Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id.* at 259–60. The Court remanded to the Fifth Circuit to determine in the first instance whether

the unconstitutional removal restriction inflicted any cognizable harm. *Id.* at 260.

Since *Collins*, courts that have confronted challenges to removal restrictions have grappled

with questions of relief. These challenges have arisen in many procedural contexts—for example,

---

[10] The shareholders had also sought prospective relief, but the third amendment had been modified during the litigation, and the Court therefore concluded that "the shareholders no longer ha[d] any ground for such relief." *Collins v. Yellen*, 594 U.S. 220, 244 (2021).

motions to preliminarily enjoin proceedings before an agency,[11] petitions for review of agency action,[12] social security appeals,[13] and as a defense to a civil investigative demand (CID).[14] But neither Mr. Musk nor the SEC identifies any case in which a court has resolved such a challenge raised by a defendant in a Rule 12(b)(6) motion.

The Second Circuit's decision in *CFPB v. Law Offices of Crystal Moroney* involves the posture closest to the one presented here. 63 F.4th 174 (2d Cir. 2023). There, the Consumer Financial Protection Bureau (CFPB) issued a CID to a law firm. *Id.* at 178. After the firm withheld some of the requested documents, the CFPB petitioned to enforce the CID in district court. *Id.* The district court granted that petition. *Id.* at 178–79. On appeal, the firm argued that "the CID was void *ab initio* because, when the CID was issued, the CFPB Director was shielded by an unconstitutional removal provision." *Id.* at 179. The Second Circuit held that *Collins* foreclosed that argument. *Id.* The circuit explained that *Collins* "excluded certain relief as inappropriate for an invalid removal restriction," including treating as void *ab initio* all actions taken by officers subject to such restrictions. *Id.* Still, the circuit noted that *Collins* "left open the possibility that a party could be entitled to relief if it could show that 'an unconstitutional provision . . . inflict[ed] compensable harm' on the petitioner." *Id.* (alterations in original) (quoting *Collins*, 594 U.S. at 259). Following Justice Kagan's and Justice Thomas's separate opinions in *Collins*, the circuit went on to hold that "to void an agency action due to an unconstitutional removal protection, a party must show that the agency action would not have been taken *but for* the President's inability

---

[11] *See, e.g.*, *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761 (5th Cir. 2025); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748 (10th Cir. 2024).

[12] *See, e.g.*, *K & R Contractors, LLC v. Keene*, 86 F.4th 135 (4th Cir. 2023); *Calcutt v. FDIC*, 37 F.4th 293 (6th Cir. 2022), *rev'd*, 598 U.S. 623 (2023).

[13] *Kaufmann v. Kijakazi*, 32 F.4th 843 (9th Cir. 2022).

[14] *CFPB v. L. Offs. of Crystal Moroney*, 63 F.4th 174 (2d Cir. 2023).

to remove the agency head." *Id.* at 180. And the circuit concluded that there was nothing to suggest that the CFPB Director's removal protection "affected the issuance of the CID or the investigation" into the firm. *Id.*

The firm sought to distinguish *Collins* on the basis that *Collins* involved retrospective relief whereas *Law Offices of Crystal Moroney* involved prospective relief (production of withheld documents). *Id.* at 180. The circuit rejected that argument. It reasoned that "the Supreme Court's reasoning that an officer's actions are valid so long as she was validly appointed applies with equal force regardless of the relief sought by the party challenging the officer's actions." *Id.* at 180–81.

Much of the Second Circuit's analysis accords with approaches to relief taken by other circuits. The Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Circuits have agreed that *Collins* stands for the proposition that a litigant must demonstrate harm—*i.e.*, that an unconstitutional removal restriction affected the complained-of agency conduct—to be entitled to relief. *K & R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023) ("*Collins* instructs that a party who has successfully challenged an unconstitutional removal restriction is not entitled to have the underlying agency action set aside absent reason to believe that the unconstitutional removal provision itself inflicted harm."); *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022) ("[A]fter *Collins*, a party challenging agency action must show not only that the removal restriction transgresses the Constitution's separation of powers but also that the unconstitutional provision caused (or would cause) them harm."), *rev'd on other grounds*, 601 U.S. 416 (2024); *Calcutt v. FDIC*, 37 F.4th 293, 314 (6th Cir. 2022) ("*Collins* instructs that relief from agency proceedings is predicted on a showing of harm[.]"), *rev'd on other grounds*, 598 U.S. 623 (2023); *Bhatti v. Fed. Hous. Fin. Agency*, 97 F.4th 556, 559 (8th Cir. 2024) (quoting the Fifth Circuit's formulation); *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) ("A party

challenging an agency's past actions must instead show how the unconstitutional removal provision *actually harmed* the party[.]"); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 756 (10th Cir. 2024) ("[T]he challenger must establish that the unconstitutional provision actually caused him compensable harm—in other words, he must demonstrate that the unconstitutional removal provision actually affected the agency's decision or conduct against him.")

    Like the Second Circuit, the Tenth Circuit has articulated this as a but-for causation test: without the infirm provision, would the agency conduct be different in any way? *Leachco*, 103 F.4th at 757. The Fourth, Fifth, Sixth, Eighth, and Ninth Circuits have also pitched the inquiry in terms of causation but have not articulated a but-for test. *K & R Contractors*, 86 F.4th at 149 (challenger must show "the constitutional violation caused them harm"); *Cmty. Fin. Servs. Ass'n of Am.*, 51 F.4th at 632 ("a nexus between the desire to remove and the challenged actions taken by the insulated actor" can prove harm); *Calcutt*, 37 F.4th at 316 (the "constitutional infirmity must 'cause harm' to the challenging party" (quoting *Collins*, 594 U.S. at 260)); *Bhatti*, 97 F.4th at 561 (the claimed harm "must be connected in some way, or share some nexus with, the president's inability to remove"); *Kaufmann*, 32 F.4th at 849 (the challenger "must demonstrate that the unconstitutional provision actually caused her harm" (cleaned up)).

    This Court agrees that *Collins* requires a party to show harm before a court may invalidate agency conduct. Here, Mr. Musk fails to carry that burden. To show harm, he points to Executive Order 14147. Mot. Dismiss 45; Reply 23. There, President Donald J. Trump ordered the Attorney General "to review the activities of all departments and agencies exercising civil or criminal enforcement authority . . . , including . . . the Securities and Exchange Commission . . . , over the last 4 years and identify any instances where a department's or agency's conduct appears to have

been contrary to the purposes and policies of this order." Exec. Order No. 14,147, 90 Fed. Reg. 8235 (Jan. 20, 2025). But that directive does not show any connection between the President's purported inability to remove SEC Commissioners and the SEC bringing this case. If anything, the fact that this case is ongoing despite President Trump's order means that the President has elected not to intercede on Mr. Musk's behalf. And Mr. Musk's claim of harm is especially implausible given that two of the three current Commissioners were appointed by President Trump.[15]

Mr. Musk's inability to show the requisite harm is perhaps why he instead claims that he need not show harm at all. He distinguishes between the retrospective relief at issue in *Collins* and the ongoing enforcement proceedings here, which he says changes the calculus for relief. Mot. Dismiss 45; Reply 23. His principal support is the Fifth Circuit's decision in *Space Exploration Technologies Corporation v. NLRB*, 151 F.4th 761 (5th Cir. 2025). Mot. Dismiss 44; Reply 23.

In *Space Exploration Technologies*, the Fifth Circuit affirmed two preliminary injunctions issued to halt proceedings before administrative law judges at the National Labor Relations Board (NLRB). 151 F.4th at 766–67. The circuit concluded that the plaintiffs were likely to prevail on their claims that NLRB administrative law judges, as well as the NLRB Board Members themselves, were insulated by unconstitutional removal protections. *Id.* at 775, 778. The circuit then turned to the next preliminary-injunction requirement, irreparable harm. *Id.* at 778. The NLRB argued that the plaintiffs had to prove "a distinct injury flowing from the constitutional violations." *Id.* The circuit disagreed. *Id.* It acknowledged that *Collins* held that "backward-looking relief

---

[15]  *See* SEC Commissioners, U.S. Sec. & Exch. Comm'n (Jan. 6, 2026), https://www.sec.gov/about/sec-commissioners [https://perma.cc/6ZYA-ZHFH]. Although President Trump did not appoint the third Commissioner, the President designated that Commissioner as Acting Chairman pending confirmation of the current Chairman. *See* Press Release, U.S. Sec. & Exch. Comm'n, Mark T. Uyeda Named Acting Chairman of the SEC (Feb. 28, 2025), https://www.sec.gov/newsroom/press-releases/2025-29 [https://perma.cc/D9NA-34XB].

requires a causal link between the [constitutional] violation and the [agency] outcome." *Id.* at 779. But the circuit distinguished the plaintiffs' request for preliminary injunctive relief, which challenged "not past agency conduct but the validity of the ongoing proceeding itself." *Id.* at 780. Relying on the Supreme Court's decision in *Axon Enterprise, Inc. v. FTC*—a case concerning a district court's statutory jurisdiction to hear challenges to agency structure—the circuit concluded that it was sufficient to establish irreparable harm that the plaintiffs asserted "the 'here-and-now injury' of 'being subjected to unconstitutional agency authority.'" *Id.* (quoting *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023)).

This Court, however, is foreclosed by D.C. Circuit precedent from relying on the reasoning adopted in *Space Exploration Technologies*. The Circuit recently summarized its caselaw as holding that "being investigated by, or participating in a proceeding before, an unconstitutionally appointed officer is not, without more, an injury that necessitates preliminary injunctive relief." *Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1334 (D.C. Cir. 2024). True, Mr. Musk brings a removal-protection challenge and not an appointment challenge. "But the same reasoning applies, because this claim is still fundamentally about 'being subjected to an unconstitutional proceeding'" prosecuted by "an unconstitutional body." *Hannam Chain USA, Inc. v. NLRB*, No. 25-cv-2896, 2025 WL 3204539, at *6 (D.D.C. Nov. 17, 2025) (quoting *Alpine*, 121 F.4th at 1332). In fact, as the Supreme Court explained in *Collins*, a successful appointment challenge supports more widespread invalidation of agency action than would a successful removal-protection challenge. *See* 594 U.S. at 257–58.

The D.C. Circuit has further rejected *Space Exploration Technologies*' interpretation of *Axon*. The Circuit explained that "*Axon* at most says that, as a matter of statutory jurisdiction, a federal-court challenge to an unconstitutional appointment can begin before the agency acts. It

does not say that every agency proceeding already underway must immediately be halted because of an asserted constitutional flaw." *Alpine*, 121 F.4th at 1336.[16] "[T]o state the obvious, the Fifth Circuit—unlike this Court—was not bound by the D.C. Circuit's interpretation of *Axon* in *Alpine*." *Hannam Chain*, 2025 WL 3204539, at *7. Even if Mr. Musk "is right that the best reading of *Axon* supports" his argument, "this Court 'lacks the authority to circumvent binding precedent by reading between the lines.'" *Id.* (quoting *VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 24-cv-2577, 2024 WL 4817175, at *6 (D.D.C. Nov. 17, 2024)).

Even in the absence of D.C. Circuit precedent, this Court would nevertheless find Mr. Musk's reliance on *Space Exploration Technologies* unpersuasive. Assuming that *Space Exploration Technologies*' logic applies outside the context of the irreparable harm requirement for a preliminary injunction, the Second, Sixth, and Tenth Circuits have persuasively rejected that the *Collins* harm requirement is inapplicable for prospective rather than retrospective relief. *L. Offs. of Crystal Moroney*, 63 F.4th at 180–81; *Calcutt*, 37 F.4th at 316; *Leachco*, 103 F.4th at 757. As the Sixth Circuit explained, "[t]he *Collins* inquiry focuses on whether a 'harm' occurred that would create an entitlement to a remedy, rather than the nature of the remedy, and [a] determination as to whether an unconstitutional removal protection 'inflicted harm' remains the same whether the petitioner seeks retrospective or prospective relief." *Calcutt*, 37 F.4th at 316 (quoting *Collins*, 594 U.S. at 260). Ultimately, the Supreme Court has cautioned that "the unlawfulness of [a] removal provision does not strip [an agency head] of the power to undertake the other responsibilities of his office"—and this Court sees no reason why that admonishment applies with

---

[16] The Tenth Circuit has similarly declined to "misunderstand what was said about jurisdiction in *Axon* 'as a holding on a party's entitlement to relief based on an unconstitutional removal provision.'" *Leachco*, 103 F.4th at 759 (quoting *Collins*, 594 U.S. at 258 n.24).

any less force when the relief sought is prospective, much less when a litigant requests dismissal under Rule 12(b)(6). *Collins*, 594 U.S. at 258 n.23.

In sum, Mr. Musk has not shown that dismissal of the SEC's Complaint is an appropriate response to the SEC Commissioners' purported unconstitutional protections from removal.[17]

### E.    Motion to Strike

Finally, Mr. Musk argues that two forms of relief sought by the SEC—injunctive relief and disgorgement—should be stricken from the Complaint. Mot. Dismiss 7. In his view, the Complaint fails to allege sufficient facts supporting entitlement to either of those forms of relief. *Id.* at 8–9, 13. But as a threshold matter, the Parties disagree about whether the Court can and should address his arguments at this stage in the case. The SEC contends that it would be premature to consider Ms. Musk's arguments because it has a legal basis to seek injunctive relief and disgorgement. Opp'n 3, 5, 11. Mr. Musk says that courts "routinely" address at this stage whether those forms of relief are legally available. Reply 3.

The Court begins by discussing the varying approaches taken by federal courts to challenges like Mr. Musk's. It then addresses Mr. Musk's challenges. Ultimately, the Court denies Mr. Musk's request to strike.

---

[17] Curiously, Mr. Musk alternatively requests that "this enforcement action should be set aside under 5 U.S.C. § 706(2)(B) as 'contrary to constitutional right' because it subjects [him] to proceedings brought by Commissioners whose removal protections the Executive Branch had determined violate the Constitution." Mot. Dismiss 45 n.26. If Mr. Musk cites Section 706(2)(B) in support of his requested dismissal under Rule 12(b)(6), he has not shown that Section 706(2)(B) is apposite. This Court is not aware of any court having mixed in relief under the Administrative Procedure Act when resolving a Rule 12(b)(6) motion. If he instead means to invoke Section 706(2)(B) as an independent basis for ending this litigation, his request would appear to be a sort of counterclaim for Administrative Procedure Act relief. Suffice it to say that Mr. Musk's odd one-sentence reference to Section 706(2)(B) provides no basis to grant his Motion to Dismiss.

### 1.    Challenges to Forms of Relief

There appears to be no uniform practice for adjudicating challenges to forms of relief sought in a complaint. Start with the proper vehicle for such challenges: are they properly raised by a motion to strike pursuant to Federal Rule of Civil Procedure 12(f) or by a motion to dismiss under Rule 12(b)(6)? There is no consensus answer. *See Matiella*, 2023 WL 4684854, at *16 ("When faced with a request to find that a complaint's demand for relief is legally insufficient, courts have utilized both Rule 12(f) and Rule 12(b)(6)."); *see also Vardanyan v. State Farm Gen. Ins. Co.*, No. 25-cv-6302, 2025 WL 2659238, at *2 (C.D. Cal. Aug. 19, 2025) ("[C]ourts within the Ninth Circuit are split on the proper procedural mechanism for challenging a prayer for punitive damages—i.e., whether the motion should be brought under Rule 12(f) or 12(b)(6).").

Some courts are of the view that a Rule 12(f) motion is the proper procedure. *See, e.g.*, *Simba v. Fenty*, 754 F. Supp. 2d 19, 23 (D.D.C. 2010) ("However, 'injunctive relief is not a claim but a remedy,' making a motion to dismiss under Rule 12(b)(6), as opposed to a motion to strike under Rule 12(f), an inappropriate method of challenge." (quoting *Corral v. Homeeq Servicing Corp.*, No. 10-cv-465, 2010 WL 3927660, at *7 (D. Nev. Oct. 6, 2010))); *Holland v. Sebelius*, No. 13-cv-609, 2015 WL 13691436, at *4 (N.D. Ga. May 12, 2015) ("Courts have frequently concluded that it is appropriate pursuant to Rule 12(f) to strike a prayer for relief that is not available as a matter of law."); *Jumpfly, Inc. v. Torling*, No. 10-cv-385, 2010 WL 1978732, at *1 n.1 (N.D. Ill. May 17, 2010) ("Prayers for relief are not claims, however, and cannot be dismissed pursuant to Rule 12(b)(6). The Court will consider this as a motion to strike plaintiff's prayer for injunctive relief under Rule 12(f)."); *see also Oppenheimer v. Sw. Airlines Co.*, No. 13-cv-260, 2013 WL 3149483, at *4 (S.D. Cal. June 17, 2013) ("Because punitive damages are but a remedy,

and thus neither constitutes a claim nor pertains to whether any claim has been stated, requests for punitive damages provide no basis for dismissal under Fed. R. Civ. P. 12(b)(6).").

Other courts conclude that the correct vehicle is Rule 12(b)(6). *See, e.g.*, *Walker v. McCoud Cmty. Servs. Dist.*, No. 16-cv-61, 2016 WL 951635, at *2 (E.D. Cal. Mar. 14, 2016) ("The proper vehicle for challenging the sufficiency of a punitive damages claim is a motion to dismiss under Rule 12(b)(6), and not a motion to strike under Rule 12(f)."); *Brown v. Aetna Life Ins. Co.*, No. 13-cv-131, 2013 WL 3442042, at *4 (W.D. Tex. July 8, 2013) (concluding that the plaintiff's "claims for extracontractual and punitive damages" could not "be challenged with a motion to strike under Rule 12(f)" and analyzing the motion under Rule 12(b)(6)); *Lahey v. JM Mortg. Servs., Inc.*, No. 99-cv-4074, 2000 WL 420851, at *7 (N.D. Ill. Apr. 18, 2000) ("Rather [than Rule 12(f)], the correct Rule under which a defendant asserts that a plaintiff is not entitled to punitive damages, is Rule 12(b)(6)."); *see also Koch v. White*, 134 F. Supp. 3d 158, 164 (D.D.C. 2015) ("[Rule 12(f)] is not a proper way to procure the dismissal of all or part of a complaint based on the legal insufficiency of the pleading. The proper vehicle for such a challenge is Rule 12(b)(6)." (quotation omitted)).

Of course, "[a]s is true in other contexts, the technical name given to a motion challenging a pleading is of little importance inasmuch as prejudice to the nonmoving party hardly can result from treating a motion that has been denominated a motion to strike as a motion to dismiss." 5C Wright & Miller's Federal Practice and Procedure § 1380 (3d ed. Nov. 2025 Update). And Mr. Musk's briefing suggests that the Court should interpret his motion as one under Rule 12(b)(6) if the Court concludes that is the proper vehicle. Reply 3. That assumes, however, that if Mr. Musk's challenge cannot be heard via Rule 12(f), it must be available through Rule 12(b)(6).

In fact, courts have not reached a uniform conclusion about what kinds of challenges to prayers for relief—if any—may be brought under either framing at this stage in the litigation.

"[W]ith respect to motions to strike a prayer for relief, courts [in this District] have found such requests premature if such relief is generally provided for by law." *Matiella*, 2023 WL 4684854, at *16 (collecting cases). Some courts outside this District that use the Rule 12(f) framing similarly ask whether the complaint's prayer for relief requests relief that "is unavailable as a matter of law." *Doe v. Indyke*, 457 F. Supp. 3d 278, 284 (S.D.N.Y. 2020); *see, e.g.*, *Schmidt v. C.R. Bard, Inc.*, No. 14-cv-62, 2014 WL 5149175, at *7 (S.D. Ga. Oct. 14, 2014) ("A survey of relevant case law and commentary leads the Court to the conclusion that striking a prayer for relief pursuant to a Rule 12(f) motion is proper only where the relief requested is not available as a matter of law."); *Baldwin v. Peake*, No. 08-cv-1352, 2009 WL 1911040, at *1 (W.D. Penn. July 1, 2009) ("[C]ourts may—and regularly do—exercise discretion to strike requests for relief that are not recoverable as a matter of law."). *But see Maxwell v. McLane Pac., Inc.*, No. 17-cv-550, 2017 WL 8186758, at *11 (C.D. Cal. Oct. 19, 2017) ("However, Rule 12(f) does not authorize district courts to strike claims for relief on the ground that such claims are precluded as a matter of law."). Most of these courts answer that question by determining whether there is a basis in law for the form of relief sought—not whether the complaint pleads facts sufficient to support the plaintiff's entitlement to that form of relief. *See, e.g.*, *United States v. Retta*, 840 F. Supp. 2d 262, 269 (D.D.C. 2012) (denying request to strike prayer for statutory liquidated damages because the relevant statute provided for such damages); *Simba*, 754 F. Supp. 2d at 23 ("[S]ince Title VII specifically provides for injunctive relief, a request to strike the amended complaint's prayer for injunctive

relief would be denied[.]" (citation omitted));[18] *see also* 2 Moore's Federal Practice § 12.37[3] (3d ed. 2024) ("The absence of allegations supporting a particular theory of recovery should not provide grounds for striking a claim."). A minority of courts analyzing a Rule 12(f) motion go beyond that question and evaluate the adequacy of the complaint's allegations. *See, e.g.*, *Matiella v. Murdock St., LLC*, No. 21-cv-2112, 2024 WL 3967367, at *19 (D.D.C. Aug. 28, 2024) (striking prayer for punitive damages because the complaint did not allege sufficient facts supporting such damages under D.C. law); *In re Merrill Lynch Auction Rate Secs. Litig.*, 851 F. Supp. 2d 512, 544 (S.D.N.Y. 2012) (same applying California law); *Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., Inc.*, 176 F. Supp. 2d 199, 207 (S.D.N.Y. 2001) (same applying New York law).

The practice of courts assessing these challenges under Rule 12(b)(6) is even more diverse. Some courts dismiss requests for certain forms of relief if that form of relief is forbidden by law. *See Indyke*, 457 F. Supp. 3d at 283 (collecting S.D.N.Y. cases regarding punitive damages). Other courts dismiss prayers for relief that are inadequately supported by factual allegations in the complaint. *See, e.g.*, *Primas v. District of Columbia*, 718 F. Supp. 2d 59, 61–62 (D.D.C. 2010) (dismissing request for punitive damages because of insufficient pleading); *Nuwintore v. United States*, No. 13-cv-967, 2014 WL 807054, at *5 (E.D. Cal. Feb. 28, 2014) (same). And yet other courts conclude that resolving such issues under Rule 12(b)(6) is categorically premature. *See,*

---

[18] *See also, e.g.*, *Jumpfly, Inc. v. Torling*, No. 10-cv-385, 2010 WL 1978732, at *4 (N.D. Ill. May 17, 2010) ("In the instant case, injunctive relief is a remedy available under the Illinois Deceptive Trade Practices Act and the Lanham Act. Therefore, the motion is denied as premature."); *Lopez v. Machovia Mortg.*, No. 09-cv-1510, 2009 WL 4505919, at *6 (E.D. Cal. Nov. 20, 2009) ("Both RESPA section 2605 and TILA section 1640 allow for limited exemplary damages in certain cases where a pattern or practice, or multiple violations, can be established, therefore the prayed for remedy may still be available as a matter of law."); *Arenson v. Whitehall Convalescent & Nursing Home, Inc.*, 880 F. Supp. 1202, 1214 (N.D. Ill. 1995) ("The ground cited by the defendants for invoking Rule 12(f)—the lack of evidence in the Complaint to support a theory of recovery—does not fit into any category of material the Court is authorized to strike under Rule 12(f).").

*e.g.*, *Hunter v. D.C. Child & Family Servs. Agency*, 710 F. Supp. 2d 152, 161 (D.D.C. 2010) (denying motion to dismiss "the request for attorney's fees set forth in the Amended Complaint's prayer for relief" because the motion was "premature"); *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 220 (S.D.N.Y. 2019) ("Because punitive damages are a form of damages, not an independent cause of action, a motion to dismiss a prayer for relief in the form of punitive damages is 'procedurally premature.'" (quoting *Hunter v. Palisades Acquisition XVI, LLC*, No. 16-cv-8779, 2017 WL 5513636, at *9 (S.D.N.Y. Nov. 16, 2017))); *cf. Chin-Teh Hsu v. New Mighty U.S. Trust*, No. 10-cv-1743, 2020 WL 588322, at *12 (D.D.C. Feb. 6, 2020) (dismissing counts for a constructive trust and an accounting because they are remedies and not "free-standing claim[s]," but concluding that it would be "premature for the Court to opine as to the hypothetical availability of these equitable remedies"); *Base One Techs., Inc. v. Ali*, 78 F. Supp. 3d 186, 199 (D.D.C. 2015) (similar for injunctive relief).

Against the background of this jumble, the Court turns to Mr. Musk's challenges.

### 2.    Mr. Musk's Challenges

As mentioned above, Mr. Musk challenges the SEC's requests for injunctive relief and disgorgement. Mot. Dismiss 7. For injunctive relief, Mr. Musk argues that the SEC's Complaint fails to plead facts demonstrating entitlement to an injunction, including allegations aimed to show (1) that Mr. Musk's conduct was part of a pattern, (2) that the alleged violation was undertaken deliberately, (3) that Mr. Musk will have opportunities to violate the law in the future, and (4) that irreparable harm would occur in the absence of an injunction. Reply 4–6. For disgorgement, Mr. Musk contends that the SEC must establish that he profited from the alleged wrongdoing, caused pecuniary harm to victims, and acted with scienter—yet, he says, the SEC's Complaint inadequately pleads all three. Reply 8–10.

As the SEC observes, what Mr. Musk does not appear to dispute is that injunctive relief and disgorgement are, in general, forms of relief that the SEC can obtain upon proving a violation of Section 13(d). *See* Opp'n 4, 11. Indeed, 15 U.S.C. § 78u(d)(1) provides that "[w]henever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of this chapter, . . . it may in its discretion bring an action . . . to enjoin such acts or practices." And Section 78u(d) also permits the SEC to seek disgorgement. *See* 15 U.S.C. § 78u(d)(3)(A) ("Whenever it shall appear to the Commission that any person has violated any provision of this chapter, . . . the Commission may bring an action . . . to seek . . . a civil penalty . . . and . . . disgorgement under paragraph (7)[.]"), 78u(d)(5) ("In any action or proceeding brought or instituted by the Commission under an provision of the securities laws, the Commission may seek . . . any equitable relief that may be appropriate or necessary for the benefit of investors."), 78u(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek . . . disgorgement."); *see also Liu*, 591 U.S. at 74–75 ("The Court holds today that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5).").

Thus, the Court agrees with the SEC that it is premature to address Mr. Musk's arguments at this stage. Although not raised by the Parties, the Court considers Federal Rule of Civil Procedure 54(c) to be significant here. That rule provides that all final judgments other than default judgments "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). In other words, "the prayer for relief does not determine what relief ultimately will be granted." 10 Wright & Miller's Federal Practice & Procedure § 2664 (4th ed. Sept. 2025 Update). Even if the Court were to agree with Mr. Musk

that the SEC's Complaint is deficient and accordingly render inoperable the challenged prayers for relief (using either Federal Rule of Civil Procedure 12(f) or 12(b)(6)), that "would be but an empty gesture." *Goldstein v. N. Jersey Tr. Co.*, 39 F.R.D. 363, 370 (S.D.N.Y. 1966). Mr. Musk does not argue that the SEC would then be prohibited from adducing evidence supporting injunctive relief or disgorgement. Or that the Court could not grant such relief if the SEC established facts satisfying the applicable standard. After all, that's the point of Rule 54(c)—"[i]f the course of the action as litigated by the parties shows that relief of a particular kind or scope is warranted, that relief should be awarded, regardless of the state of the pleadings." 10 Moore's Federal Practice § 54.72[1][a]. Thus, courts have relied on Rule 54(c) to reject challenges like Mr. Musk's brought under both Rule 12(f) and Rule 12(b)(6). *See, e.g.*, *City Commc'ns, Inc. v. DailyTel, Inc.*, No. 22-cv-81813, 2024 WL 3105929, at *14 (S.D. Fla. June 12, 2024) (Rule 12(f)); *Manning v. YRC, Inc.*, No. 20-cv-367, 2020 WL 3544981, at *1 (S.D. Ill. 2020) (same); *Beanland v. Fed. Express Corp.*, No. 22-cv-672, 2022 WL 7366448, at *1 n.1 (D. Del. Aug. 9, 2022) (Rule 12(b)(6)); *Zaiza v. Clark*, No. 19-cv-1476, 2021 WL 5853325, at *15 (E.D. Cal. Dec. 9, 2021) (same).[19]

Rule 54(c) has special bite in this case, where the Complaint also prays for "such other and further relief as this Court may determine to be just and necessary." Compl. at 10. Courts in this Circuit have acknowledged that "when a complaint seeks 'such other and further relief as the Court may deem just and proper,' the enumerated requests for relief are 'not conclusive' in determining

---

[19] Because Mr. Musk does not challenge that injunctive relief and disgorgement may be awarded for some violations of Section 13(d), the Court need not address whether a defendant may bring a motion under Rule 12(f) or Rule 12(b)(6) arguing that certain requested relief may never be awarded on a plaintiff's claim regardless of the facts proved at trial. The Court notes, however, that Rule 54(c) appears to pose no obstacle to such an argument. And it may be that there are circumstances where "there is value in clarifying . . . the [relief] available in actions where the law permits a sure answer." *See Doe v. Indyke*, 457 F. Supp. 3d 278, 285 (S.D.N.Y. 2020).

what remedies a court may ultimately award." *Las Americas Immigrant Advoc. Ctr. v. DHS*, No. 24-cv-1702, 2025 WL 2105564, at *2 (D.D.C. July 28, 2025) (quoting *PETA, Inc. v. Gittens*, 396 F.3d 416, 420–21 (D.C. Cir. 2005)).

Mr. Musk argues that the Court should assess whether the SEC's Complaint "fails to plausibly allege entitlement" to its requested remedies because "courts routinely dismiss requests for injunctive relief at the pleading stage." Reply 3. As the cases cited above reflect, Mr. Musk is correct that courts sometimes do reject demands for relief based on inadequate pleadings—still, calling the practice "routine" is an overstatement. Courts have typically done so in the context of demands for punitive damages. Mr. Musk does cite two cases that held that a complaint had inadequately pleaded entitlement to an injunction (though he cites no similar case regarding disgorgement). Reply 3; *SEC v. Morningstar Credit Ratings*, 578 F. Supp. 3d 563, 576–77 (S.D.N.Y. 2022); *SEC v. Gentile*, No. 16-cv-1619, 2020 WL 5793699, at *13 (D.N.J. Sept. 29, 2020). But based on this Court's review of the caselaw, the more common practice—and the one supported by Rule 54(c)—is for courts to decline to address whether a complaint has adequately pleaded facts supporting entitlement to a demanded form of relief. *See, e.g.*, *City Commc'ns*, 2024 WL 3105929, at *14; *Beanland*, 2022 WL 7366448, at *1 n.1; *Zaiza*, 2021 WL 5853325, at *15; *Manning*, 2020 WL 3544981, at *1; *Chin-Teh Hsu*, 2020 WL 588322, at *12; *Base One Techs.*, 78 F. Supp. 3d at 199; *Simba*, 754 F. Supp. 2d at 23; *Hunter*, 710 F. Supp. 2d at 161; *Jumpfly*, 2010 WL 1978732, at *4. That is the route the Court considers appropriate here.

In sum, "under either of the approaches used by the courts in this Circuit, striking or dismissing [the SEC's] requests for injunctive relief [and disgorgement] is not appropriate at this early procedural stage." *Matiella*, 2023 WL 4684854, at *17. The SEC "may seek injunctive relief

44

[and disgorgement] if [it] prevails on [its] claims. Whether [its] requests for injunctive relief [and disgorgement] will succeed is an issue for another day." *Id.*[20]

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Musk's Motion to Strike and Dismiss, ECF No. 16.

A separate order will issue.

                                                 _____

                                                 SPARKLE L. SOOKNANAN
                                                 United States District Judge

Date:   February 3, 2026

---

[20] Mr. Musk also argues that disgorgement would violate the Eighth Amendment's prohibition against excessive fines. Mot. Dismiss 22. But this Court is not aware of any case that has resolved that argument at the pleadings stage, and yet again, Mr. Musk identified no such case in his Reply despite the SEC observing that he had failed to do so. Opp'n 19; Reply 12–13. Indeed, "Eighth Amendment challenges are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine." *Matthews v. District of Columbia*, 507 F. Supp. 3d 203, 210 n.3 (D.D.C. 2020) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995)). Mr. Musk's challenge is therefore premature.